# 24-824

*To Be Argued By:*
ROBERT M. POLLACK

## United States Court of Appeals

### For the Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– against –

EZHIL KAMALDOSS, also known as KAMALDOSS SEZHIAN,
also known as KAMAL DOSS, also known as EZHIL CEZHIAN,

*Defendant-Appellant*

VELAUDAPILLAI NAVARATNARAJAH, also known as RAJAH,

*Defendant.*

On Appeal From the United States District Court
for the Eastern District of New York

## BRIEF AND APPENDIX FOR THE UNITED STATES

JOHN J. DURHAM,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

AMY BUSA,
ROBERT M. POLLACK,
MARGARET SCHIERBERL,
*Assistant United States Attorneys,*
*Of Counsel.*

i

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iii

PRELIMINARY STATEMENT ............................................................. 2

STATEMENT OF FACTS .................................................................... 4

    I.    Background ............................................................... 4

    II.    Offense Conduct and Arrest................................... 4

    III.    Border Search and Suppression Ruling ................ 9

    IV.    Subsequent Proceedings ...................................... 14

SUMMARY OF ARGUMENT ............................................................ 16

ARGUMENT ...................................................................................... 19

POINT ONE - THE DISTRICT COURT DID NOT ERR
               BY DECLINING TO SUPPRESS EVIDENCE
               OBTAINED FROM KAMALDOSS'S
               ELECTRONIC DEVICES DURING A
               BORDER SEARCH .......................................... 19

    I.    Standard of Review .............................................. 19

    II.    The Fifth Amendment Does Not Compel the
        Suppression of Evidence Obtained from
        Kamaldoss's Electronic Devices .......................... 20

        A.    Applicable Law ............................................. 20

        B.    The District Court Correctly Held that
            Kamaldoss Was Not in *Miranda* Custody .................. 25

        C.    Even If Kamaldoss Were in Custody,
            Suppression Would Not Be Warranted ....................... 31

ii

III.    The Fourth Amendment Does Not Compel the
Suppression of Evidence Obtained from
Kamaldoss's Electronic Devices.............................34

    A.    Applicable Law.................................................34

    B.    A Warrant is Not Required for Border
Searches and the Border Search Doctrine
Extends to Forensic Searches for
Evidence of Criminal Offenses .....................39

    C.    The Searches of Kamaldoss's Devices
Were Supported by Reasonable Suspicion ..................45

    D.    The Good-Faith Doctrine Applies ................48

IV.    The First Amendment Does Not Compel the
Suppression of Evidence Obtained from
Kamaldoss's Electronic Devices.............................50

V.    Any Error Was Harmless....................................52

POINT TWO - THE DISTRICT COURT DID NOT ERR
BY APPLYING THE GUIDELINES
ADJUSTMENT FOR MASS MARKETING
BY INTERACTIVE COMPUTER SERVICE ................56

I.    Standard of Review ..........................................56

II.    Applicable Law...............................................57

III.    The District Court Properly Applied U.S.S.G.
§ 2D1.1(b)(7) ..................................................58

CONCLUSION .......................................................63

iii

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Abidor v. Napolitano*,
  990 F. Supp. 2d 260 (E.D.N.Y. 2013) ................................................... 46

*Alasaad v. Mayorkas*,
  988 F.3d 8 (1st Cir. 2021) .......................................... passim

*Anibowei v. Mayorkas*,
  No. 3:16-CV-3495-D,
  2024 WL 4887525 (N.D. Tex. Nov. 22, 2024) .................................... 52

*Berkemer v. McCarty*,
  468 U.S. 420 (1984) ................................................................. 22, 23, 29

*California v. Beheler*,
  463 U.S. 1121 (1983) ................................................................. 22

*Davis v. United States*,
  564 U.S. 229 (2011) ................................................................. 49

*Florida v. Bostick*,
  501 U.S. 429 (1991) ................................................................. 23, 24

*Howes v. Fields*,
  565 U.S. 499 (2012) ................................................................. 22

*Maryland v. Shatzer*,
  559 U.S. 98 (2010) ................................................................. 21, 22, 28

*Miranda v. Arizona*,
  384 U.S. 436 (1966) .......................................... passim

*New York v. P.J. Video, Inc.*,
  475 U.S. 868 (1986) ................................................................. 52-53

iv

*Rhode Island v. Innis,*
    446 U.S. 291 (1980) ................................................................ 20

*Riley v. California,*
    573 U.S. 373 ........................................................ 37, 38, 40, 41

*Stansbury v. California,*
    511 U.S. 318 (1994) ...................................................... 23, 29

*Tabbaa v. Chertoff,*
    509 F.3d 89 (2d Cir. 2007) ...................................... 35, 37, 53

*Terry v. Ohio,*
    392 U.S. 1 (1968) ........................................................... 21, 46

*United States v. Aguiar,*
    737 F.3d 251 (2d Cir. 2013) ........................................ 49, 53

*United States v. Aguilar,*
    973 F.3d 445 (5th Cir. 2020) ............................................. 50

*United States v. Aigbekaen,*
    943 F.3d 713 (4th Cir. 2019) ........................... 38, 43, 48, 49

*United States v. Archambault,*
    740 F. App'x 195 (2d Cir. 2018) ....................................... 49

*United States v. Arnold,*
    533 F.3d 1003 (9th Cir. 2008) ........................................... 52

*United States v. Asbury,*
    586 F.2d 973 (2d Cir. 1978) .............................................. 46

*United States v. Boles,*
    914 F.3d 95 (2d Cir. 2019) ................................................ 20

*United States v. Broughton,*
    600 F. App'x 780 (2d Cir. 2015) ....................................... 26

*United States v. Cacace,*
    796 F.3d 176 (2d Cir. 2015) .............................................. 53

v

*United States v. Cano,*
   934 F.3d 1002 (9th Cir. 2019) ............................................ 38, 40, 42, 43

*United States v. Cano,*
   973 F.3d 966 (9th Cir. 2020) ............................................................. 43

*United States v. Carr,*
   63 F. Supp. 3d 226 (E.D.N.Y. 2014) .................................................. 27

*United States v. Castillo,*
   70 F.4th 894 (5th Cir. 2023) ............................................................. 37

*United States v. Cavera,*
   550 F.3d 180 (2d Cir. 2008) .............................................................. 57

*United States v. Cortez,*
   449 U.S. 411 (1981) ......................................................................... 46

*United States v. Dhinsa,*
   243 F.3d 635 (2d Cir. 2001) .............................................................. 54

*United States v. Esteras,*
   102 F.4th 98 (2d Cir. 2024) .............................................................. 58

*United States v. Figueroa,*
   300 F. App'x 93 (2d Cir. 2008) ........................................................ 21

*United States v. Flores-Montano,*
   541 U.S. 149 (2004) ............................................................ 35, 40, 42

*United States v. FNU LNU,*
   653 F.3d 144 (2d Cir. 2011) ....................................................... passim

*United States v. Fridman,*
   974 F.3d 163 (2d Cir. 2020) .............................................................. 33

*United States v. Ghailani,*
   733 F.3d 29 (2d Cir. 2013) ............................................................... 57

*United States v. Gurr,*
   471 F.3d 144 (D.C. Cir. 2006) ..................................................... 39, 43

vi

*United States v. Hassan,*
  No. 18-cr-603 (ARR),
  2019 WL 5684367 (E.D.N.Y. Nov. 1, 2019) ............................ 26, 27, 29

*United States v. Hernandez,*
  No. 18-CR-1888-L,
  2018 WL 3862017 (S.D. Cal. Aug. 13, 2018) .................................. 33-34

*United States v. Ickes,*
  393 F.3d 501 (4th Cir. 2005) ............................................................ 52

*United States v. Irving,*
  452 F.3d 110 (2d Cir. 2006) ....................................................... 35, 36

*United States v. Johnson,*
  994 F.2d 980 (2d Cir. 1993) ............................................................ 45

*United States v. Kolsuz,*
  890 F.3d 133 (9th Cir. 2018) ..................................................... 47, 49

*United States v. Levy,*
  803 F.3d 120 (2d Cir. 2015) ..................................................... passim

*United States v. Mendez,*
  103 F.4th 1303 (7th Cir. 2024) ................................................. 37, 41

*United States v. Molina-Gomez,*
  781 F.3d 13 (1st Cir. 2015) ............................................................. 43

*United States v. Molina-Isidoro,*
  884 F.3d 287 (5th Cir. 2018) .......................................................... 38

*United States v. Montoya de Hernandez,*
  473 U.S. 531 (1985) ......................................................... 34, 36, 42, 46

*United States v. Morales,*
  788 F.2d 883 (2d Cir. 1986) ........................................................... 33

*United States v. Morla,*
  123 F. Supp. 3d 382 (E.D.N.Y. 2015) ........................................ 27, 31

vii

*United States v. Mulholland,*
　　702 F. App'x 7 (2d Cir. 2017) ............................................................ 45

*United States v. Newton,*
　　369 F.3d 659 (2d Cir. 2004) .................................................. 22, 25, 27

*United States v. Odofin,*
　　929 F.2d 56 (2d Cir. 1991) ................................................................ 49

*United States v. Patane,*
　　542 U.S. 630 (2004) ........................................................................... 33

*United States v. Ramsey,*
　　431 U.S. 606 (1977) ........................................................................... 35

*United States v. Salazar,*
　　489 F.3d 555 (2d Cir. 2007) .............................................................. 59

*United States v. Schaffer,*
　　851 F.3d 166 (2d Cir. 2017) .............................................................. 21

*United States v. Shvartsman,*
　　722 F. Supp. 3d 276 (S.D.N.Y. 2024) ............................................... 31

*United States v. Singh,*
　　No. 12-CR-121 (DLI),
　　2012 WL 2501032 (E.D.N.Y. June 27, 2012) .................................... 36

*United States v. Skaggs,*
　　25 F.4th 494 (7th Cir. 2022) .............................................................. 50

*United States v. Smith,*
　　967 F.3d 198 (2d Cir. 2020) .............................................................. 20

*United States v. Tavares,*
　　No. 11-CR-610 (NGG),
　　2012 WL 194974 (E.D.N.Y. Jan. 23, 2012) ....................................... 27

*United States v. Touset,*
　　890 F.3d 1227 (11th Cir. 2018) ............................................. 38, 41, 43

viii

*United States v. Watkins,*
    667 F.3d 254 (2d Cir. 2012) ............................................................. 58

*United States v. Wilson,*
    100 F. Supp. 3d 268 (E.D.N.Y. 2015)................................................. 31

*United States v. Yilmaz,*
    508 F. App'x 49 (2d Cir. 2013) ......................................................... 26

## STATUTES

47 U.S.C. § 230(f)(2) ................................................................................. 59

## SENTENCING GUIDELINES

U.S.S.G. § 1B1.3 ...................................................................................... 60

U.S.S.G. § 2D1.1, comment. (n.13)............................................. 58, 59, 62

U.S.S.G. § 2D1.1(b)(7) ......................................................... 16, 58, 59

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 24-824

UNITED STATES OF AMERICA,

*Appellee*,

-against-

EZHIL KAMALDOSS also known as KAMALDOSS SEZHIAN,
also known as KAMAL DOSS, also known as EZHIL CEZHIAN,

*Defendant-Appellant*,

VELAUDAPILLAI NAVARATNARAJAH, also known as RAJAH,

*Defendant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

2

## PRELIMINARY STATEMENT

Defendant-Appellant Ezhil Kamaldoss appeals from a judgment[1] entered on March 28, 2024, in the United States District Court for the Eastern District of New York (Ross, J.), convicting him, after a jury trial, of one count of conspiracy to distribute and possess with intent to distribute Tramadol, Alprazolam, and Carisoprodol, in violation of 21 U.S.C. §§ 846 and 841(b)(2), four counts of attempted distribution and possession with intent to distribute Tramadol and Alprazolam, in violation of 21 U.S.C. § 841(b)(2), and one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and sentencing him principally to 27 months' imprisonment.  (SPA:45-51).[2]

---

[1]    The judgment filed by the district court erroneously indicates (by the wrong box being checked on its first page) that Kamaldoss pleaded guilty rather than having been found guilty by a jury.  For the reasons discussed herein, the government respectfully submits that the conviction and sentence should be affirmed in their entirety, but the mandate should direct the district court to correct this scrivener's error.

[2]    Parenthetical references to "Br.," "A," "SPA," "SA," "GA," "GX," "T," and "DE" are to Kamaldoss's brief, his appendix, his special appendix, his sealed appendix, the government's appendix, the government's trial exhibits, the trial transcript, and entries on the district court's docket, respectively.  "DE" refers to entries on the district court docket in *United States v. Ezhil Sezhian Kamaldoss*, No. 19-CR-543 (S-1) (ARR) (E.D.N.Y.).  References to the "PSR" are to the Presentence

3

On appeal, Kamaldoss argues that the district court erred by (1) denying his motion to suppress evidence obtained from his electronic devices during a border search, and (2) applying a two-level increase to his adjusted offense level, pursuant to § 2D1.1(b)(7) of the United States Sentencing Guidelines ("U.S.S.G."), for the online mass-marketing of the drugs he was convicted of distributing throughout the United States. For the reasons that follow, these arguments lack merit and should be rejected.

---

Investigation Report dated September 30, 2022, filed separately under seal.

4

## STATEMENT OF FACTS

### I. Background

For years, Kamaldoss owned and operated an international drug-trafficking enterprise that distributed throughout the United States millions of prescription pills, including misbranded opioids and other drugs, without prescriptions or medical oversight. (PSR ¶¶ 12, 20). On June 27, 2022, following a one-week jury trial, a unanimous jury convicted Kamaldoss on all seven counts with which he was charged, including one count of conspiracy to distribute and possess with intent to distribute Schedule IV controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(2); five counts of attempted distribution and attempted possession with intent to distribute Schedule IV controlled substances, in violation of 21 U.S.C. § 841(b)(2); and one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (PSR ¶¶ 1-8; DE:307).

### II. Offense Conduct and Arrest

As established at trial, since at least 2017, Kamaldoss distributed addictive and dangerous drugs, including Tramadol (a Schedule IV synthetic opioid) and Alprazolam (a Schedule IV controlled substance marketed under the brand name Xanax), after importing them

5

from India, and he conspired to launder the proceeds to keep his criminal business churning.  (PSR ¶¶ 18-19, 21; DE:298 at 2).

Kamaldoss's customers purchased the drugs directly from other co-conspirators online and through encrypted chat programs.  (PSR ¶¶ 14, 17; DE:298 at 2).  Kamaldoss aggregated their orders and fulfilled them from a warehouse in Queens, New York, where he and his co-conspirators re-packaged the drugs that had been smuggled from India and mailed them en masse virtually every day to customers throughout the United States.  (PSR ¶¶ 12, 14-17).

Kamaldoss rented a warehouse near John F. Kennedy International Airport ("JFK") specifically for this criminal operation, (PSR ¶ 14), and he arranged for others to import the drugs to keep his warehouse stocked.  (DE:298 at 2).  Shipments of drugs were routinely smuggled as legitimate cargo through JFK, and Kamaldoss's co-conspirators collected the drugs and brought them to Kamaldoss's warehouse, where other co-conspirators printed postage labels (which Kamaldoss sent them by email) associated with each day's drug purchases, packaged the drugs into Priority Mail envelopes for shipping,

6

and carried them in laundry bags to nearby post offices for mailing.  (PSR ¶¶ 14-15; GA:98; T:730).

In early 2018, the Food and Drug Administration ("FDA") and other federal law enforcement agencies began investigating this scheme. They conducted a series of undercover purchases that resulted in the shipment of hundreds of illegal pills, including Tramadol and Carisoprodol, from Kamaldoss's warehouse to an undercover agent.  (PSR ¶¶ 12-14).  In the summer of 2018, the FDA intercepted and seized over a million Tramadol pills that were shipped from India and destined for Kamaldoss's warehouse.  (PSR ¶ 14).  Law enforcement agents subsequently surveilled the warehouse and interviewed confidential informants who had worked there for Kamaldoss—one of whom agreed to wear an audio-recording device and surreptitiously take photographs of the operation from the inside (he later testified at trial and identified Kamaldoss to the jury).  (A:45, 599-601).

Running this illegal pill mill was Kamaldoss's full-time job. His electronic communications were replete with examples of his giving instructions and quoting drug prices directly to his co-conspirators.  For instance, to one co-conspirator who had been taking online orders at too

7

low a price per pill, Kamaldoss wrote, "Soma 500 is $0.52.  Don't take orders less than this price." (T:334:20-21).  He lamented when payment for drugs was late, which forced him to wait to buy new stock: "Balance 24,437.  Bro, if I buy stock, they don't give credit even one dollar.  How I will get stock?  If account is not zero always, I have to stop shipping from next week." (T:335:25-336:2).  And he badgered co-conspirators about late payments: "Bro, what happened payment?  Why you don't make account zero?  Don't do this business on credit.  Yesterday my party sold all items to someone from Texas.  Valium and new products all sold." (T:338:2-5).

Kamaldoss bought pills by the tens of thousands.  When a co-conspirator asked Kamaldoss whether to take an order of 10,000 Valium pills, Kamaldoss responded: "Let me check how much I get today, then you take 10,000 order." (T:343:14-15).  Kamaldoss's conduct was deliberate and knowing—indeed, it was plotted to maximize profit.  As he wrote in one message, strategizing to ship pills without incurring excess shipping costs, "USPS charges more above 180 pills weight.  I can't pay more shipping cost.  Don't take orders above 180.  If more 180, we will ship two packages, two tracking, two charges, [$]25 and $25."

8

(T:343:21-24). In another exchange, Kamaldoss sought clarity about a drug order, "What is this? X30? . . . Is it Xanax 60 and Klonopin .5-30? What happened? Tell me fast." (T:342:15-16). His co-conspirator's response was clear: "Pills, bro." (T:342:18).

Kamaldoss's communications demonstrate that he knew his transnational pill mill was illegal. When asked about shipping drugs directly from India to purchasers in the United States, Kamaldoss replied "Not possible. Nobody ship from India. Everyone will go to jail." (T:337:14-15). He then wrote, "You can't send in flight from India. You will be arrested." (T:337:18-19). To keep his criminal business afloat, he tried to be cautious: "I don't use my address for delivery. Too much problem." (T:342:25-343:1). In order to evade detection, he paid cash to ship the pills (GA:100), and used multiple post offices (GA:99-100). Finally, Kamaldoss admitted in text messages that he was risking arrest and prosecution for his drug distribution scheme: "Even this only more few days. After that, I will stop. Many people arrested here. Too much problem and risk. Very soon, all shipping I am going to stop." (T:344:2-4).

9

Kamaldoss and numerous co-conspirators were arrested on a complaint in September 2019. (DE:2). A grand jury sitting in the Eastern District of New York returned an indictment against them in November 2019, and a superseding indictment (the operative charging instrument at trial) in April 2021. (DE:119).

III.    Border Search and Suppression Ruling

Over the course of the investigation and during the period of the conspiracy that preceded it, Kamaldoss resided principally with his family in India but traveled several times to the United States, where he sometimes stayed for lengths of time. (PSR ¶ 49). Upon two of his entries into the United States at JFK—on April 23, 2019 and August 15, 2019—he was referred to a secondary inspection area at the airport, and law enforcement agents performed border searches, including forensic searches of his electronic devices. (A:124, 131). Kamaldoss moved in the district court to suppress evidence obtained from these searches.[3] (DE:159).

---

[3]    Kamaldoss moved to suppress evidence obtained from *three* border searches, the first of which he alleged occurred when he arrived at JFK from India in June 2018. Government records offered at the suppression hearing reflected that he entered uneventfully on that date

10

On April 12, 2022, the district court held an evidentiary hearing, at which Kamaldoss testified. (DE:178). The court also heard the testimony of, inter alia, the Customs and Border Protection ("CBP") officer (Roy Clark) who encountered Kamaldoss at a secondary inspection area and obtained Kamaldoss's electronic devices and passcodes and the Homeland Security Investigations ("HSI") case agent (Chatchai Chunton) who encountered Kamaldoss during the secondary inspection and was involved in imaging his devices. (A:344, 407-08, 453).

As established at the hearing, on April 23, 2019, Kamaldoss arrived at JFK from India along with his wife and two of their children; while being processed through customs, a CBP officer directed them to a secondary inspection area. (SPA:10). The district court found the testimony of Clark and Chunton about the environment and the events

---

without being referred to secondary inspection, and the district court found that no such inspection occurred. (SPA:10). Additionally, the government represented that it would not use at trial any evidence obtained from the August 2019 border search—indeed, the government obtained none, and inferred that Kamaldoss sanitized his devices after the April 2019 search (A:124-25)—and the district court accordingly addressed only the April 2019 search in its suppression ruling (SPA:6 n.2, 12-28).

11

of the secondary inspection to be credible and consistent, and Kamaldoss's testimony unreliable, and accordingly credited the former and discounted the latter to the extent that they conflicted.  (SPA:16).

Specifically, the district court found that "the secondary inspection room to which Mr. Kamaldoss and his family were first brought is 'a big waiting area' that contains twenty to fifty chairs and a counter, behind which the secondary officers sit, not unlike 'the DMV.'" (SPA:15 (quoting Chunton's testimony)).  It is "a sky-blue room containing a water fountain, bathroom, and television, which is often turned on to the news or sports," where travelers referred for secondary inspection "may sit in any chair they want" while waiting to be called up to the counter, "and, when their name is called by a secondary inspection officer, they walk themselves up to the counter to answer routine questions."  (SPA:15).  "Frequently, an agent will *ask* a traveler for their electronic devices and passcodes" at the counter, which is what "Officer Clark did with Mr. Kamaldoss," and individuals so asked "are free to say no."  (SPA:15).  Kamaldoss provided his passcodes when asked.  (SPA:17-18).

12

After 30 to 40 minutes in the main secondary inspection room with other travelers (SPA:16), during which time Kamaldoss was asked, by his own account, "'many questions' about why he was in the United States" (SPA:14), Kamaldoss and his family "were moved to a smaller, private room—a 'family room'—so that they would be more comfortable" (SPA:15 (quoting Chunton's testimony)). That room "contains toys for children and a couch." (SPA:15). During their time in the family room, Kamaldoss and his family "were left to themselves, although Mr. Kamaldoss occasionally checked in with Agent Chunton about the status of his family's stay in secondary inspection." (SPA:16). At no point was Kamaldoss (or any member of his family) restrained, arrested, or told he was under arrest. (SPA:16-17). "Indeed, at one point, Agent Chunton accompanied Mr. Kamaldoss to the luggage carousel so they could find a missing bag of Mr. Kamaldoss's," after which "and before returning to secondary inspection, Mr. Kamaldoss separated entirely from Agent Chunton and used the restroom." (SPA:16). Agent Chunton "was cordial, respectful, and professional during his interactions with Mr. Kamaldoss," and "[a]t the end of their encounter, Agent Chunton even helped the Kamaldoss family with their bags." (*Id.*). Kamaldoss and his family were

13

allowed to formally enter the United States after about three hours in secondary inspection. (SPA:15).

During the time that Kamaldoss waited, HSI agents searched his belongings and made forensic copies of his iPhone and laptop. Two days later, on April 25, 2019, HSI agents shared those forensic copies with FDA Special Agent Patrick Connor, who reviewed them on two days in May before obtaining a search warrant on May 24, 2019. (SPA:11).

Kamaldoss argued below that evidence obtained from these devices should be suppressed because he was not given warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), before being asked for his passwords, which he claimed were obtained in violation of his Fifth Amendment rights; and because the warrantless searches of his devices (at the border and during Connor's continuation of that review away from the border) allegedly violated the Fourth Amendment. (A:55-56). The district court correctly rejected these arguments, finding based principally upon the facts set forth above that Kamaldoss was not in custody for *Miranda* purposes when he was asked for his passwords (SPA:18), and ruling both that the border search was lawful and performed in good faith, and that the search warrant that Connor

14

obtained was supported by probable cause independent of his earlier review, even assuming *arguendo* that his earlier review was improper (SPA:31-32).

IV.   Subsequent Proceedings

Kamaldoss was tried by a jury beginning on June 21, 2022. (DE:263).  On June 27, 2022, the jury reached a unanimous verdict convicting him of all counts with which he was charged.  (DE:269).

Kamaldoss was sentenced on March 26, 2024.  At sentencing, the district court applied—and rejected Kamaldoss's argument against the application of—a two-level increase to the Guidelines offense level pursuant to U.S.S.G. § 2D1.1(b)(7) for the mass marketing of controlled substances by interactive computer service.  (A:896).  Specifically, the court found by a preponderance of the evidence, based upon the trial record, that it was reasonably foreseeable and in fact well known to Kamaldoss that his co-conspirators used the internet to mass market the drugs he distributed, which was essential to their common scheme. (A:893-95).

The district court determined that the applicable advisory Sentencing Guidelines range was 37 to 46 months of imprisonment,

15

which was based on a total offense level of 21 and a Criminal History Category of I.  (A:898). The court imposed a downward variance and sentenced Kamaldoss principally to 27 months' imprisonment.  (A:907). He filed a timely notice of appeal on March 28, 2024.  (DE:309).

Kamaldoss, who had been at liberty, surrendered for service of his sentence.  He moved in this Court for bail pending appeal on the purported basis that the forensic border searches of his electronic devices were unlawful and presented a substantial question under 18 U.S.C. § 3143(b).  (*United States v. Kamaldoss*, No. 24-824, Dkt. 33.1 (2d Cir. July 22, 2024)).  This Court denied his motion.  (*United States v. Kamaldoss*, No. 24-824, Dkt. 46.1 (2d Cir. Sept. 6, 2024)).

16

## SUMMARY OF ARGUMENT

Kamaldoss argues that the district court erred by refusing to suppress evidence obtained from his cellphone and laptop computer during a border search, because (1) he was not given *Miranda* warnings before being asked for his device passwords, which were therefore obtained in violation of his Fifth Amendment rights; and (2) his Fourth Amendment rights were violated by the warrantless forensic search of his electronic devices at the border and subsequent review of the device images, notwithstanding that a warrant was later obtained for the devices.  *Amici Curiae* argue (for the first time in this case) that warrantless border searches of electronic devices also violate the First Amendment.  Additionally, Kamaldoss argues that the district court erred at sentencing by increasing the Sentencing Guidelines offense level pursuant to U.S.S.G. § 2D1.1(b)(7) for the mass marketing of controlled substances by interactive computer service.

All of these arguments fail.  First, the circumstances of the border search were—in the words of a witness whose testimony the district court credited—akin to a DMV, and not at all akin to a formal arrest.  Accordingly, Kamaldoss was not in custody and no *Miranda*

17

warnings were necessary. Moreover, even if he had been in *Miranda* custody and were illegally compelled to surrender his passwords, suppression of derivative evidence (rather than just the passwords) would be improper.

Second, warrantless searches at the international border, even invasive searches of property with no suspicion whatsoever, have long been established as reasonable under the Fourth Amendment because of the heightened interest of the sovereign to safeguard the integrity of its borders. Thus, the highest standard ever applied by this Court for a border search is reasonable suspicion, which is necessary for invasive searches of the body. Even if reasonable suspicion of a border-related crime, which would be an extension beyond this Court's jurisprudence in *United States v. Levy*, 803 F.3d 120, 124 (2d Cir. 2015) (holding that Customs officials are authorized to seize evidence of any crime, not just those that they are authorized to investigate, that they observe during a border search), is necessary to justify a forensic search of electronic devices at the border, as some courts have held, that standard is easily met here. Moreover, law enforcement agents acted in good-faith reliance on the state of the law when performing the border

18

search—and subsequently obtained a warrant supported by probable cause independent of the border search.  For all of these reasons, the district court was correct not to suppress the evidence on Fourth Amendment grounds.

Nor does the First Amendment counsel in favor of suppression.  *Amici*'s argument makes conclusory (and implausible) claims of burden to First Amendment interests and fails to grapple with the actual scope of the border search doctrine, or with the critical government interest at issue.

Lastly, the district court correctly applied the two-level increase to Kamaldoss's offense level for the use of online mass-marketing.  The trial record provided ample evidentiary support for the court's finding by a preponderance of the evidence, including the massive geographic breadth of the drug distribution, the testimony of a co-conspirator, and Kamaldoss's own description of his "online business."

For all of these reasons, the judgment of the district court should be affirmed in its entirety.

19

## ARGUMENT

## POINT ONE

### THE DISTRICT COURT DID NOT ERR BY DECLINING TO SUPPRESS EVIDENCE OBTAINED FROM KAMALDOSS'S ELECTRONIC DEVICES DURING A BORDER SEARCH

Kamaldoss argues that the district court should have suppressed evidence obtained from his electronic devices because the passcodes were obtained without *Miranda* warnings, and thus in violation of the Fifth Amendment; and because the warrantless border searches purportedly violated the Fourth Amendment. Additionally, although Kamaldoss does not raise this argument on appeal and it was never considered by the district court, *amici curiae*, the Knight First Amendment Institute and Reporters Committee for Freedom of the Press, argue that the border searches of Kamaldoss's electronic devices also violate the First Amendment. For the reasons that follow, all of these arguments should be rejected.

### I. Standard of Review

When reviewing the grant or denial of a motion to suppress, this Court "applies a de novo standard of review of the district court's conclusions of law, and a deferential, clear-error standard of review of the

20

district court's findings of fact." *United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020); *United States v. Boles*, 914 F.3d 95, 102 (2d Cir. 2019).[4]

II.   **The Fifth Amendment Does Not Compel the Suppression of Evidence Obtained from Kamaldoss's Electronic Devices**

A.   Applicable Law

Generally, a person must be advised of certain rights before being subject to a "custodial interrogation." *Miranda*, 384 U.S. at 444. For *Miranda* warnings to be required, a court must find both that (1) there was an "interrogation" of the defendant, and (2) the interrogation was while he was in "custody." *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011).

"Interrogation" includes express questioning of the suspect and its "functional equivalent . . . words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).  Statements made by law enforcement agents as they fulfill their

---

[4]   When quoting cases, unless otherwise noted, citations, internal quotation marks, and footnotes are omitted, and all alterations are adopted.

21

employment responsibilities do not qualify as interrogation. *United States v. Figueroa*, 300 F. App'x 93, 95 (2d Cir. 2008) (statements made "while the officers were going about their routine tasks in conducting a search, securing a crime scene, and making an arrest" were not "reasonably likely to elicit an incriminating response").

The meaning of "custody" under *Miranda* is narrower than the meaning of a "seizure" under the Fourth Amendment, and thus "not every seizure constitutes custody for purposes of *Miranda*." *United States v. Schaffer*, 851 F.3d 166, 175-76 (2d Cir. 2017) (holding that defendant was not in custody even though he was denied permission to leave). Indeed, individuals are not free to leave during routine traffic stops, nor in investigative *Terry* stops, *see Terry v. Ohio*, 392 U.S. 1 (1968), and those forms of detention are therefore seizures under the Fourth Amendment; yet they do not generally constitute *Miranda* custody. *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("[T]he temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop . . . does not constitute *Miranda* custody."). The Supreme Court has "[made] clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody," which is

22

not accorded "'talismanic power,' because *Miranda* is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'" *Shatzer*, 559 U.S. at 112.

In determining whether a defendant is in *Miranda* custody, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *see also Howes v. Fields*, 565 U.S. 499, 509 (2012) (issue is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.")   This Court, interpreting the Supreme Court in *Berkemer v. McCarty*, 468 U.S. 420 (1984), has indicated that two "particularly relevant" factors when determining whether an investigative seizure "involves restraints generally associated with a formal arrest" are "whether a reasonable person in the suspect's shoes would have understood that his detention was not likely to be 'temporary and brief,'" and "whether a person stopped under the circumstances at issue would feel that he was 'completely at the mercy of the police.'" *United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004) (quoting *Berkemer*, 468 U.S. at 437-38).   The test is objective,

23

based upon the perspective of a reasonable person in the suspect's position. *See Berkemer*, 468 U.S. at 442. Thus, an officer's subjective intention to arrest a suspect does not necessarily render the suspect in custody for *Miranda* purposes, *see id.*, nor does an officer's subjective belief that an individual is not a suspect preclude a finding of *Miranda* custody, *see Stansbury v. California*, 511 U.S. 318, 324-25 (1994). "[T]he inquiry remains a holistic one in which the nature and context of the questions asked, together with the nature and degree of restraints placed on the person questioned, are relevant." *FNU LNU*, 653 F.3d at 154. This inquiry "necessarily involves considering the circumstances surrounding the encounter with authorities," including:

> the interrogation's duration; its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion . . .

*Id.* at 153. Notably, the reasonable person from whose perspective "custody" is defined is a reasonable innocent person. *Florida v. Bostick*,

24

501 U.S. 429, 437-38 (1991).  Whether a person knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.  *Id*.

This Court has clarified that questioning at the border presents unique factors that must be considered in the foregoing analysis.  When arriving at an American airport, "compulsory questioning—with no freedom to enter the United States and with nowhere else to go—inheres in the situation" and the traveler "has voluntarily submitted to some degree of confinement and restraint by approaching the border."  *FNU LNU*, 653 F.3d at 153.  As a result, "a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on."  *Id*. at 153-54.  This expectation of both constraints and questions, and the fact that "at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave[,] reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest."  *Id*. at 154.

25

B.  The District Court Correctly Held that
      Kamaldoss Was Not in *Miranda* Custody

The district court's factual findings about the circumstances

of Kamaldoss's secondary inspection at JFK, based upon the court's

credibility assessments of the testimony of multiple live witnesses,

including Kamaldoss,[5] reflect a condition dramatically unlike the

"restraints generally associated with a formal arrest." *Newton*, 369 F.3d

at 675. Rather, as it was characterized by a witness whose testimony the

district court credited, it was "not unlike 'the DMV.'" (SPA:15).

Kamaldoss was ushered (with his wife and children) into a

large waiting area with capacity for many other travelers, where he could

sit wherever he liked, and where there was "a water fountain, bathroom,

and television," which is typically "turned on to the news or sports."

(SPA:15-16). Kamaldoss, like other travelers, was summoned to a

counter where he was questioned by a CBP officer in full view of other

travelers, and the officer collected his electronic devices and asked for his

passwords, which he gave. (*Id.*). After 30 to 40 minutes in the main

---

[5] The district court found Kamaldoss's "version of events
incredible" and discounted his testimony where it conflicted with the
testimony by the government's witnesses. (SPA:15-16).

26

secondary inspection room with other travelers (SPA:16), during which time Kamaldoss was asked questions about why he was traveling to the United States (SPA:14), Kamaldoss and his family were taken to wait in a private "family room" with toys and a couch, where they were left to themselves and not questioned. (SPA:15-16).

This was nothing at all like an arrest. Indeed, this Court and numerous district courts in this Circuit have frequently found similar and even more onerous circumstances amount to nothing more than a routine, non-custodial border search. *See, e.g.*, *FNU LNU*, 653 F.3d at 155 (finding non-custodial a 90-minute airport interrogation in a private room, during which defendant was finger-printed and confronted with apparent false statements in an old passport application); *United States v. Broughton*, 600 F. App'x 780, 783 (2d Cir. 2015) (affirming that defendant was not in custody after being escorted by law enforcement officers to a private part of the airport to field test a white powdery substance found on the defendant's belongings); *United States v. Yilmaz*, 508 F. App'x 49, 52 (2d Cir. 2013) (affirming as non-custodial a 90-minute inspection at vehicular border crossing); *United States v. Hassan*, No. 18-cr-603 (ARR), 2019 WL 5684367, at *3 (E.D.N.Y. Nov. 1, 2019) (defendant

27

affidavit alleging CBP officers took him to "a separate room, questioned him about his travels, searched his luggage, copied his paperwork, took his cell phone, and would not allow him to be alone," amounted to nothing more than a "modern border inspection"); *United States v. Tavares*, No. 11-CR-610 (NGG), 2012 WL 194974, at *2 (E.D.N.Y. Jan. 23, 2012) (defendant confronted by uniformed government agent and not free to leave CBP interrogation was not in custody and subject only to a "modern border inspection"); *cf. Newton*, 369 F.3d at 676 ("Handcuffs are generally recognized as a hallmark of a formal arrest.").

"In the rare cases where a court has suppressed a defendant's statements to CBP, it was because CBP's conduct went beyond a typical border inspection that an international traveler would expect." *Hassan*, 2019 WL 5684367, at *3 (citing *United States v. Morla*, 123 F. Supp. 3d 382, 384 (E.D.N.Y. 2015), in which defendant was handcuffed to a bench, and *United States v. Carr*, 63 F. Supp. 3d 226, 236 (E.D.N.Y. 2014), in which defendant was escorted to pat-down room by four armed officers and repeatedly questioned about drug smuggling). No conduct of this type by law enforcement agents is at issue here.

28

Kamaldoss argues that he was in *Miranda* custody—that is, that his circumstances should be regarded as akin to formal arrest—because he was not free to leave, he was the target of an ongoing criminal investigation (a fact that was not communicated to him (SPA:10-11, 16-17)), he was questioned (he says now, erroneously) about things unrelated to admissibility to the United States "for approximately two hours" (Br. 22-23), and "most importantly," he was asked for his passwords (Br. 23).

First, although it is true in a qualified sense that Kamaldoss was not free to leave, in the context of a border search, being "free to leave" necessarily means something very different than in, for instance, a police detention on the street—which difference vividly illustrates why the Supreme Court has cautioned that the "freedom-of-movement test" does not carry "talismanic power." *Shatzer*, 559 U.S. at 112. Kamaldoss, a foreign national (PSR at 2), chose to present himself at the nation's border, seeking entry. When he sat in secondary inspection waiting to be admitted, he was not "free to leave" only in the sense that he had not been cleared to cross the border and *enter the United States*. Indeed, the district court found that he *did* leave the secondary inspection area to

29

retrieve a missing bag from a luggage carousel, accompanied by a law enforcement agent, and then separated from that agent to use the restroom alone before returning, so his movement was not altogether restrained.  (SPA:16).  Nor is there any basis in the record to doubt that Kamaldoss would have been free to leave onto a flight back to India—as he would have had to do if he had not been admitted.  In short, *waiting* at the border to be cleared to enter is not akin to arrest and cannot, by itself, constitute *Miranda* custody.

Second, the fact that Kamaldoss was the target of an ongoing investigation cannot convert his wait at the border into *Miranda* custody because the test for *Miranda* custody is objective, based upon the perspective of a reasonable person in the interviewee's position.  *See Berkemer*, 468 U.S. at 442.  The subjective intention of law enforcement officers is immaterial as a matter of law.  *See, e.g.*, *Stansbury*, 511 U.S. at 323 ("[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."); *see also Hassan*, 2019 WL 5684367, at *4 ("But the possibility that the questioning may have been coordinated with the FBI does not change the

30

analysis. Unless the officers objectively acted in a way that would make a person think that he was under arrest, there is no custody for *Miranda* purposes."). Moreover, it would be an absurd result if the questioning of travelers during border searches based upon suspicions that arose upon their arrival or based upon no suspicion at all were regarded by this Court as non-custodial while the questioning of other travelers in precisely the same conditions were regarded by this Court as custodial only because of the existence of a prior investigation. The meaning of "custody" cannot reasonably be so stretched.

Third, Kamaldoss is mistaken when he suggests in conclusory fashion that he was questioned about matters unrelated to admissibility and was questioned for hours. The district court ruled (based in part on Kamaldoss's own testimony) that he was questioned for no more than 30 to 40 minutes in total, in a large room in full view of other passengers (SPA:16), and that Kamaldoss spent the rest of his time in secondary inspection sitting and waiting with his family, in conditions akin to a DMV (SPA:15). And other than asking for his password, he does not specify any questions—not now and not in his testimony in the district court—that supposedly did not relate to admissibility. Indeed, even in

31

the self-serving declaration that Kamaldoss submitted with his suppression motion in order to establish entitlement to an evidentiary hearing, the only questions he specified that anyone asked him were "about [his] trip to the United States, about a previous trip that [he] had taken to the country, and about [his] current and previous employment." (DE:159-2 ¶ 11).

Thus, the reasons that supposedly establish *Miranda* custody here are reducible to one: that CBP asked Kamaldoss for his device passwords. Yet it cannot be that merely *asking* for his passwords, without more, escalates a non-custodial, routine border inspection into a custodial interrogation, equivalent to handcuffing him to a bench. *FNU LNU*, 653 F.3d at 153-55; *United States v. Shvartsman*, 722 F. Supp. 3d 276, 323-24 (S.D.N.Y. 2024); *Morla*, 123 F. Supp. 3d at 384; *United States v. Wilson*, 100 F. Supp. 3d 268, 280 (E.D.N.Y. 2015). The district court was right to reject this implausible proposition.

C.  Even If Kamaldoss Were in Custody,
    <u>Suppression Would Not Be Warranted</u>

Even if Kamaldoss could establish that he was in *Miranda* custody and subject to a custodial interrogation without being advised of

32

his rights, he has never claimed to have made any statements during such interrogation, inculpatory or otherwise, that he sought to suppress, and the government did not offer any at trial. Rather, the only non-testimonial "statement" that has concerned him is the disclosure of his passwords. Even assuming *arguendo* that disclosure of a password—analogous to the production of a physical key—is a "statement" within the contemplation of *Miranda* or the Fifth Amendment, and assuming that Kamaldoss could establish that a password was elicited in violation of *Miranda* (which he cannot do, for the reasons discussed above), the remedy would be suppression of the statement at issue: that is, suppression of the password. That might be desirable for defendants in some cases, where knowledge of the password establishes ownership of an otherwise unclaimed device and where the act of producing the password is therefore testimonial and incriminating; but not where, as here, the defendant's ownership of the device he was carrying is a foregone conclusion. *Cf., e.g.*, *United States v. Fridman*, 974 F.3d 163, 174-76 (2d Cir. 2020) (discussing the act-of-production doctrine and foregone-conclusion exception). Indeed, Kamaldoss never sought to suppress the passwords, nor did the government seek to introduce them.

33

Rather, Kamaldoss sought the suppression of all evidence derived directly or indirectly from the passwords as fruit of the poisonous tree. (A:42).

But suppression of such derivative evidence would be improper. That is because the Fifth Amendment only proscribes "extract[ing] from the person's own lips an admission of guilt, which would thus take the place of other evidence." *United States v. Patane*, 542 U.S. 630, 637 (2004); *see also id.* at 639, 642 (holding that "[t]here is . . . no reason to apply the 'fruit of the poisonous tree' doctrine" to evidence obtained derivatively from statements elicited without *Miranda* warnings because the rationale of deterring unlawful searches does not apply to failures to give *Miranda* warnings). "The *Miranda* presumption of coercion," therefore, "has not barred the use of unwarned, voluntary statements . . . to locate non-testimonial evidence[.]" *United States v. Morales*, 788 F.2d 883, 886 (2d Cir. 1986); *see also United States v. Hernandez*, No. 18-CR-1888-L, 2018 WL 3862017, at *4 (S.D. Cal. Aug. 13, 2018) (denying motion to suppress evidence from cell phone where passcode was obtained after defendant invoked her right to counsel following her arrest at the border for narcotics offenses because there was

34

no evidence of coercion or a denial of due process in elicitation of the statements).

Consequently, even if Kamaldoss were in *Miranda* custody when he disclosed his passwords, and the passwords themselves should therefore be suppressed, the derivative evidence obtained from his electronic devices should not be.

III.   The Fourth Amendment Does Not Compel the Suppression of Evidence Obtained from Kamaldoss's Electronic Devices

   A.   Applicable Law

   "[T]he Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior" due to the government's broad and comprehensive "power to protect the Nation by stopping and examining persons entering this country." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).  Thus, "[i]t is well established that the government has broad powers to conduct searches at the border even where . . . there is no reasonable suspicion that the prospective entrant has committed a crime." *Tabbaa v. Chertoff*, 509 F.3d 89, 97-98 (2d Cir. 2007) (collecting cases); *see also United States v. Ramsey*, 431 U.S. 606, 616-17 (1977) ("That searches made at the border, pursuant to the long-standing right of the sovereign to protect

35

itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration;" explaining that the same Congress that had proposed the Bill of Rights had already enacted the first customs statute, showing that members of that Congress did not regard border searches as unreasonable "and they are not embraced within the prohibition of the [Fourth] [A]mendment"); *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) ("Border searches[,] from before the adoption of the Fourth Amendment, have been considered reasonable by the single fact that the person or item in question had entered our country from outside.").

Indeed, the Supreme Court has emphasized that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). "[A]irports such as JFK are functionally equivalent to international borders, and 'since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to

36

prevent the introduction of contraband into this country.'" *United States v. Singh*, No. 12-CR-121 (DLI), 2012 WL 2501032, at *3 (E.D.N.Y. June 27, 2012) (quoting *Montoya de Hernandez*, 473 U.S. at 537 (internal alterations omitted)); *see also Irving*, 452 F.3d at 123 ("An airport is considered the functional equivalent of a border and thus a search there may fit within the border search exception.").

It is thus well-settled that warrantless searches upon entry to the United States, including invasive searches of property, are lawful and require no suspicion whatsoever. While there is broad authority to conduct routine, suspicionless searches at the border, this Court has recognized that more invasive searches, like strip searches, require reasonable suspicion. *See, e.g.*, *United States v. Levy*, 803 F.3d 120, 123 n.3 (2d Cir. 2015) (noting that "non-routine" searches require reasonable suspicion and that the Supreme Court and this Court "have suggested that the label 'non-routine' should generally be reserved for intrusive border searches of the person (such as body-cavity searches or strip searches), not belongings")). The precise line, however, between what is and is not a routine search has not been clearly delineated. *Tabbaa*, 509 F.3d at 98.

37

This Court and the Supreme Court have not yet addressed what level of suspicion, if any, is required to search electronic devices at the border. CBP search policies require no suspicion to conduct a basic, manual search of an electronic device, and they require reasonable suspicion to conduct an advanced or forensic search of an electronic device. (GA:22 n.9). Notably, no circuit court has held that a manual search of electronic devices at the border requires *any* level of suspicion, and circuit courts have held that even forensic searches of electronic devices require at most reasonable suspicion. *See, e.g.*, *United States v. Mendez*, 103 F.4th 1303, 1309 (7th Cir. 2024) ("No circuit court has read *Riley* [*v. California*, 573 U.S. 373 (2014)] to require more than reasonable suspicion to support even the most intrusive electronics search at the border"; holding that manual phone searches require no individualized suspicion); *United States v. Castillo*, 70 F.4th 894, 897-98 (5th Cir. 2023) (same); *Alasaad v. Mayorkas*, 988 F.3d 8, 16-18 (1st Cir. 2021) (collecting cases); *United States v. Cano*, 934 F.3d 1002, 1019 (9th Cir. 2019) (manual searches require no suspicion "whatsoever"); *United States v. Aigbekaen*, 943 F.3d 713, 723 (4th Cir. 2019) (requiring reasonable suspicion with a nexus to the purposes behind the border search

38

exception for forensic border searches of electronic devices); *United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018) (requiring no suspicion for forensic border search of electronic device); *United States v. Molina-Isidoro*, 884 F.3d 287, 292 (5th Cir. 2018) (declining to import *Riley*'s warrant requirement to border search of a cellphone).

When finding reasonable suspicion, this Court has held that border agents are entitled to rely on information provided by other law enforcement officers from separate agencies to justify a border search. *See Levy*, 803 F.3d at 123-24 (finding Customs officer's border inspection and copying of notebook belonging to individual suspected of financial crimes was justified by reasonable suspicion and declining to reach whether suspicion was necessary to do the same). As this Court observed,

> Whether a Customs official's reasonable suspicion arises entirely from her own investigation or is prompted by another federal agency is irrelevant to the validity of a border search, which we have held does not depend on whether it is prompted by a criminal investigative motive. . . . We see no constitutional reason to prevent . . . federal law enforcement agents from also supplying information to Customs officials in aid of a border search. Nor are Customs officials prevented by the Fourth Amendment from conducting such a search merely because it furthers another federal agency's criminal investigation.

39

*Id.* at 123-24. Further, this Court rejected the argument that Customs officials should be limited to crimes that CBP is authorized to investigate: "But (like other federal law enforcement officers) CBP officers are neither expected nor required to ignore tangible or documentary evidence of a federal crime." *Levy*, 803 F.3d at 124. Several circuit courts have similarly held that border agents may search for evidence of crimes, not just contraband. *See, e.g.*, *Alasaad*, 988 F.3d at 20 ("Searching for evidence is vital to achieving the border search exception's purposes of controlling who and what may enter the country."); *United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006) ("The distinction that [defendant] would draw between contraband and documentary evidence of a crime is without legal basis").

    B.    A Warrant is Not Required for Border Searches
           and the Border Search Doctrine Extends to
           <u>Forensic Searches for Evidence of Criminal Offenses</u>

Kamaldoss advocates for the narrowest version of border search authority, relying on the Ninth Circuit's *Cano* decision, 934 F.3d at 1018, which permits warrantless forensic searches of electronic devices at the border only with reasonable suspicion that the device contains digital contraband. (Br. 36). But that cramped view of the law is not the

40

natural extension of Supreme Court and this Court's precedent regarding the scope of the border search exception.

As discussed above, this Court and the Supreme Court have recognized that persons at an international border have lower privacy interests and the government's "interest in preventing the entry of unwanted persons and effects is at its zenith." *Flores-Montano*, 541 U.S. at 152. While the Supreme Court in *Riley* recognized that people have a heightened privacy interest in the content of their cellphones due to the quantity of personal information that they sometimes possess, 573 U.S. at 386,

> *Riley* does not command a warrant requirement for border searches of electronic devices nor does the logic behind *Riley* compel us to impose one. . . . Nor does *Riley* by its own terms apply to border searches, which are entirely separate from the search incident to arrest searches discussed in *Riley*. . . . Further, given the volume of travelers passing through our nation's borders, warrantless electronic device searches are essential to the border search exception's purpose of ensuring that the executive branch can adequately protect the border.

*Alasaad*, 988 F.3d at 17; *Touset*, 890 F.3d at 1235 ("Nothing in *Riley* undermines this interest [in preventing unwanted persons and effects

41

from entering the country].”); *Mendez*, 103 F.4th at 1308 (“What is unreasonable after arrest may be perfectly reasonable at customs, as *Riley* itself anticipated.”).   In light of the government’s strong interest in protecting the border, detecting contraband, preventing crime, economic espionage, and terrorism, and otherwise protecting national security at the border, *Riley* does not compel a conclusion that a warrant or even heightened suspicion is required.   Here, Kamaldoss’s devices were forensically reviewed pursuant to agency policies that require border agents to have reasonable suspicion such that this Court need only address whether, assuming the reasonable suspicion standard applies, the district court erroneously found the relevant standard was met.

Despite Kamaldoss’s arguments to the contrary, the government’s interest reflected in the border search exception is not limited to detecting contraband.  As this Court has already found, border agents may rely on information from other law enforcement officers to provide reasonable suspicion to search for evidence of a crime.  *See Levy*, 803 F.3d at 124.  The *Levy* Court also declined to limit border agents from searching for only those crimes that CBP is authorized to investigate.  *Id*. “Searching for evidence is vital to achieving the border search exception’s

42

purposes of controlling who and what may enter the country." *Alasaad*, 988 F.3d at 20.

The Ninth Circuit's holding in *Cano* is thus inconsistent with this Court's analysis and is not supported by the weight of relevant precedent or the principles underlying the border search exception, which are grounded in "the longstanding right of the sovereign" to "prevent[] the entry of unwanted persons and effects," *Flores-Montano*, 541 U.S. at 152, and "to prevent the introduction of contraband into this country," *Montoya de Hernandez*, 473 U.S. at 537. *Cano*'s rationale "fails to appreciate the full range of justifications for the border search exception beyond the prevention of contraband itself entering the country." *Alasaad*, 988 F.3d at 21 (rejecting *Cano*, 934 F.3d 1002, explaining that Supreme Court precedent clarifies that the border search exception's purpose is not limited to interdicting contraband); *see also Aigbekaen*, 943 F.3d at 721 (purposes of the border search exception include "disrupting efforts to export or import contraband"); *Touset*, 890 F.3d at 1233; *United States v. Molina-Gomez*, 781 F.3d 13, 20 (1st Cir. 2015) (text messages found on the defendant's phone contributed to reasonable suspicion he was smuggling drugs); *Gurr*, 471 F.3d at 149 (border search doctrine

43

permits searches of non-contraband evidence of border-related offenses); *see also United States v. Cano*, 973 F.3d 966, 967 (9th Cir. 2020) (Bennett, J., dissenting from denial of rehearing en banc).

Indeed, *Cano*'s definition of "digital contraband," 934 F.3d at 1014, should be rejected as untenable given its practical limitations. *Cano* distinguishes between "digital contraband," the "best example [of which] is child pornography," and "searches for evidence of a crime" which would exceed, in its view, the proper scope of a border search. *Id*. at 1014, 1016. Under this reasoning, the government is hard pressed to discern what, *other* than child pornography, would satisfy Cano's definition of "digital contraband." This exceptionally narrow standard starkly contrasts to the border search exception's historic purposes, which include protection of this country from crimes, including crimes like Kamaldoss's prolific opioid trafficking.

Similarly unavailing is Kamaldoss's suggestion that evidence should be suppressed because Connor reviewed the forensic images obtained from his devices after the devices were returned to him. Kamaldoss does not dispute that the detention of electronic devices or forensic copies of data stored on electronic devices occurred at the border,

44

upon entry to the United States, pursuant to a border search. The subsequent review of those detained devices or copies, in continuation of the border search, is inherent in any forensic search—and as noted above, forensic searches have been ruled permissible at least at some level of individualized suspicion by nearly every court to have addressed the issue, and the Eleventh Circuit requires no suspicion. Indeed, the First Circuit has expressly rejected constitutional challenges to internal CBP and Immigration and Customs Enforcement ("ICE") policies that permit detention of devices for extendable periods of time (30 days under ICE policy, five days under CBP policy, both extendable with supervisory approval) for thorough review pursuant to border searches. *Alasaad*, 988 F.3d at 21.

The essence of a border search is that it is a search upon entry to the United States; law enforcement agents' review of forensic copies of data detained upon entry to the United States is such a search. Such forensic review is a continuation of the search initiated at the moment of detention. And, in any event, the district court was correct that even if one assumes *arguendo* that Connor's review was unlawful, he thereafter obtained a search warrant that was supported by probable cause

45

independent of the border search. Suppression would therefore be improper pursuant to the independent source doctrine. (SPA:31-32). *See generally United States v. Mulholland*, 702 F. App'x 7, 10 (2d Cir. 2017) (quoting *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993)).

    C.    The Searches of Kamaldoss's Devices
           Were Supported by Reasonable Suspicion

Kamaldoss does not appear to contest that at the time of the border searches, law enforcement agents had reasonable suspicion that he was committing border-related crimes; rather, he argues that reasonable suspicion could only justify searches for contraband, not searches for evidence—an argument that should be rejected for the reasons discussed above. Assuming, as some other courts have held, that reasonable suspicion is necessary to justify a forensic search, that standard is easily met here.

The Supreme Court has defined reasonable suspicion as "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The standard is met when law enforcement agents can point to "specific and articulable facts" that lead to the inference that criminal

46

activity "may be afoot." *Terry*, 392 U.S. at 21, 30. In the border-search context, this Court has instructed that "the issue is simply whether the border official has a reasonable basis on which to conduct the search," and that "what is reasonable will depend on all the facts of a particular case." *United States v. Asbury*, 586 F.2d 973, 976 (2d Cir. 1978). "Reasonable suspicion is a relatively low standard and border officials are afforded deference due to their training and experience." *Abidor v. Napolitano*, 990 F. Supp. 2d 260, 282 (E.D.N.Y. 2013) (citing *Montoya de Hernandez*, 473 U.S. at 542).

Here, law enforcement agents clearly had reasonable suspicion that Kamaldoss was engaged in an international drug trafficking conspiracy. As described in the background section above, the underlying investigation began in early 2018, involved undercover purchases of controlled substances sent through the mail, and by approximately July 2018 involved physical surveillance and interviews of confidential informants who said that Kamaldoss (together with others) was importing millions of pills of foreign unapproved medications from India through a facility at JFK and mailing them to people throughout the United States. This far exceeds the standard of a

47

reasonable basis to suspect that Kamaldoss possessed contraband or evidence of contraband when he entered the United States from India, and it was information that law enforcement agents possessed prior to the contested border search in April 2019—which is sufficient to justify a forensic search of electronic devices as part of a border search. *See, e.g.*, *Alasaad*, 988 F.3d at 21 (holding that "advanced border searches of electronic devices may be used to search for . . . evidence of contraband, or for evidence of activity in violation of the laws enforced or administered by CBP or ICE"); *United States v. Kolsuz*, 890 F.3d 133, 143 (9th Cir. 2018) ("[t]he justification behind the border search exception is broad enough to accommodate . . . the prevention and disruption of ongoing efforts to export contraband illegally"); *Aigbekaen*, 943 F.3d at 721 (purposes of the border search exception include "disrupting efforts to export or import contraband").

Accordingly, even assuming that reasonable suspicion is necessary for forensic searches of electronic devices upon entry to the United States, it was clearly present here, and for that reason, too, the district court was correct not to suppress the evidence.

48

D.   The Good-Faith Doctrine Applies

There is no serious question regarding the application of the good-faith doctrine to the border search of Kamaldoss's electronic devices under controlling precedent at the time, rendering the exclusion of evidence improper here.  As the district court found, the agents had reasonable suspicion that evidence of a crime was on Kamaldoss's electronic devices.  (GA:26).  Even if this Court now were to decide under the most restrictive standard that reasonable suspicion that devices contained contraband was required, "[b]ased on the governing law in this [C]ircuit, then, the border agents who searched Mr. Kamaldoss's devices had no reason to think that they could do so only if they had reasonable suspicion that the devices contained digital contraband."  (GA:28); *accord Kolsuz*, 890 F.3d at 148; *United States v. Odofin*, 929 F.2d 56, 58 (2d Cir. 1991).

Kamaldoss feebly attempts to discredit the district court's reliance upon the good-faith doctrine by claiming that there was not specific precedent governing how to address the border search of an electronic device at the time of the search.  (Br. 37-42).  This is of no moment.  As the district court properly explained, the "fruits of a search

49

conducted in reasonable reliance on binding appellate precedent are not subject to the exclusionary rule, as that rule is designed to deter future Fourth Amendment violations."  (GA:26-27 (citing *Aigbekaen*, 943 F.3d at 725 (quoting *Davis v. United States*, 564 U.S. 229, 249-50 (2011) ("[W]hen the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply.")))); *United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013) ("binding [appellate] precedent refers to the precedent of this Circuit and the Supreme Court" existing at the time of the search); *see also United States v. Archambault*, 740 F. App'x 195, 203 (2d Cir. 2018).

While at the time of the search, "there was neither Supreme Court nor Second Circuit precedent limiting warrantless forensic searches to digital contraband," "caselaw existed from both courts making clear that, in the context of border searches in general, at most reasonable suspicion was required for some more intrusive searches." (GA:28).  Thus, because the agents had reasonable suspicion that evidence of Kamaldoss's international drug trafficking was on his electronic devices and relied in good faith on existing precedent, suppression of the evidence was unwarranted.  *See, e.g.*, *United States v.*

50

*Skaggs*, 25 F.4th 494, 499-500 (7th Cir. 2022); *United States v. Aguilar*, 973 F.3d 445, 449-50 (5th Cir. 2020).

IV.   The First Amendment Does Not Compel the Suppression
      of Evidence Obtained from Kamaldoss's Electronic Devices

Kamaldoss has not raised a First Amendment argument and the district court therefore did not address it below, but *amici curiae* now argue that so much information (including associational and expressive information) is contained in electronic devices that border searches of those devices chill protected speech and impermissibly burden the First Amendment.  This argument, too, fails.

*Amici*'s argument cites the large number of border searches and simply posits, in conclusory terms, that such searches chill speech and burden the First Amendment.  But *amici* fail to acknowledge, and their argument therefore fails to grapple with, the narrowness of the applicability of the border search doctrine—that is, that it applies only to objects that are voluntarily brought to the border when seeking entrance to the United States.  Accordingly, such searches would chill, at most, the carrying of electronic devices with sensitive information over an international border, but they would not chill speech to any perceptible

51

degree.  On the record of this case—in which the district court found following an evidentiary hearing that Kamaldoss was asked for his passwords and voluntarily gave them to law enforcement agents— Kamaldoss could have avoided the search of his devices by declining to bring them across the border or even by declining to provide his passwords when asked.    Neither path would burden his First Amendment interests.

The First Circuit in *Alasaad* squarely rejected a facial First Amendment challenge to the CBP policies that permit border searches of electronic devices on the basis that the content-neutral policies "have a plainly legitimate sweep and serve the government's paramount interests in protecting the border."  988 F.3d at 22; *see also United States v. Arnold*, 533 F.3d 1003, 1008-10 (9th Cir. 2008) ("case law does not support a finding that a search which occurs in an otherwise ordinary manner, is 'particularly offensive' simply due to the storage capacity of the object being searched;" upholding border search without reasonable suspicion of passenger's laptop computer); *United States v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005) (rejecting argument advocating for First Amendment carve out to the border search doctrine; "Particularly in

52

today's world, national security interests may require uncovering terrorist communications, which are inherently 'expressive.' Following Ickes's logic would create a sanctuary at the border for all expressive material—even for terrorist plans. This would undermine the compelling reasons that lie at the very heart of the border search doctrine."); *Anibowei v. Mayorkas*, No. 3:16-CV-3495-D, 2024 WL 4887525, at * 7 (N.D. Tex. Nov. 22, 2024) ("warrantless border search of an electronic device without probable cause does not violate the First Amendment merely because the device may contain expressive or associational context"); *cf. New York v. P.J. Video, Inc.*, 475 U.S. 868, 874 (1986) (refusing to require a higher standard of probable cause for warrant applications involving expressive material); *Tabbaa*, 509 F.3d at 101 ("Mere incidental burdens on the right to associate do not violate the First Amendment."). The *Alasaad* decision is correct, and *amici*'s First Amendment argument fares no better than Kamaldoss's arguments as a justification for suppression.

## V.   Any Error Was Harmless

For all of the reasons discussed above, there was no error in the district court's denial of Kamaldoss's suppression motion and its

53

admission at trial of evidence obtained from the challenged border search. But even assuming *arguendo* that the district court erred, the judgment should be affirmed because such error would have been harmless beyond a reasonable doubt. *See United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015) (per curiam) ("We review the erroneous admission of evidence obtained in violation of a defendant's constitutional right for harmless error, affirming the judgment if we conclude beyond a reasonable doubt that a rational jury would have rendered a verdict of guilty absent the alleged error."); *Aguiar*, 737 F.3d at 263 (harmlessness standard satisfied where "the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury"); *United States v. Dhinsa*, 243 F.3d 635, 650 (2d Cir. 2001) ("The strength of the government's case against the defendant is probably the most critical factor in determining whether an error affected the verdict.").

The government presented to the jury overwhelming evidence—separate and apart from the communications obtained from Kamaldoss's electronic devices—that proved Kamaldoss committed the crimes charged. The trial evidence included, inter alia, the testimony of

54

a confidential informant whom Kamaldoss had employed in his warehouse to package pills into mailing envelopes, and who identified Kamaldoss in the courtroom (GA:46, 48, 52); photographs that the informant had surreptitiously taken of operations inside the warehouse, including photographs of drugs and photographs of emails sent from Kamaldoss's email address with drug orders and mailing labels for packages (GA:53-57); and audio recordings the informant surreptitiously made of himself and Kamaldoss discussing, inter alia, the late receipt of drug orders and packing of illegal pills (GA:58-62, 66). This evidence was further corroborated by years' worth of similar emails of drug orders and mailing labels in Kamaldoss's email account obtained pursuant to search warrant directly from a third-party email provider. In addition, a co-conspirator who operated an import business that smuggled drugs through JFK for Kamaldoss testified as a cooperating witness. He identified Kamaldoss in the courtroom and testified about Kamaldoss's role in the conspiracy, including the financial aspects of the scheme and its online nature. (GA:79, 81-123). Moreover, a law enforcement witness testified that he observed Kamaldoss personally deliver packages to the

55

United States Post Office, which packages were seized and found to contain drugs. (GA:67-71).

The evidence from Kamaldoss's electronic devices primarily revealed Kamaldoss's communications about his criminal enterprise over WhatsApp. These communications, although compelling because they were in his own voice and obtained from his phone, were largely duplicative of evidence obtained from email search warrants and adduced through the testimony of the confidential informant, cooperating witness, and law enforcement agent. Thus, it is clear beyond a reasonable doubt that the jury would have convicted Kamaldoss even without evidence obtained from his electronic devices, and that any error in denying his suppression motion and admitting the evidence was harmless.

\*     \*     \*

For all the reasons above, the district court was right to reject Kamaldoss's motion to suppress evidence obtained from his electronic devices, and, even if the court erred, any error was harmless. The judgment should accordingly be affirmed.

56

## POINT TWO

### THE DISTRICT COURT DID NOT ERR BY APPLYING THE GUIDELINES ADJUSTMENT FOR MASS MARKETING BY INTERACTIVE COMPUTER SERVICE

Kamaldoss argues that the district court erred by applying a two-level increase to his Guidelines offense level for the use of online mass-marketing in his drug distribution offense. Kamaldoss is wrong, and the evidentiary record established at trial provided ample basis for the district court's ruling.

### I.  Standard of Review

In evaluating whether a sentence is procedurally unreasonable, the Court must examine "the procedure employed in arriving at the sentence." *United States v. Ghailani*, 733 F.3d 29, 54 (2d Cir. 2013). "A district court errs *procedurally* when it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the [18 U.S.C.] § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails to adequately explain the chosen sentence." *Id.*; *see also United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc).

57

Although the district court's application of the Guidelines is reviewed de novo on appeal, the factual determinations that underpin its Guidelines calculation are reviewed for clear error. *See United States v. Watkins*, 667 F.3d 254, 261 (2d Cir. 2012). This Court will find clear error "only where the record as a whole leaves [it] with the definite and firm conviction that a mistake has been committed." *United States v. Esteras*, 102 F.4th 98, 104 (2d Cir. 2024).

II.   Applicable Law

The Sentencing Guidelines provide for a two-level increase in the offense level for a defendant convicted of a controlled substance offense when "the defendant, or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct), distributed a controlled substance through mass-marketing by means of an interactive computer service." U.S.S.G. § 2D1.1(b)(7). The Guidelines define "mass-marketing by means of an interactive computer service" to mean "the solicitation, by means of an interactive computer service, of a large number of persons to induce those persons to purchase a controlled substance," such as, for example, "operat[ing] a web site to promote the sale of [a controlled substance]." U.S.S.G. § 2D1.1, comment. (n.13). "Interactive computer

58

service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet." 47 U.S.C. § 230(f)(2); U.S.S.G § 2D1.1, comment. (n.13).

The standard for finding facts relevant to a Guidelines calculation is preponderance of the evidence. *United States v. Salazar*, 489 F.3d 555, 557-58 (2d Cir. 2007) (per curiam). Accordingly, applying the two-level increase to the Guidelines offense level pursuant to U.S.S.G. §2D1.1(b)(7) required the district court to determine that the defendant, or a person for whose conduct the defendant is accountable, more likely than not distributed a controlled substance through mass-marketing by means of an interactive computer service.

III.   The District Court Properly Applied U.S.S.G. § 2D1.1(b)(7)

The district court properly applied the two-point increase pursuant to U.S.S.G. § 2D1.1(b)(7) because the trial evidence overwhelmingly demonstrated that Kamaldoss engaged in a joint criminal venture that distributed narcotics through mass-marketing by

59

means of an interactive computing service.  Kamaldoss fails to establish clear error.

In analyzing the applicability of the enhancement at sentencing, the district court properly noted that "the enhancement does not require the defendant personally use a computer to mass[-]market a controlled substance," and thus rested its determination on the activity of persons "for whose conduct [the] defendant is accountable under the relevant conduct guideline."  (A:891).  There is no dispute that under U.S.S.G. § 1B1.3, in the case of a jointly undertaken criminal activity, "a defendant is accountable for all aspects of others that were within the scope of the jointly[ ]undertaken criminal activity, in furtherance of that activity, and reasonably foreseeable in connection with that criminal activity" (A:892), nor is there any dispute that the district court engaged in a three-step analysis under the relevant conduct guideline in reaching its determination (A:892-96; Br. 46).

Indeed, Kamaldoss concedes that the court's analysis that the enhancement applies here "would hold if there were evidence that in fact established that Mr. Kamaldoss's co-conspirators had engaged in mass

60

marketing via an interactive computer service," but he submits that the "record is silent on this point." (Br. 47). This is false.

As proved at trial, Kamaldoss's criminal conspiracy sold enormous volumes of illegal pills—numbering in the millions—that Kamaldoss imported from India and distributed daily throughout the United States by mail. (GA:82). The scope of this operation alone, without more, would strongly suggest that Kamaldoss's pill mill was an online enterprise. But there is more: as Kamaldoss said himself in a message to a co-conspirator, "[t]his is online business." (GA:78). Specifically, orders for pills were placed online. As described by a co-conspirator who testified at trial pursuant to a cooperation agreement with the government, "the orders were placed online. . . . [O]rders were received in Mumbai or some part of India and they were then sent here to [the] U.S." (GA:88). The consolidated orders were sent to Kamaldoss (*id*.), and Kamaldoss then communicated those orders to his co-conspirators for packaging and distribution.

The district court was thus able to rely at sentencing on evidence adduced at trial, including Kamaldoss's own admission that the nature of his drug-trafficking enterprise was an "online business"

61

(GA:78), witness testimony given by Kamaldoss's co-conspirator, which explained that customers placed orders online that were received internationally and communicated to United States-based distributors to be fulfilled and shipped (GA:88), and enormous quantities of mailing labels and drug ledgers showing daily shipments throughout the United States. (*E.g.*, GA:124-32). This was plainly sufficient to establish by a preponderance of the evidence that Kamaldoss's co-conspirators, with his knowledge, used the internet to mass-market the drugs he distributed.

The government agrees that mere use by co-conspirators of an online platform to communicate with each other would not suffice to apply the enhancement, *see* U.S.S.G. § 2D1.1, comment. (n.13) (enhancement does not apply to co-conspirators who use an interactive computer service only to communicate with one another in furtherance of the offense), but Kamaldoss's description of his criminal enterprise as an "online business" was not a directive to his accomplices to continue to use encrypted applications to communicate. Rather, it was a plain acknowledgment of the nature of his criminal enterprise—soliciting and receiving online drug orders in India, aggregating them, and sending them to the United States for fulfillment by mail throughout the United

62

States.  (GA:88) ("Q: [H]ow did customers place orders for [T]ramadol? A: Ma'am, the orders were placed online, do no[t] know exactly how online, but they were placed online and orders were received in Mumbai or some part of India and they were then sent here to U.S.").

The clear result of the "online" nature of Kamaldoss's business was its extraordinary geographic reach.  Just a selection of five packages of drugs that he placed into the mail on one day—which were seized from the mail and offered as trial exhibits, underlying the attempted distribution Counts Two through Six—were addressed to people in Texas, Alaska, Minnesota, Florida, and Georgia. (GA:73-76).  Kamaldoss contends that the district court "drew an unsubstantiated leap" to conclude that the drugs were marketed online, but the court correctly recognized that "the enormous quantity and geographic reach of the drugs [the] defendant distributed were explicable only if customers ordered drugs online."  (Br. 47; A:896).

63

## CONCLUSION

For the reasons stated above, the judgment should be affirmed in all respects.

Dated:      Brooklyn, New York
            January 24, 2025

Respectfully submitted,

JOHN J. DURHAM,
*United States Attorney*,
*Eastern District of New York.*

By:   /s/ ROBERT M. POLLACK
      ROBERT M. POLLACK
      Assistant U.S. Attorney

AMY BUSA,
ROBERT M. POLLACK,
MARGARET SCHIERBERL
*Assistant United States Attorneys*,
      (*Of Counsel*).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 11,606 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
        January 24, 2025

                    /s/ AMY BUSA
                    AMY BUSA
                    Assistant U.S. Attorney

APPENDIX

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Opinion and Order,
   *United States v. Kamaldoss*, No. 19-CR-543 (ARR)
   April 22, 2022 .................................................................................GA1

Trial Transcripts,
   *United States v. Kamaldoss*, No. 19-CR-543 (ARR)

    June 21, 2022 ...........................................................................GA45

    June 22, 2022 ...........................................................................GA77

Trial Exhibits,
   *United States v. Kamaldoss*, No. 19-CR-543 (ARR)

    GX1722 ...................................................................................GA124

    GX1726 ...................................................................................GA126

    GX1822 ...................................................................................GA127

    GX1824 ...................................................................................GA130

    GX1826 ...................................................................................GA131

    GX1828 ...................................................................................GA132

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                                                                    :
UNITED STATES OF AMERICA,                                           :        19-CR-543 (ARR)
                                                                    :
            -against-                                               :
                                                                    :
EZHIL SEZHIAN KAMALDOSS,                                            :        **OPINION & ORDER**
        also known as "Kamaldoss Sezhian,"                          :
        "Kamal Doss" and "Ezhil Cezhian,"                           :
                                                                    :
and                                                                 :
                                                                    :
VELAUDAPILLAI NAVARATNARAJAH,                                       :
        also known as "Rajah,"                                      :
                                                                    :
            Defendants.                                             :
                                                                    :
------------------------------------------------------------------- X

ROSS, United States District Judge:

## Table of Contents

BACKGROUND ................................................................................................................ 1

DISCUSSION ................................................................................................................... 6

  I.    The June 7, 2018, Border Search. ....................................................................... 6

  II.   The April 23, 2019, Border Search. ..................................................................... 9

        A.    Because Mr. Kamaldoss was not in custody on April 23, 2019, Mr. Kamaldoss's Fifth
              Amendment rights were not violated. .................................................................. 11

        B.    The April 23, 2019, border search did not violate Mr. Kamaldoss's Fourth
              Amendment rights............................................................................................ 17

              1.   Searches of electronic devices at the border............................................ 18

              2.   The May 2, 2019, and May 11, 2019, searches of forensic copies of Mr. Kamaldoss's
                   electronic devices................................................................................... 27

  III.  Materials Searched Pursuant to a Warrant. ....................................................... 31

        A.    The August 29, 2018, and January 8, 2019, intercepted packages............................ 31

        B.    The June 14, 2019, and June 24, 2019, searches of forensic copies of Mr.
              Kamaldoss's electronic devices. ......................................................................... 36

        C.    Mr. Kamaldoss's Apple and Yahoo email accounts................................................ 39

  IV.   Dismissal of the Underlying and Superseding Indictments Is Improper. ...................... 41

GA002

On April 9, 2021, a grand jury sitting in the Eastern District of New York returned an indictment charging defendants, Ezhil Sezhian Kamaldoss and Veludapillai Navaratnarajah, with conspiracy to distribute and possess with intent to distribute several Schedule IV controlled substances (Tramadol, Alprazolam, and Carisoprodol) in violation of 21 U.S.C. §§ 846 and 841(b)(2); attempted distribution and possession with intent to distribute one or more of these substances in violation of 21 U.S.C. § 841(b)(2); distribution and possession with intent to distribute the same substances in violation of 21 U.S.C. § 841(b)(2); and conspiracy to launder money in violation of 18 U.S.C. § 1956(h).[1] Superseding Indictment, ECF No. 119. These charges relate to an alleged transnational scheme, the investigation of which began in early 2018 and was carried out by several United States agencies, including the Food and Drug Administration ("FDA") and the Department of Homeland Security, Homeland Security Investigations ("HSI"). *See* Gov't's Mem. Law in Opp'n to Defs.' Mots. to Suppress Evid. 2 ("Gov't Opp'n"), ECF No. 166.

Defendants now move to suppress various pieces of evidence. *See generally* Def. Kamaldoss's Mem. of Law in Supp. of Pre-Trial Mots. ("Kamaldoss Mot."), ECF No. 159; Def. Navaratnarajah's Mem. of Law in Supp. of Pre-Trial Mots. ("Navaratnarajah Mot."), ECF No. 163. Mr. Kamaldoss also moves to dismiss his underlying and superseding indictments on the grounds that the FDA, which led the investigation, lacked statutory authority to pursue this matter. *See* Kamaldoss Mot. 36. For the reasons that follow, defendants' motions are denied in their entirety.

## BACKGROUND

In early 2018, the FDA and other agencies began investigating a transnational scheme

---

[1] Mr. Kamaldoss was first indicted for conspiracy to distribute and possess with intent to distribute Tramadol on November 15, 2019. Indictment, ECF No. 83. This indictment was superseded by the April 9, 2021, indictment charging both Mr. Kamaldoss and Mr. Navaratnarajah with this and other counts. *See* Superseding Indictment, ECF No. 119.

1

involving shipments of misbranded prescription drugs from distributors abroad to individuals and entities in the United States. Gov't Opp'n 2. Once in the United States, the products—including Tramadol and Alprazolam, a Schedule IV synthetic opioid and a Schedule IV benzodiazepine, respectively—were repackaged by the recipient individuals and entities and mailed to domestic customers. *Id.*

On or about March 21, 2018, Special Agent Patrick Connor, an undercover agent with the FDA, received an unsolicited text message from an individual who later identified himself as "James Wills." Kamaldoss Mot. 2; Gov't Opp'n 2. Mr. Wills said he was from an online pharmacy and offered to sell Agent Connor medications, including 100 milligram pills of Tramadol. Kamaldoss Mot. 2−3; Gov't Opp'n 2−3. Over the course of their text exchanges, Agent Connor ascertained that Mr. Wills was willing to sell thousands of Tramadol pills in bulk shipment. Gov't Opp'n 3. Between March and July 2018, Agent Connor and other law enforcement agents conducted a series of controlled buys from Mr. Wills. *Id.*; Kamaldoss Mot. 3. For example, on or around March 21, 2018, Mr. Wills agreed to sell undercover agents pills of Tramadol and Alprazolam, of which the agents took custody on or about April 16, 2018. Compl. ¶¶ 6−9, ECF No. 2; Gov't Opp'n 3 (noting that Xanax is a brand name of Alprazolam).

In the course of investigating the origin of these drugs, law enforcement agents interviewed two confidential informants in or about July 2018; these informants relayed that Mr. Kamaldoss and Mr. Navaratnarajah owned a company, Hosea Express, that was importing millions of unapproved medications from India through a facility at John F. Kennedy International Airport ("JFK Airport") and mailing the medications to individuals throughout the United States. Kamaldoss Mot. 4; Gov't Opp'n 3. The informants pointed agents to a warehouse in Queens, New York, which they alleged was Hosea Express's base of operations. Kamaldoss Mot. 4; Gov't Opp'n

GA004

3. Beginning in July 2018 and continuing through about August 2019, agents surveilled this warehouse, using methods including pole cameras. Gov't Opp'n 3; Navaratnarajah Mot. 3. During their surveillance, agents observed defendants and others on the warehouse's loading ramp. Gov't Opp'n 3. Agents also regularly observed individuals unloading boxes from trucks and loading packages into other vehicles; these packages were then driven to various locations, including a post office in Fresh Meadows, Queens. *Id.* After speaking with employees at the Fresh Meadows post office, agents learned that Mr. Kamaldoss went there almost daily, regularly mailed hundreds of United States Postal Service ("USPS") Priority Mail flat rate envelopes to addresses across the country, and always paid in cash. *Id.* at 3–4. The government later learned that Mr. Navaratnarajah routinely mailed a large number of packages at this post office as well. *Id.*; Navaratnarajah Mot. 3.

On August 29, 2018, Special Agent Connor and a postal inspector observed Mr. Kamaldoss mail eighty-eight packages at the Fresh Meadows post office. Kamaldoss Mot. 5. The postal inspector proceeded to detain five of the packages, which bore the same sender name and return address as those listed on the packages Agent Connor purchased from Mr. Wills: "Andrew Fistel, 124-10 Metropolitan Aenue [*sic*] suite #3." *Id.* Pursuant to a warrant obtained the following day, the packages were searched and revealed to contain Tramadol and Alprazolam. *Id.*; Gov't Opp'n 4.

On January 8, 2019, after observing Mr. Navaratnarajah mail several USPS Priority Mail flat rate envelopes at the Fresh Meadows post office, agents coordinated with postal inspectors to detain four of the mailed packages. Navaratnarajah Mot. 5; Gov't Opp'n 4. The packages—which also bore the name and return address of Andrew Fistel, *see* Gov't Opp'n 34—were brought to the United States Postal Inspection Service in Brooklyn, where they remained until January 23, 2019, when agents obtained a warrant to search them. Navaratnarajah Mot. 5. The packages were also found to contain Tramadol. Gov't Opp'n 4.

3

GA005

During the course of this investigation, Mr. Kamaldoss, a resident and native of India, traveled to the United States on several occasions. Kamaldoss Mot. 6. Mr. Kamaldoss always entered the United States by way of JFK Airport—once on June 7, 2018, again on April 23, 2019, and finally on August 15, 2019. *See id.* 3–4, 6–9, 11–14; Gov't Opp'n 4, 5–7. According to Mr. Kamaldoss, during each of his entries, he was brought by border agents to a secondary inspection area where he was detained and subjected to a search of his electronic devices, Kamaldoss Mot. 3–4, 6–9, 11–14; according to the government, neither Mr. Kamaldoss nor his electronic devices were searched during Mr. Kamaldoss's June 7, 2018, entry into the United States, Gov't Opp'n 5–7.

Of relevance to Mr. Kamaldoss's motions, following the April 23, 2019, border search and based in part on electronic evidence viewed during that search, the government obtained a series of search warrants: one to re-search a copy of the electronic material taken from Mr. Kamaldoss's devices during the April 23 search; one to search materials related to his Apple iCloud account; and two to search email communications associated with Mr. Kamaldoss's two Yahoo email addresses. Kamaldoss Mot. 8–11.

Mr. Kamaldoss was arrested on September 12, 2019. *Id.* at 14. Mr. Navaratnarajah was arrested on February 1, 2020. Navaratnarajah Mot. 5. On April 9, 2021, a grand jury in this district returned a superseding indictment charging both defendants with various counts related to conspiracy and attempt to distribute controlled substances and conspiracy to launder money. Kamaldoss Mot. 14; Navaratnarajah Mot. 5.

*Procedural History*

On February 14, 2022, and February 27, 2022, Mr. Kamaldoss and Mr. Navartnarajah each moved to suppress evidence in this case and for various other forms of relief. Specifically, Mr. Kamaldoss seeks to suppress the contents of the packages that were seized by agents on August

4

GA006

29, 2018; evidence obtained from his electronic devices during the June 7, 2018, and April 23, 2019, border searches and the fruits thereof;[2] and materials and communications searched in connection with his Apple iCloud account and Yahoo email addresses. *See* Kamaldoss Mot. Mr. Kamaldoss also seeks to dismiss his underlying and superseding indictments. *See id.* at 36. Mr. Navaratnarajah moves to suppress the contents of the packages seized by agents on January 8, 2019, and, pursuant to Federal Rule of Criminal Procedure 12, joins Mr. Kamaldoss's motions to the extent that they apply to him. *See* Navaratnarajah Mot. On March 16, 2022, the government filed its opposition to Mr. Kamaldoss's and Mr. Navaratnarajah's pre-trial motions, *see* Gov't Opp'n, to which both defendants replied on March 30, 2022, *see* Def. Kamaldoss's Reply Mot. ("Kamaldoss Reply"), ECF No. 167; Def. Navaratnarajah's Reply Mot. ("Navaratnarajah Reply"), ECF No. 168.

On April 12, 2022, I held a limited evidentiary hearing on two discrete issues relevant to the motions before me: first, whether a June 7, 2018, border search occurred; and second, whether Mr. Kamaldoss was in custody during the April 23, 2019, border search. Mr. Kamaldoss took the stand and testified as to both matters. In support of its arguments, the government proffered three witnesses: United States Customs and Border Protection ("CBP") Officer Robert Pierce III, who was working in primary inspection at JFK Airport and stamped Mr. Kamaldoss's passport on June 7, 2018; HSI Special Agent Chatchai Chunton, who Mr. Kamaldoss alleges was involved in the

---

[2] Mr. Kamaldoss additionally requests suppression of evidence obtained during the August 15, 2019, border search. *See* Kamaldoss Mot. 14−30. I need not address this search, however, as the government does not intend to introduce at trial any evidence obtained therefrom. Moreover, the evidence that Mr. Kamaldoss seeks to suppress—such as the contents of his intercepted packages and communications associated with his Apple iCloud and email accounts—did not come from information the government learned during the August 15, 2019, search. Accordingly, I evaluate only the June 7, 2018, and April 23, 2019, border searches in resolving Mr. Kamaldoss's motions.

5

GA007

June 2018 and April 2019 border searches; and CBP Officer Roy Clark, who was assigned to secondary inspection on April 23, 2019, and was involved in seizing Mr. Kamaldoss's electronic devices on that day and inquiring about their passcodes. In addition, the government made Egbert Simon, a supervisory CBP officer, available to defense counsel for cross-examination. Although Officer Simon did not testify on direct examination, I give his affidavit, filed by the government on March 16, 2022, *see* Gov't Opp'n, Ex. A ("Simon Decl."), ECF No. 166-1, the same weight as direct testimony because he was subject to cross-examination. *Cf. United States v. Robles*, 253 F. Supp. 2d 544, 549 n.14 (S.D.N.Y. 2002) ("[C]ourts give greater weight to witness testimony, which was subject to cross examination, than to sworn affidavits." (internal quotation marks, citation, and modifications omitted)).

## DISCUSSION

### I.  The June 7, 2018, Border Search.

On June 7, 2018, Mr. Kamaldoss traveled from India to the United States, arriving at JFK Airport. Kamaldoss Mot. 3−4; Gov't Opp'n 6. Concerningly, while the government contends that its records from that day show only that Mr. Kamaldoss was "uneventfully processed," *see* Gov't Opp'n 6, Mr. Kamaldoss submits that upon arriving at the airport, he was detained and escorted by government agents to a secondary inspection area, where his devices were seized, unlocked, and reviewed by agents for one to two hours, Kamaldoss Mot. 3–4. Based on the cumulative evidence in the record—including the testimony of Mr. Kamaldoss, CBP Officer Pierce, and Special Agent Chunton—I conclude that Mr. Kamaldoss was not subjected to a secondary search on this date.

At the April 12 evidentiary hearing, Mr. Kamaldoss took the stand and testified that on

6

GA008

June 7, 2018, he was taken by an officer at JFK Airport to a secondary inspection room,[3] where he was "told" by two officers to hand over his electronic devices (at the time, Mr. Kamaldoss was carrying two phones and one laptop), as well as all papers and objects in his pockets. Apr. 12 Tr. 19:21−24:15; 28:4−23; 29:19−25 ("Tr."). Mr. Kamaldoss was then asked for and gave the passwords to his devices. *Id.* at 34:3−11. Once handed over, his devices were taken elsewhere, as was Mr. Kamaldoss's luggage. *Id.* at 30:24−31:20. Thereafter, the officers proceeded to question Mr. Kamaldoss for approximately thirty minutes without explaining why Mr. Kamaldoss was in secondary inspection. *Id.* at 32:9−22; 36:8−10. Eventually, Mr. Kamaldoss's belongings were returned to him, and he was allowed to formally enter the United States. *See id.* at 37:3−17; Kamaldoss Mot. 4. Mr. Kamaldoss alleges that, in total, he spent around two hours in secondary inspection. Tr. 32:23−33:4. During this time, he believes that the agents who took his devices unlocked them and reviewed the information therein. Kamaldoss Decl. ¶ 6. Mr. Kamaldoss recalled only that the officers involved in this encounter were wearing uniforms; he was unable to recall what either of them looked like. Tr. 30:4−7.

Following Mr. Kamaldoss's testimony, CBP Officer Pierce and Special Agent Chunton credibly testified that no secondary inspection occurred on June 7. On that day, Officer Pierce— employed by CBP since 2015, *id.* at 127:16−19—was working in primary inspection, through which all travelers are required to pass upon disembarking from their planes, *id.* at 128:1−19; 135:17−18. Mr. Kamaldoss was among the more than 100 passengers whom Officer Pierce processed that day. *Id.* at 136:1−9. According to CBP's TECS System's Person Encounter List ("TECS List") and Officer Pierce's review of the same, Mr. Kamaldoss was not referred to

---

[3] Although Mr. Kamaldoss did not characterize this room as a "secondary inspection" area, I assume based on his testimony and his counsel's briefs on this motion that this is what he understood it to be. *See* Kamaldoss Mot. 3.

secondary inspection on that date. *See id.* at 136:21−139:24 (explaining that the "ref" column on the TECS List refers to the basis for referring someone from primary to secondary inspection and that the column is blank when someone was not referred); Kamaldoss Mot., Ex. B ("TECS Person Encounter List"), ECF No. 159-1 (showing a blank "ref" column for Mr. Kamaldoss on the date of June 7, 2018). The TECS List is critical evidence in this case: When a traveler is referred from primary to secondary inspection, the referral must be recorded in the TECS List because, *inter alia*, the referral explains to secondary inspection officers the reasons why a traveler is coming to secondary inspection. Tr. 132:8−133:16; 156:2−6. Indeed, officers who fail to record referrals in the TECS system may be subject to disciplinary action. *Id.* at 140:19−25. According to Officer Pierce, in his time working for CBP, he has never failed to record an individual whom he referred to secondary inspection. *Id.* at 133:17−19. In addition to recording referrals in the TECS List, border agents are required to complete an electronic media memorandum any time data is extracted from the electronic devices of a traveler who has been referred to secondary inspection. *Id.* at 133:23−134:17. Officer Pierce testified that, from his review of all records relating to June 7, 2018, no such memorandum exists for Mr. Kamaldoss. *Id.* at 139:23−140:4. Based on the TECS List and the lack of an electronic media memorandum, Officer Pierce stated that it was "highly unlikely" that Mr. Kamaldoss was subjected to a secondary search. *Id.* at 140:13−17.

This conclusion was echoed by Officer Simon, *see* Gov't Opp'n, Ex. A ¶ 8, ECF No. 166-1, as well as Agent Chunton, who was involved in the April 23, 2019, border search of Mr. Kamaldoss, *see* Tr. 167:19−25; 170:19−171:1. In fact, according to Agent Chunton, it wasn't until April 2019 that a "lookout," which alerts border agents to travelers who should be sent to secondary inspection for further processing, was first entered for Mr. Kamaldoss in the CBP system. *Id.* at 131:15−25; 167:4−18. And, critically, in light of his role as case agent in Mr.

Case 1:19-cr-00543-ARR    Document 182    Filed 04/22/22    Page 10 of 44 PageID #: 708

Kamaldoss's case, Agent Chunton was unaware of any evidence obtained from Mr. Kamaldoss prior to April 2019. *Id.* at 171:7−10.

While the testimony of Officers Simon and Pierce and Agent Chunton contradicts that of Mr. Kamaldoss, I find the government's witnesses credible and their testimony consistent with each other and with the documentary evidence in this case: the TECS List, which shows that Mr. Kamaldoss was not referred to secondary inspection, and the government's submission that no evidence exists of a June 7 secondary search, *see* Gov't Opp'n 5−7. Mr. Kamaldoss has failed to impugn this fulsome record.[4] In light of this and in the absence of any records corroborating the extraction of data from Mr. Kamaldoss's devices, I find that a secondary inspection did not occur on June 7, 2018, and do not factor such an inspection into my analysis of Mr. Kamaldoss's subsequent claims.

**II.    The April 23, 2019, Border Search.**

On April 23, 2019, Mr. Kamaldoss, his wife, and their two young sons arrived at JFK Airport from India. Kamaldoss Mot. 6. At approximately 4:30 p.m., as the family was proceeding through the airport, a CBP officer directed them to a secondary inspection area. *Id.* There, Special Agent Chunton questioned Mr. Kamaldoss about his plans for his visit to the United States, a previous trip to the country, and his current and past employment. *Id.* at 7. According to Mr. Kamaldoss, Agent Chunton directed Mr. Kamaldoss to open his luggage, which revealed a Dell

---

[4] Mr. Kamaldoss seems to ask that I infer that the absence of any record pertaining to a June 7 secondary border search of him is explained by human error in failing to record such a search. *See* Tr. 152:16−153:4. I decline to make this inference. No referral to secondary inspection was recorded for Mr. Kamaldoss on this date, unlike on April 23, 2019, and August 15, 2019, when his referrals were recorded, *see* TECS Person Encounter List. Moreover, no CBP or HIS agent had any recollection of a secondary inspection of Mr. Kamaldoss taking place on June 7, 2018. In the face of this abundant evidence, I find Mr. Kamaldoss's argument unpersuasive.

laptop (the "laptop"). *Id.* Eventually, Agent Chunton asked Mr. Kamaldoss for the passwords to his laptop and to his iPhone (the "iPhone" or the "cell phone"). *Id.* After Mr. Kamaldoss supplied his passwords, Agent Chunton turned the devices over to a waiting HSI Computer Forensic Agent. *Id.*

Once in possession of these devices, the HSI Computer Forensic Agent imaged[5] them and, using a forensic software program called Cellebrite,[6] extracted data from Mr. Kamaldoss's iPhone.[7] *Id.*; Kamaldoss Mot., Ex. H, ECF No. 159-1. At approximately 7 p.m., Mr. Kamaldoss's electronic devices were returned to him, and he and his family were permitted to leave the secondary inspection area. Kamaldoss Mot. 8.

Two days later, on April 25, 2019, Special Agent Chunton provided Special Agent Connor of the FDA with copies of the images of Mr. Kamaldoss's electronic devices and the data extracted from Mr. Kamaldoss's iPhone (collectively, the "forensic copies"). Kamaldoss Mot., Ex. G, at 4, ECF No. 159-1. According to Mr. Kamaldoss, Agent Connor searched the images and extracted information at least five times over the next few months: once on May 2, once on May 11, twice on June 14, and once on June 24. *See* Kamaldoss Mot. 8, 28. Though in May 24, 2019, Special Agent Connor applied for and obtained a warrant authorizing his search of the forensic copies, *see* Kamaldoss Mot., Exs. D ("Forensic Search Warrant Appl.") & K ("Forensic Search Warrant"),

---

[5] Imaging refers to the act of "creat[ing] a digital copy of the hard drive that is identical to the original in every relevant respect." Office of Legal Education, Executive Office for United States Attorneys, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 78, https://www.justice.gov/file/442111/download (last accessed Apr. 22, 2021).

[6] According to Mr. Kamaldoss, Cellebrite "enables the extraction and review of specific data sources from an iPhone, including text messages, emails, contacts, and call logs." Kamaldoss Mot. 7 n.6.

[7] Mr. Kamaldoss alleges that in addition to extracting data from his cell phone, the Computer Forensic Agent generated a report detailing the phone's contents. *Id.* at 7–8. Based on my review of the "Cellebrite Extraction Report," submitted by Mr. Kamaldoss as Exhibit H to his Suppression Motion, it appears that the report was in fact generated approximately one month after the extraction. *See* Kamaldoss Mot., Ex. H, ECF No. 159-1 (listing "report creation time" as May 27, 2020).

10

GA012

ECF No. 159-1, his two May searches were not conducted pursuant to a warrant. *See* Kamaldoss Mot. 27−28.

Mr. Kamaldoss moves to suppress evidence taken from his electronic devices during the April 23 border search and the fruits thereof, including the May and June searches. As to the border search, Mr. Kamaldoss argues his statements regarding the passwords to his laptop and iPhone were obtained in violation of his Fifth Amendment rights. *See* Kamaldoss Mot. 15–22. He also claims that the search of his electronic devices exceeded the permissible scope of a border search, violating his rights under the Fourth Amendment. *Id.* at 22–26. Based on these constitutional violations, he concludes that evidence obtained from his electronic devices should be suppressed as fruits of the poisonous tree. *Id.* at 20−26. As to the May searches, Mr. Kamaldoss argues that suppression is required because they were not conducted at the border and occurred more than nine days after the initial search of Mr. Kamaldoss's electronic devices, putting them outside the scope of the border search exception to the warrant requirement. *Id.* at 26. Finally, as to the June searches, Mr. Kamaldoss contends that suppression is required because the electronic devices were searched pursuant to the May 24, 2019, warrant, which was based on evidence tainted by the April 23 border search. *Id.* at 27−28**.** Because I find that the May 24, 2019, warrant did not rely upon tainted evidence, *see infra* Discussion III.B, I find this last argument unavailing**.** I address Mr. Kamaldoss's remaining arguments *seriatim.*

**A. Because Mr. Kamaldoss was not in custody on April 23, 2019, Mr. Kamaldoss's Fifth Amendment rights were not violated.**

Mr. Kamaldoss contends that evidence taken from his electronic devices during the April 23 border search should be suppressed because it was obtained in violation of his Fifth Amendment rights. Specifically, he argues that agents collected this evidence only because he disclosed the passcodes to his devices during an un-*Mirandized* custodial interrogation. *See* Kamaldoss Mot. 15−22. Because I

11

GA013

find that Mr. Kamaldoss was not in custody on April 23, suppression is unwarranted.

Pursuant to the Fifth Amendment, "[s]tatements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his or her rights." *United States v. Faux*, 828 F.3d 130, 134 (2d Cir. 2016) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). It is undisputed that Mr. Kamaldoss was not advised of his *Miranda* rights on April 23. *See* Kamaldoss Mot. 15; Gov't Opp'n 8. Whether he had to be, however, depends on whether he was interrogated and in custody on that day. *See Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). Because the government argues only that Mr. Kamaldoss was not in custody on April 23, *see* Gov't Opp'n 8−13, I focus my analysis on this factor.

"[C]ustody for *Miranda* purposes is not coterminous with . . . the colloquial understanding of custody." *United States v. FNU LNU*, 653 F.3d 144, 152–53 (2d Cir. 2011) (quotations omitted). Instead, "[t]he test for determining custody . . . asks (1) whether a reasonable person would have thought he was free to leave the police encounter at issue and (2) whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Faux*, 828 F.3d at 135 (internal quotations and citations omitted); *see also United States v. Belitz*, No. 21-CR-693 (JSR), 2022 WL 205585, at *2 (S.D.N.Y. Jan. 24, 2022) ("The 'free to leave' inquiry is a necessary, but not determinative first step, and the second question remains the ultimate inquiry: 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" (quoting *United States v. Newton*, 369 F.3d 659, 670−71 (2d Cir. 2004))). This inquiry is an objective one: "An individual's subjective belief about his or her status generally does not bear on the custody analysis." *Faux*, 828 F.3d at 135. Factors to be considered include "whether a suspect is or is not told that []he is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect

12

is searched, frisked, or patted down; and the length of the interrogation." *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (citations omitted). At the border—"in which compulsory questioning . . . inheres in the situation and [] in which the traveler has voluntarily submitted to some degree of confinement and restraint," *FNU LNU*, 633 F.3d at 153—the nature of the questions asked is also relevant: a *Miranda* advisal *might* be required where the questions fall outside the scope of what a reasonable traveler would expect at the border. *Id.* at 153–54.

According to Mr. Kamaldoss, who testified to the events of April 23, 2019, he, his wife, and his two children were escorted by officers to a secondary inspection area after arriving at JFK Airport. Tr. 39:5–8; 45:12–14; 47:8–10. At first, they were brought to a main room that had about ten people in it. *Id.* at 45:12–23. Although none of the individuals were handcuffed, the room contained chairs that had handcuffs attached, and many of the people in this room were upset or crying. *Id.* at 45:24–46:5. Mr. Kamaldoss and his wife were told that they were required to give officers their electronic devices, passwords, and any effects that they had on their persons. *Id.* at 50:7–20; 54:1–9. Their belongings were then taken away by officers. *See id.* at 53:4–25. After about thirty or forty minutes—during which time agents asked Mr. Kamaldoss "many questions" about why he was in the United States—Mr. Kamaldoss and his family were taken to a different, smaller room. *Id.* at 55:16–56:17. On the stand, Mr. Kamaldoss described this room as "like a cell," *id.* at 56:13, because it was small, empty, and windowless and because the door to the room was closed, *id.* at 57:1–21. Mr. Kamaldoss also testified that this room contained neither toys nor couches. *Id.* at 113:21–23. In his words, it was "worse" than the main room he had been in earlier. *Id.* at 58:3–4. Mr. Kamaldoss and his family remained in this room for more than an hour. *Id.* at 57:24–25. During their time there, they were not offered food or water, nor were they permitted to use the restroom or leave. *Id.* at 58:13–17; 59:1–3. When asked if he ever left the secondary

Case 1:19-cr-00543-ARR   Document 182   Filed 04/22/22   Page 15 of 44 PageID #: 713

inspection room to get an additional bag from baggage claim, Mr. Kamaldoss said no. *Id.* at 115:2−6. Eventually, Mr. Kamaldoss's devices were returned to him, and he and his family were allowed to formally enter the United States. *Id.* at 62:17−63:4. In total, the Kamaldoss family spent at least three hours in secondary inspection. *Id.* at 59:6−16.

While the facts alleged by Mr. Kamaldoss would be concerning if true, I find his version of events incredible based on the testimony given by CBP Officer Roy Clark, the secondary inspection officer who obtained Mr. Kamaldoss's electronic devices and passcodes on April 23, and Special Agent Chunton, who was involved in the devices' digital imaging and extraction. According to Agent Chunton, the secondary inspection room to which Mr. Kamaldoss and his family were first brought is "a big waiting area" that contains twenty to fifty chairs and a counter, behind which the secondary officers sit, not unlike "the DMV." *Id.* at 173:18−174:3. Officer Clark described a sky-blue room containing a water fountain, bathroom, and television, which is often turned on to the news or sports. *Id.* at 218:12−19; 219:5−9. Travelers in the secondary inspection room may sit in any chair they want, *id.* at 221:9−11, and, when their name is called by a secondary inspection officer, they walk themselves up to the counter to answer routine questions, *id.* at 174:12−175:9. Frequently, an agent will *ask* a traveler for their electronic devices and passcodes, as Officer Clark did with Mr. Kamaldoss. *Id.* at 175:10−11; 222:15−25; 225:1−6. Individuals are free to say no. *Id.* at 175:12−15; 223:3−224:5.

According to Agent Chunton, when Mr. Kamaldoss and his family arrived in secondary inspection, they were moved to a smaller, private room—a "family room"—so that they would be more comfortable. *Id.* at 176:9−23. This room, as described by Agent Chunton and Officer Clark, is a far cry from the "cell" testified to by Mr. Kamaldoss: notably, it contains toys for children and a couch. *Id.* at 176:23−177:1; 219:1−4. During the time that Mr. Kamaldoss and his family were in

GA016

the family room, they were left to themselves, although Mr. Kamaldoss occasionally checked in with Agent Chunton about the status of his family's stay in secondary inspection. *Id.* at 179:23−180:15.

Agent Chunton testified that at no point during this encounter was Mr. Kamaldoss told that he was under arrest. *Id.* at 178:5−6. Indeed, at one point, Agent Chunton accompanied Mr. Kamaldoss to the luggage carousel so they could find a missing bag of Mr. Kamaldoss's. *Id.* at 178:8−18. After he retrieved his missing bag and before returning to secondary inspection, Mr. Kamaldoss separated entirely from Agent Chunton and used the restroom. *Id.* Agent Chunton testified that he was cordial, respectful, and professional during his interactions with Mr. Kamaldoss. *Id.* at 180:19−21. At the end of their encounter, Agent Chunton even helped the Kamaldoss family with their bags. *Id.* at 180:23−181:3.

Having listened to the accounts of Agent Chunton and Officer Clark, I find their testimony credible and consistent. And considering the many substantial discrepancies between Mr. Kamaldoss's testimony and the testimony given by Agent Chunton and Officer Clark—including details about the private room to which Mr. Kamaldoss and his family were taken and the question of whether Mr. Kamaldoss ever went to baggage claim or the restroom—I find Mr. Kamaldoss's testimony unreliable. Therefore, I accord the testimony of Agent Chunton and Officer Clark greater weight and discount the aspects of Mr. Kamaldoss's testimony that conflict with theirs.

In light of these credibility determinations, I am left with testimonial evidence that does not support a finding that Mr. Kamaldoss was in custody: Mr. Kamaldoss was questioned for between thirty to forty minutes in a room that contained other people; he was then moved to a private room that, despite having a closed door, contained couches and toys; his family was left to themselves while they were in this room; Mr. Kamaldoss was never handcuffed, *id. at* 95:4−5; no weapons were ever drawn, *id.* 76:1−4; nor has evidence been adduced that Mr. Kamaldoss or

15

GA017

members of his family were physically restrained at any point. While Mr. Kamaldoss may have believed that he was not free to leave, *see id.* 27:24−28:3—and indeed, Agent Chunton testified that Mr. Kamaldoss was not permitted to leave secondary inspection, as he had not yet been admitted into the United States, *id.* 200:9−12—just because someone is not free to leave does not mean they are "subjected to restraints comparable to those associated with a formal arrest," *FNU LNU*, 653 F.3d at 153 (internal quotation marks and citation omitted). And courts in this circuit have found environments to be non-custodial where the circumstances present were similar or even more restricting than those here. *See, e.g.*, *FNU LNU*, 653 F.3d at 154−55 (finding that a defendant was not in custody at the airport even though she was interrogated in a private room for ninety minutes and was fingerprinted); *United States v. Broughton*, 983 F. Supp. 2d 224, 230−31 (E.D.N.Y. 2013), *aff'd*, 600 F. App'x 780 (2d Cir. 2015) (concluding that a defendant was not in custody when she was moved to a private search room at the airport, where a suspicious item in her luggage was inspected); *United States v. Hassan*, No. 18-CR-603 (ARR), 2019 WL 5684367, at *3 (E.D.N.Y. Nov. 1, 2019) (concluding a defendant was not in custody when "CBP officers took him [to] a separate room, questioned him about his travels, searched his luggage, copied his paperwork, took his cell phone, and would not allow him to be alone"); *United States v. Wilson*, 100 F. Supp. 3d 268, 279−81 (E.D.N.Y. 2015) (finding an interrogation non-custodial when the defendant was escorted to a private room, questioned, and subjected to a physical pat-down).

Because the "substance of CBP questioning[] can be an important factor in determining whether a person was in custody," *Hassan*, 2019 WL 5684367, at *3, the strongest evidence weighing in favor of a finding that Mr. Kamaldoss was in custody is the fact that he was asked for the passcodes to his electronic devices. As an initial matter, because I find Agent Clark's testimony more credible than Mr. Kamaldoss's, I find that, based on the evidence before me, Mr. Kamaldoss

16

was *asked* for his laptop, iPhone, and their passcodes in secondary inspection, not told that he must hand them over. *See* Tr. 222:15−25; 225:1−6. To be sure, this is "not necessarily the type of question that a reasonable traveler might expect at the border" because it does not relate to admissibility. *Wilson*, 100 F. Supp. 3d at 280. But I decline to find that this single factor transformed an otherwise non-custodial environment into a custodial one. Agent Clark's question was not so accusatory as to change the very fabric of the encounter. *See United States v. Vallerius*, No. 17-CR-20648 (EGT), 2018 WL 2325729, at *4 (S.D. Fla. May 1, 2018), *report and recommendation adopted*, No. 17-CR-20648 (RNS), 2018 WL 2324059 (S.D. Fla. May 22, 2018) (explaining that a defendant was not in custody merely because an agent asked for his passcodes at the airport); *see also Wilson*, 100 F. Supp. 3d at 280 (finding that although an agent's question was not of the type one would normally expect at the border, the "single question . . . alone [was] not sufficient to transform [the] situation into a custodial one"). Considering the many factors that otherwise indicate a non-custodial environment, "the nature of this question . . . does not tip the scales toward a finding that a reasonable person in [Mr. Kamaldoss's] shoes would have felt restraint to the same degree associated with formal arrest." *Wilson*, 100 F. Supp. 3d at 280.

In sum, evaluating the totality of circumstances, I find that Mr. Kamaldoss was not in custody on April 23, 2019, and thus *Miranda* warnings were not required.[8] I turn now to his argument that the events of this day violated his rights under the Fourth Amendment.

**B. The April 23, 2019, border search did not violate Mr. Kamaldoss's Fourth Amendment rights.**

Mr. Kamaldoss's principal Fourth Amendment argument is that the April 23, 2019, search

---

[8] I find Mr. Kamaldoss's heavy reliance on *United States v. Djibo*, 151 F. Supp. 3d 297 (E.D.N.Y. 2015), which is not controlling authority, misplaced. While the court in that case concluded that the defendant was in custody, the fact that the defendant was an *outbound*—not inbound— traveler at the time he was stopped by border agents was integral to the court's determination. *Id.* at 306. Here, Mr. Kamaldoss was inbound when he was stopped.

of his electronic devices exceeded the scope of a permissible border search. Kamaldoss Mot. 23–26. Mr. Kamaldoss argues that law enforcement was required to have reasonable suspicion that his electronic devices contained *actual* contraband—not just *evidence* of contraband—when the agents searched them on April 23. *Id.* The government disagrees, contending that law enforcement needed at most reasonable suspicion that Mr. Kamaldoss was committing border-related crimes, which they had here. Gov't Opp'n 23–25. As explained below, I need not decide the level of suspicion that was required to search Mr. Kamaldoss's electronic devices: if reasonable suspicion of a border-related offense was necessary, that standard was clearly met, and under the good faith exception, the search was permissible even if more was required.

        1. *Searches of electronic devices at the border.*

The "touchstone of the Fourth Amendment is reasonableness," which is evaluated "by assessing, on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights*, 534 U.S. 112, 118−19 (2001) (internal quotation marks and citation omitted). In considering this inquiry, the Supreme Court has stated that "where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, reasonableness generally requires the obtaining of a judicial warrant." *Riley v. California*, 573 U.S. 373, 382 (2014) (internal quotation marks, citation, and alterations omitted). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.*

Searches at the international border, where "the [g]overnment's interest in preventing the entry of unwanted persons and effects is at its zenith," *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004), have long been held exempt from the warrant requirement. *Id.* at 152–53. This

exception derives from "the longstanding right of the sovereign to protect itself," as well as its authority to collect duties from those entering the country. *Id.* (internal quotation marks and citation omitted). "Routine searches of the persons and effects of entrants are [thus] not subject to any requirement of reasonable suspicion, probable cause, or warrant." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). Rather, routine "searches made at the border . . . are reasonable simply by virtue of the fact that they occur at the border," *United States v. Ramsey*, 431 U.S. 606, 616 (1977), or its functional equivalent, *see Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73 (1973) (noting that routine border searches "may in certain circumstances take place not only at the border itself, but at its functional equivalents as well"); *United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015) ("It is well established that the Customs area of an international airport is the functional equivalent of a border for purposes of the border search doctrine.").

Although this exception is broad, it is not unfettered. While the Supreme Court has not spoken to the precise circumstances under which some level of suspicion is required for a border search, it has suggested that "in the case of highly intrusive searches" where salient "dignity and privacy interests" are at stake, "a requirement of . . . suspicion" might be supported. *Flores-Montano*, 541 U.S. at 152; *see also United States v. Kolsuz*, 890 F.3d 133, 138 (4th Cir. 2018), *as amended* (May 18, 2018) (noting that the Supreme Court has suggested that some level of suspicion might be appropriate for "destructive searches of property and searches carried out in 'particularly offensive' manners" (quoting *Flores-Montano*, 541 U.S. at 152, 154 & n.2)); *Montoya de Hernandez*, 473 U.S. at 541−42 (holding that the detention of a traveler beyond the scope of a routine search required reasonable suspicion that the traveler was smuggling drugs in their alimentary canal). The Second Circuit and several other circuits have since recognized that more invasive searches, such as strip searches, are nonroutine, thus requiring reasonable suspicion. *See*

19

*United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006); *Kolsuz*, 890 F.3d at 144−47; *United States v. Gonzalez-Rincon*, 36 F.3d 859, 864 (9th Cir. 1994); *United States v. Yakubu*, 936 F.2d 936, 939 (7th Cir. 1991); *United States v. Oyekan*, 786 F.2d 832, 837–39 (8th Cir. 1986). Whether a search is so intrusive that it crosses into the territory of nonroutine hinges on how "deeply [the search] intrudes into a person's privacy." *Kolsuz*, 890 F.3d at 144; *see also Irving*, 452 F.3d at 123 (noting that nonroutine searches are those that "substantially infringe on a traveler's privacy rights").

In the context of searches of electronic devices, this distinction between routine and nonroutine searches is an area of evolving jurisprudence. Faced with the proliferation and ubiquity of electronic devices—without which it is neither "realistic nor reasonable to expect the average [person]" to travel, *United States v. Saboonchi*, 990 F. Supp. 2d 536, 556 (D. Md. 2014)—courts have had to reckon with the conditions under which a search of electronic devices becomes nonroutine and what the Fourth Amendment requires when it does. Neither the Supreme Court nor the Second Circuit has "addressed the issue of border searches of electronic devices." *Abidor v. Napolitano*, 990 F. Supp. 2d 260, 281 (E.D.N.Y. 2013); *see also Irving*, 452 F.3d at 123−24 (declining to determine whether searches of diskettes and film found in a traveler's bag were routine or nonroutine because the searches were supported by reasonable suspicion either way). Of the circuits that have addressed the issue, the Fourth and Ninth Circuits stand alone in concluding that forensic searches of electronic devices, which "generally entail[] the connection of external equipment and/or the use of specialized software," *United States v. Aigebekaen*, 943 F.3d 713, 718 n.2 (4th Cir. 2019), are nonroutine and thus require reasonable suspicion.[9] *See id.*

---

[9] Unlike manual searches of electronic devices, which do not entail the use of specialized software or connection of external equipment, forensic searches are "'a powerful tool' capable of not only revealing data that a user has intentionally saved on an electronic device, but also 'unlocking password-protected files, restoring deleted material, and retrieving images viewed on websites.'" *Aigebekaen*, 943 F.3d 713, 718 n.2 (4th Cir. 2019) (quoting *United States v. Cotterman*, 709 F.3d

at 720 ("If the border exception applies to the . . . forensic searches of [the defendant's] devices, these searches . . . were sufficiently intrusive to be 'nonroutine' and so required some level of individualized suspicion."); *United States v. Cano*, 934 F.3d 1002, 1016 (9th Cir. 2019) ("[W]e hold that manual searches of cell phones at the border are reasonable without individualized suspicion, whereas the forensic examination of a cell phone requires a showing of reasonable suspicion."); *Kolsuz*, 890 F.3d at 144 (agreeing with the district court that "a forensic border search of a phone must be treated as nonroutine"); *United States v. Cotterman*, 709 F.3d 952, 962 (9th Cir. 2013) ("It is the comprehensive and intrusive nature of a forensic examination . . . that is the key factor triggering the requirement of reasonable suspicion here."). *But see United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018) ("We see no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property.").

In reaching this conclusion, the Fourth and Ninth Circuits emphasized "the breadth of private information" that can be uncovered from a forensic search, signifying a deep intrusion into a traveler's privacy. *Kolsuz*, 890 F.3d at 144−45; *see Cotterman*, 709 F.3d at 964. Indeed, as the Ninth Circuit explained in *United States v. Cotterman*, 709 F.3d 952, whereas "[t]he amount of private information carried by international travelers was traditionally circumscribed by the size

---

952, 957 (9th Cir. 2013)). Indeed, CBP appears to distinguish between manual and forensic searches, although it uses different nomenclature. Under CBP policy, advanced searches, which are searches where "an officer connects external equipment [] through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or analyze its contents," should be performed only where "there is reasonable suspicion of activity in violation of the laws enforced or administered by CBP, or in which there is a national security concern." *See* U.S. Customs and Border Protection, CBP Directive No. 3340-049A, at 5.1.4 (2018), https://www.dhs.gov/sites/default/files/publications/CBP%20Directive%203340-049A_Border-Search-of-Electronic-Media.pdf (last accessed Apr. 21, 2022). A basic search, which is defined as anything other than an advanced search, does not require such suspicion. *Id.* at 5.1.3.

of the traveler's luggage or automobile," such is no longer the case in the digital age. *Id.* at 964. "The average 400-gigabyte laptop hard drive can store over 200 million pages−the equivalent of five floors of a typical academic library." *Id.* (citing Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 542 (2005)). "Laptop computers, iPads and the like are [thus] simultaneously offices and personal diaries. They contain the most intimate details of [a traveler's life]: financial records, confidential business documents, medical records and private emails." *Id.*[10]

In light of the "unparalleled breadth of private information" that can be revealed by a comprehensive forensic analysis, *Kolsuz*, 890 F.3d at 145, there seems to be good reason to consider forensic searches nonroutine and thus demanding of reasonable suspicion. But if they are, this raises another question of first impression in this circuit: "[O]f *what* must the [g]overnment have [reasonable] suspicion for the border search exception to apply?" *Aigbekaen*, 943 F.3d at 720. Put differently, if reasonable suspicion was in fact required to search Mr. Kamaldoss's electronic devices on April 23, was it reasonable suspicion of general criminal activity or something more? While Mr. Kamaldoss and the government seem to agree that the imaging of Mr. Kamaldoss's devices and the use of Cellebrite on his iPhone amounted to a forensic search, *see* Kamaldoss Mot. 25; *see generally*

---

[10] Integral to the Fourth Circuit's conclusion was the Supreme Court's holding in *Riley v. California*, 573 U.S. 373 (2014), that the search-incident-to-arrest exception to the warrant requirement does not apply to searches of cell phones. *See id.* at 386. The justifications underlying *Riley*, the Fourth Circuit explained, apply with similar force to searches of cell phones at the border: the "immense storage capacity"; "the special sensitivity of the kinds of information that may be stored"; and finally, the pervasive nature of cell phones. *Kolsuz*, 890 F.3d at 145–46 (internal quotation marks and citations omitted). In the Fourth Circuit's view, "*Riley* insists [that] cell phones are fundamentally different 'in both a quantitative and a qualitative sense' from other objects traditionally subject to government searches." *Id.* at 145 (quoting *Riley*, 573 U.S. at 393). Although the holding in *United States v. Kolsuz*, 890 F. 3d 133, was confined to the forensic search of a cell phone at the border, the Fourth Circuit later applied the same reasoning to hold that reasonable suspicion is required to forensically search laptops and iPods at the border. *Aigbekaen*, 943 F. 3d at 721.

GA024

Gov't Opp'n 17–25, they disagree on the answer to this question. Mr. Kamaldoss urges me to answer

it in accord with the Ninth Circuit, which recently held that border officials may conduct a forensic

search of a cell phone only when they reasonably suspect that the cell phone *itself* contains digital

contraband, not just evidence of contraband, *Cano*, 934 F.3d at 1020. Kamaldoss Mot. 23−26. The

government contends that this distinction between a search for digital contraband and a search for

evidence of contraband is misguided because it goes against the purposes of the border-search

doctrine and the weight of authority. Gov't Opp'n 22. The government argues that, at most, the

forensic search must have been supported by general reasonable suspicion, which was satisfied on

April 23 because Agent Chunton had reasonable suspicion that Mr. Kamaldoss was engaged in an

international drug trafficking conspiracy. *Id.* at 23–25.

      While the Second Circuit has not spoken to the scope of a forensic search at the border,

"[a]s a general rule, the scope of a warrant exception should be defined by its justifications."

*Kolsuz*, 890 F.3d at 143; *see also Arizona v. Gant*, 556 U.S. 332, 351 (2009) ("When the[]

justifications" undergirding an exception to the warrant requirement "are absent, a search . . . will

be unreasonable unless police obtain a warrant or show that another exception to the warrant

requirement applies."). For this very reason, the Supreme Court has found that the search-incident-

to-arrest exception does not apply to warrantless searches of cell phones, where the reasons behind

the exception are not present. *See Riley*, 573 U.S. at 386 (concluding that the concerns of officer

safety and destruction of evidence are not implicated by digital data stored on a cell phone).

Similarly, while "an[] emergency threatening life or limb" may provide a basis for a warrantless

search, this exception cannot continue to justify a search once the initial exigency ends. *See Mincey*

*v. Arizona*, 437 U.S. 385, 393 (1978) (holding that a warrantless search based on an exigency must

be "strictly circumscribed by the exigencies which justif[ied] its initiation" (internal quotation

marks and citation omitted)). Heeding this precedent and across two cases, the Fourth Circuit has articulated a similar "nexus" requirement for warrantless searches at the border. Concluding that "a direct link between the predicate for the search [at a border] and the rationale for the border exception," existed in *United States v. Kolsuz*, 890 F. 3d 133, *id.* at 143, the Fourth Circuit clarified in *United States v. Aigbekaen*, 943 F.3d 713, that "to conduct [a forensic search] under the border search exception . . . the [g]overnment must have individualized suspicion of an offense that bears some nexus to the border search exception's [historic] purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband," *Aigbekaen*, 943 F.3d at 721. Accordingly, a warrantless forensic search may not be justified by the government's "generalized interest in law enforcement and combatting crime." *Aigbekaen*, 943 F.3d at 721 (internal quotation marks and citation omitted). Under this framework, evidence that a traveler has committed *domestic* crimes, for example, would not provide reasonable suspicion to search an electronic device because domestic offenses are untethered from the historic rationales of the border search exception. *See id.* at 721–22.

While I find this nexus requirement compelling and in line with the lineage of cases articulating the boundaries of exceptions to the warrant requirement,[11] I ultimately need not decide whether this standard is correct as a matter of law. Assuming *arguendo* that it is, it was clearly met during the April 23 border search. "A reasonable suspicion inquiry simply considers, after taking into account all the facts of a particular case, whether [a] border official had a reasonable basis on which to conduct the search." *Irving*, 452 F.3d at 124 (internal quotation marks, alteration, and citation omitted). Under the Fourth Circuit's nexus requirement, the reasonable suspicion must be

---

[11] At least one other court in this district has expressed that a "showing of reasonable suspicion should be required" if "suspicionless forensic computer searches at the border threaten to become the norm." *Abidor v. Napolitano*, 990 F. Supp. 2d 260, 282 (E.D.N.Y. 2013).

GA026

of an offense related to one of the border search exception's justifications. Factors relevant to a court's determination include "unusual conduct of the defendant, discovery of incriminating matter during routine searches, computerized information showing propensity to commit relevant crimes, or a suspicious itinerary." *Id.* By the time Mr. Kamaldoss was stopped at the border on April 23, 2019, border agents had a reasonable basis to believe that he was involved in a transnational conspiracy: the government's investigation of this conspiracy had been ongoing for more than a year and included several controlled buys of Tramadol and Alprazolam; as of July 2018, approximately eight months before the border search, Mr. Kamaldoss had been identified by two confidential informants as a conspirator in the larger importation and distribution scheme; Mr. Kamaldoss had been seen at the very warehouse identified by the informants as the base of operations for the conspiracy; and packages mailed by Mr. Kamaldoss and seized by the government contained Tramadol and Alprazolam. Gov't Opp'n 3–4. Taken together, this information more than supplied border agents with a reasonable basis for believing that Mr. Kamaldoss was engaged in efforts to illegally import scheduled drugs from abroad, an offense directly tied to at least one of the historic rationales for the border exception—the disruption of efforts to import contraband.

Apparently rejecting the Fourth Circuit's approach, Mr. Kamaldoss asks that I instead take the considerable step of adopting the standard for forensic searches articulated by the Ninth Circuit in *United States v. Cano*, 934 F.3d 1002. Noting that "[t]he detection of . . . contraband [itself] is the strongest historic rationale for the border-search exception," the *Cano* court held that border searches are restricted in scope to searches for contraband, and, as a corollary, that forensic searches at the border require reasonable suspicion that the device itself contains contraband.

25

GA027

*Cano*, 934 F.3d at 1018, 1019–20 (internal quotation marks and citation omitted).[12] Since *Cano*, no other circuit has held that forensic searches of electronic devices should be limited to searches for digital contraband. Indeed, just last year, the First Circuit in *Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021), rejected the distinction between searches for contraband and searches for evidence of contraband, holding that the "search[] for evidence is vital to achiev[e] the border search exception's purposes of controlling 'who and what may enter the country.'" *Id.* at 20 (quoting *United States v. Ramsey*, 431 U.S. 606, 620 (1977)).

That said, there may be reasons to limit the scope of forensic searches to digital contraband given the trove of private information contained in electronic devices. *Cf. United States v. Vergara*, 884 F.3d 1309, 1317 (11th Cir. 2018) (Pryor, J., dissenting) ("[F]orensically searching a cell phone may lead to the discovery of physical contraband. . . . But this general law enforcement justification is quite far removed from the purpose originally underlying the border search exception."). But the time for such a decision is not now. In the face of conflicting circuit precedent and the absence of any guidance from the Second Circuit on searches of digital devices at the border, I leave this matter for a later date and a higher court.

Additionally, for the present purposes, I need not determine whether to follow the approach offered in *Cano*: under the good-faith doctrine, exclusion of evidence would be improper even were I to apply that approach in this case. While the "evidentiary fruits of Fourth Amendment violations are generally inadmissible at trial[,] . . . the fruits of 'a search conducted in reasonable reliance on binding [appellate] precedent are not subject to the exclusionary rule,' as that rule is designed 'to deter *future* Fourth Amendment violations,'" *Aigbekaen*, 943 F.3d at 725

---

[12] Although *Cano* concerned the forensic search of a cell phone, the court noted that there is "no basis to distinguish a forensic cell phone search from a forensic laptop search." 934 F.3d at 1015.

26

(modification omitted) (quoting *Davis v. United States*, 564 U.S. 229, 236–37, 241 (2011)); *see also Davis*, 564 U.S. at 249–50 ("[W]hen the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply."). In looking to appellate precedent, I am bound by "the precedent of this [c]ircuit and the Supreme Court." *United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013). At the time of the April 23, 2019, border search, there was neither Supreme Court nor Second Circuit precedent limiting warrantless forensic searches to digital contraband.[13] In fact, neither court had ever addressed the issue of border searches of electronic devices. Instead, caselaw existed from both courts making clear that, in the context of border searches in general, at most reasonable suspicion was required for some more intrusive searches. *See Flores-Montano*, 541 U.S. at 152; *Irving*, 452 F.3d at 123. Based on the governing law in this circuit, then, the border agents who searched Mr. Kamaldoss's devices had no reason to think that they could do so only if they had reasonable suspicion that the devices contained digital contraband. *Cf. Kolsuz*, 890 F.3d at 148 (declining to decide whether more than reasonable suspicion is required for a forensic border search because either way, agents acted in accordance with applicable law at the time). Because the border agents acted in reasonable reliance on then-existing case law, the digital evidence from Mr. Kamaldoss's devices would not be subject to suppression regardless of whether I apply the *Cano* standard.

> 2. *The May 2, 2019, and May 11, 2019, searches of forensic copies of Mr. Kamaldoss's electronic devices.*

On April 25, 2019, Special Agent Chunton provided Special Agent Connor of the FDA with forensic copies prepared from the searches completed on Mr. Kamaldoss's laptop and iPhone.

---

[13] Indeed, even *Cano*, which is not binding precedent in this circuit, had not been decided as of the April 23, 2019, border search. *See* 943 F.3d at 1019–20. The decision was handed down approximately four months later.

*See* Kamaldoss Mot., Ex. G, at 4, ECF No. 159-1. According to a "Report of Investigation" prepared by Special Agent Connor, he reviewed these forensic copies on two later dates—May 2, 2019, and May 11, 2019—and neither search was conducted pursuant to a warrant. *See* Kamaldoss Mot., Ex. I, at 2−3, ECF No. 159-1. Mr. Kamaldoss moves to suppress the fruits of these searches, submitting that because the searches were conducted "(a) away from the border, (b) weeks after the data was seized, (c) by, most importantly, a government agent with no authority to conduct border searches," they cannot fall within the border search exception to the warrant requirement.[14] Kamaldoss Reply 12−14; *see also* Kamaldoss Mot. 26−27. The government maintains that Agent Connor's review of the forensic copies on later dates was a continuation of the border search and that such subsequent review is "inherent to any forensic search." Gov't Opp'n 22.

Though I appreciate the parties' arguments, the caselaw on what constitutes a permissible continuation of a border search often involves circumstances quite different from those present here. While other courts have held that "an off-site forensic search of an electronic device over a long period of time is nonetheless a border search," in those cases "the electronic device was seized at the border, the device was never cleared to pass through the border, and therefore the defendant never regained an expectation of privacy in the electronic device." *United States v. Kolsuz*, 185 F. Supp. 3d 843, 851–52 (E.D. Va. 2016) (citation, quotation marks, and modifications omitted), *aff'd*, 890 F.3d 133, *as amended* (May 18, 2018); *cf. United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013) (noting that a defendant had not regained an expectation of privacy in his computers when they were searched before being cleared for entry). In contrast, Mr. Kamaldoss's electronic

---

[14] In the alternative, Mr. Kamaldoss argues that even if I decide that the searches fall into the border search exception, their fruits should still be suppressed because the searches exceeded the permissible scope of a border search of an electronic device. As discussed above, suppression is not justified under this argument. *See supra* Discussion II.B.1.

devices were returned to him on April 23, 2019, and he was ultimately cleared for entry into the United States. Kamaldoss Mot. 8; Tr. 62:15−63:4. Mr. Kamaldoss thus regained some expectation of privacy in his devices on this date. *See Kolsuz*, 185 F. Supp. 3d at 851–52. That he did, however, does not mean that these later May searches of data taken from his devices were impermissible.

As explained above, *see supra* Discussion II.B.1, the "touchstone of the Fourth Amendment is reasonableness." *Knights*, 534 U.S. at 118. While law enforcement officers are typically permitted to re-search materials already in their possession, in the context of forensic copies created pursuant to a search warrant, the Second Circuit has gestured at the possibility that the long-term retention of such copies may be unreasonable when they contain data that is not responsive to the items called for by the terms of the warrant. In *United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016) (en banc), law enforcement agents made forensic images of the hard drives of a company pursuant to a valid search warrant. *Id.* at 200−01. Though agents apparently promised to purge or delete nonresponsive files from their copies, this was never done. *Id.* at 203 n.7. Nearly three years later, when Stavros Ganias, who owned the company whose hard drives had been searched, became a suspect in a separate criminal case, the government obtained a second warrant to search the forensic copies that were seized in relation to the government's earlier investigation. *Id.* at 201, 207. In filing a motion to suppress the fruits of that latter search, Mr. Ganias alleged that the long-term retention of nonresponsive files violated his Fourth Amendment rights. *Id.* at 207–08. While the Second Circuit declined to address the merits of his argument—resolving his claim on good-faith grounds instead, *id.* at 225—it took note of the "privacy concerns implicated when a hard drive or forensic mirror is retained, even pursuant to a warrant," given the "significance of the data kept by many individuals on their [electronic devices]," *id.* at 217−18. Indeed, "[t]he seizure of a computer hard drive, and its subsequent retention by the government,

29

can give the government possession of a vast trove of personal information about the person to whom the drive belongs, much of which may be *entirely irrelevant* to the criminal investigation that led to the seizure." *Id.* at 217 (emphasis added).

While these concerns "highlight the importance of careful consideration of the technological contours of digital search and seizure," *id.* at 209, I do not find that they warrant suppression in this case. It is likely that the forensic copies searched by Agent Connor on May 2 and May 11 contained data both responsive and nonresponsive to the investigation of Mr. Kamaldoss. *See* Forensic Search Warrant Appl. Nevertheless, these searches occurred within weeks of the initial seizure, and they related to the same and ongoing investigation into a transnational criminal scheme. They did not occur, as was the case in *Ganias*, more than two years after the fact and in the scope of a new investigation. While searches justified at their inception may be rendered unreasonable when circumstances change, *see, e.g.*, *United States v. Place*, 462 U.S. 696, 707−10 (1983) (holding that while the initial seizure of luggage for purposes of subjecting it to a dog-sniffing test was reasonable, the seizure became unreasonable when the seizure was prolonged for ninety minutes); *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) ("[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'"), in light of the proximity and relatedness of the May searches to the April 23 border search, I decline to find the May searches unreasonable.

Moreover, suppression of the May searches is barred under the independent source doctrine, which "permits the admission of evidence seized pursuant to an unlawful search if that evidence would have been obtained through separate, lawful means," *United States v. Vilar*, 729 F.3d 62, 83 n.19 (2d Cir. 2013) (citing *Murray v. United States*, 487 U.S. 533, 537 (1988)). "Where

30

evidence is obtained pursuant to a warrant issued after an illegal search, the independent source doctrine applies if[] '(1) the warrant was supported by probable cause derived from sources independent of the illegal search; and (2) the decision to seek the warrant was not prompted by information gleaned from the illegal conduct.'" *United States v. Mulholland*, 702 F. App'x 7, 10 (2d Cir. 2017) (summary order) (quoting *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993)). Assuming for argument's sake that the May 2 and May 11 searches were illegal, their fruits would still be admissible under this doctrine. In June 2019, Special Agent Connor reviewed the same forensic copies pursuant to a May 24, 2019, search warrant. As described below, *see infra* Discussion III.B, the May 24 warrant was supported by probable cause derived from the April 23 border search—a source independent from the May 2 and May 11 searches. "That the second element is satisfied is evident from the warrant application[] [itself]," *United States v. Loera*, 333 F. Supp. 3d 172, 187 (E.D.N.Y. 2018), which makes no reference to the May searches, *see* Forensic Search Warrant Appl. ¶¶ 24−57. Instead, the warrant application's grounds for probable cause are evidence adduced from months of investigation and information gleaned from the April 23 border search—not the subsequent searches of forensic copies created on that day. *See id.*; *see also infra* n.17 (concluding that paragraphs fifty-one through fifty-three of the search warrant application are based on information learned during the border search).

In light of the foregoing, I find the contents of the May 2, 2019, and May 11, 2019, border searches admissible. I now turn to Mr. Kamaldoss's and Mr. Navaratnarajah's remaining motions, which largely concern the admissibility of material searched pursuant to warrants.

### III.    Materials Searched Pursuant to a Warrant.

#### A. The August 29, 2018, and January 8, 2019, intercepted packages.

As detailed above, on August 29, 2019, and January 8, 2019, postal inspectors seized sets

GA033

of packages mailed by Mr. Kamaldoss and Mr. Navaratnarajah, respectively. While agents obtained a warrant to search the packages dropped off by Mr. Kamaldoss within one day of the packages' seizure, Kamaldoss Mot. 5, they did not procure a warrant to search the packages mailed by Mr. Navaratnarajah until fifteen days after the agents seized them, Navaratnarajah Mot. 4. Once searched, both sets of packages were revealed to contain Tramadol. Gov't Opp'n 4 (noting that the packages dropped off by co-defendants contained Tramadol and that the packages mailed by Mr. Kamaldoss also contained Alprazolam). Mr. Kamaldoss and Mr. Navaratnarajah now independently move to suppress the contents of these packages, contending that the government's delays in obtaining search warrants were constitutionally unreasonable.[15] *See* Kamaldoss Mot. 30–31; Navaratnarajah Mot. 5–10. Considering the balance of factors, I find that the delays in obtaining search warrants to search the packages were not unreasonable.

"It has long been held that first-class mail such as letters and sealed packages subject to letter postage . . . is free from inspection by postal authorities, except in the manner provided by the Fourth Amendment." *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970). This does not mean, however, that absent a warrant, "first-class mail is [] beyond the reach of all inspection." *Id.* at 252. A package may be temporarily detained without a warrant for purposes of investigation, "provided [that] (1) law enforcement authorities have a reasonable suspicion of criminal activity; and (2) the packages are not detained for an unreasonable length of time" before a search warrant is secured. *United States v. Martinez*, 869 F. Supp. 202, 205 (S.D.N.Y. 1994). Regarding this

---

[15] Mr. Kamaldoss alternatively argues that suppression is appropriate because, in obtaining a warrant to search the packages, the government relied on information learned during its June 7, 2018, border search. Kamaldoss Mot. 34. As an initial matter, the application in support of a warrant to search Mr. Kamaldoss's packages makes no mention of a June 7, 2018, border search. *See generally* Kamaldoss Mot., Ex. A, ECF No. 159-1. Moreover, as discussed above, *see supra* Discussion I, I have already found that no forensic search took place on June 7, 2018. This argument is thus without merit.

32

second prong, the Second Circuit has articulated four factors that are "generally relevant to whether the police have waited an unreasonable amount of time before seeking a search warrant": (1) the length of the delay; (2) the importance of the seized property to the defendant; (3) whether the defendant had a reduced property interest in the seized item; and (4) the strength of the state's justification for the delay. *United States v. Smith*, 967 F.3d 198, 206 (2d Cir. 2020).

Factors two and three, which look the same across both co-defendants here, strongly weigh toward finding that law enforcement agents' one- and fifteen-day delays in securing search warrants were reasonable. As to the second factor—the importance of the seized property to the defendant—although Mr. Kamaldoss and Mr. Navaratnarajah both had a Fourth Amendment interest in their packages, *see United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998), the packages were not personal effects. Indeed, the packages were misbranded drugs imported from abroad that were being distributed to domestic third parties. To the extent that the seized packages were important to Mr. Kamaldoss and Mr. Navaratnarajah, their importance was minimal at best. *Cf. Smith*, 967 F.3d at 207 (finding that the seized property—a personal tablet computer, which contained "immense amounts of personal data," much of which had "nothing to do with the investigation of criminal activity"—was important to the defendant). As to the third factor, both Mr. Kamaldoss's and Mr. Navaratnarajah's possessory interests in their packages were substantially diminished. An individual's possessory interest in their property is already reduced when that property is put into the stream of mail. *See United States v. Okparaeke*, No. 17-CR-225 (NSR), 2018 WL 4003021, at *12 (S.D.N.Y. Aug. 21, 2018) ("Defendant's possessory interest was diminished by sending the package through United Parcel Service."); *Martin*, 157 F.3d at 54 (noting that a seizure is less intrusive where the owner has relinquished control of the property to USPS); *see also Smith*, 967 F.3d at 208 & n.2 (collecting cases where courts have found a

33

diminished property interest "because the property had been . . . voluntarily relinquished to a third party"). Here, however, the packages not only were relinquished to USPS but also all bore the same fictitious name and return address: "Andrew Fistel, 124-10 Metropolitan Aenue [*sic*] suite #3." Gov't Mot. 34. Based on this, there is strong reason to believe that it would have been difficult, if not impossible, for Mr. Kamaldoss and Mr. Navaratnarajah to retrieve their packages if they had so desired. *Cf. United States v. Pitts*, 322 F.3d 449, 456−57 (7th Cir. 2003) (explaining that because a co-defendant who used a false return address had no legitimate way of retrieving it, the package was therefore abandoned). Considering these facts, I find that their possessory interests in the packages were substantially reduced.

Factor four—the strength of the state's justification for the delay—weighs in favor of Mr. Navaratnarajah. In advance of the April 12 evidentiary hearing, the government proffered that (1) as of the date that Mr. Navaratnarajah's packages were seized—January 8, 2019—the government had all the information necessary to obtain its search warrant, and (2) the affiant who secured the search warrant could not recall any particular reason why the warrant was not secured until fifteen days after their seizure. Letter in Opp'n 4, ECF No. 174. Accordingly, there is no basis for finding that the government was justified in its delay.

As for the fourth factor's application to Mr. Kamaldoss, at the time of the August 29 seizure, the government's investigation into Mr. Kamaldoss had been ongoing for several months and it had gathered credible evidence that he was involved in a drug distribution conspiracy. *See supra* Background (explaining that, by August 29, 2018, Mr. Kamaldoss had been identified by two confidential informants and observed at the warehouse identified as the base of operations). It therefore appears that the government was in possession of sufficient information to obtain a warrant to search the packages on August 29. It did not obtain a warrant, however, until a day later.

GA036

Even with a mere one-day delay between the seizure and the warrant, therefore, this factor may weigh in Mr. Kamaldoss's favor, albeit only very slightly.

Turning finally to the first factor, the length of the delay, I find that this factor also weighs differently across co-defendants. Turning first to Mr. Kamaldoss, the one-day delay between when his packages were seized and when a warrant was obtained to search them was not material. In *United States v. Van Leeuwen*, 397 U.S. 249, the Supreme Court explained that "[n]o interest protected by the Fourth Amendment was invaded" by detaining two packages for twenty-nine hours before a warrant was secured. *Id.* at 253. While the *Van Leeuwen* Court reached its conclusion based on the specific facts before it—which included that the two packages at issue appeared suspicious and were going to separate destinations—I find that Mr. Kamaldoss's case presents similar facts. Each package was of a "suspicious character," *id.*, and all five packages were going to different destinations, *see* Kamaldoss Mot. Ex. A, at Attach. A, ECF No. 159-1. Given these facts, I do not find the length of the delay to weigh in Mr. Kamaldoss's favor. Because, as I have found, factors two and three also weigh strongly against Mr. Kamaldoss, and factor four weighs only slightly in his favor, I conclude that the government's delay in securing a warrant to search Mr. Kamaldoss's packages was not constitutionally unreasonable.

The weight to be accorded to the fifteen-day delay between when Mr. Navaratnarajah's packages were seized and when a warrant was issued is less clear. In *United States v. Martin*, 157 F.3d 46, the Second Circuit held that an eleven-day delay in securing a warrant to search seized packages was acceptable because, *inter alia*, the period included two weekends and a holiday; the owner of the packages had put them in the stream of mail; and the packages' seizure did not restrain the owner's liberty. *See id.* at 54. The *Martin* court noted, however, that "[i]n some circumstances eleven days might well constitute an unreasonable delay." *Id.* Since then, the Second Circuit has

35

GA037

held that a "month-long delay well exceeds what is ordinarily reasonable." *Smith*, 967 F.3d at 207. Fifteen days falls somewhere in between the eleven days affirmed in *Martin* and the month-long delay criticized in *Smith*. Given these precedents, I am inclined to find that here, where the fifteen-day delay included two weekends and involved packages of contraband that were put into the stream of mail, this period of delay should not weigh against the government. Moreover, considering how strongly factors two and three weigh against Mr. Navaratnarajah, this first factor is not dispositive: measuring all four factors together, the scale tips in favor of the government. Accordingly, the delay in securing a warrant to search Mr. Navaratnarajah's packages was not unreasonable, and the contents of his packages, like those of Mr. Kamaldoss's, are admissible.[16]

### B. The June 14, 2019, and June 24, 2019, searches of forensic copies of Mr. Kamaldoss's electronic devices.

On May 24, 2019, the government secured a warrant to search the forensic copies of Mr. Kamaldoss's electronic devices. *See* Forensic Search Warrant. Pursuant to this warrant, the forensic copies were reviewed by Special Agent Connor at least twice on June 14, 2019, and once on June 24, 2019. Kamaldoss Mot. 28. Mr. Kamaldoss now moves to suppress these searches on the ground that Agent Connor's affidavit in support of the May warrant included tainted evidence. *Id.* at 27–28. Specifically, Mr. Kamaldoss alleges that paragraphs fifty-one through fifty-three of Agent Connor's affidavit describe information that was unlawfully obtained during the April 23 border search.[17] *Id.* at 27; *see also id.* at 24–26. These paragraphs reference types of information

---

[16] Because I find that that the government's one- and fifteen-day delays in securing warrants to search Mr. Kamaldoss's and Mr. Navaratnarajah's packages were reasonable, I decline to address the government's alternative argument: that defendants forfeited their Fourth Amendment interests in the packages when they put them in the stream of mail using fictional return addresses and thus do not have standing to challenge the packages' search.

[17] In his suppression motion, Mr. Kamaldoss principally contends that the information referenced in paragraphs fifty-one through fifty-three was based on Special Agent Connor's May review of the forensic copies. *See* Kamaldoss Mot. 27–28. However, in his reply to the government's

GA038

that were seen by border agents upon their preliminary review of Mr. Kamaldoss's electronic devices. *See* Forensic Search Warrant Appl. ¶¶ 51−53. Mr. Kamaldoss argues that the May warrant's reliance on this evidence renders the warrant constitutionally infirm and that the June searches should be suppressed as a result. Kamaldoss Mot. 28. Mr. Kamaldoss also seeks suppression on two further grounds: first, because the forensic images were obtained in violation of his Fifth and Fourth Amendment rights; and second, because under the terms of the warrant, Special Agent Connor was required to execute his search by June 7, 2019. *Id.* at 28 n.13; *see also* Forensic Search Warrant 1. I find none of Mr. Kamaldoss's arguments availing.

As an initial matter, Mr. Kamaldoss misapprehends the governing law on "tainted" warrants. "[A]lthough unlawfully obtained evidence should not be included in an affidavit [in support of a warrant], it is well established that the mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant." *United States v. Peeples*, 962 F. 3d 677, 688 (2d Cir. 2020) (internal quotation marks and citation omitted). Instead, "a reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *Id.* at 688–89 (internal quotation marks and citation omitted). Here, ample additional evidence was included in Agent Connor's affidavit in support of the May 24 warrant—indeed, only a few paragraphs in his affidavit describe the April 23 search of Mr. Kamaldoss's devices and

---

opposition, Mr. Kamaldoss argues that the warrant was tainted "by the April 2019 border search and/or by subsequent warrantless searches conducted by [Special Agent] Connor [in May]." *See* Kamaldoss Reply 16−17. On my read of Special Agent Connor's application for the May 24 warrant, paragraphs fifty-one through fifty-three describe content observed on Mr. Kamaldoss's electronic devices on April 23 and relayed to Agent Connor by the border agents. *See* Forensic Search Warrant Appl. ¶¶ 52−53 (describing what law enforcement agents observed during a preliminary review of both devices). Because there is no evidence that paragraphs fifty-one through fifty-three were based on Agent Connor's May searches, I consider Mr. Kamaldoss's claim with respect to the April 23 border search only.

GA039

the contents thereof. *See generally* Forensic Search Warrant Appl. But in any event, I need not engage in such analysis: as I have already found that the April 23 border search was constitutional, *see supra* Discussion II, there is no tainted evidence to excise. Mr. Kamaldoss's second additional argument—that suppression is proper because the forensic images were initially obtained in violation of his Fifth and Fourth Amendment rights—fails for this same reason.[18]

Regarding Mr. Kamaldoss's final argument—that the June searches should be suppressed because they occurred after the warrant's June 7 execution date—the government is correct that Federal Rule of Criminal Procedure 41(e)(2)(B) resolves this issue. *See* Gov't Opp'n 27 n.4. Under Rule 41(e)(2)(B), the time for executing a warrant for the seizure or copying of electronically stored information "refers to the seizure or on-site copying of the media or information, and *not* to any later off-site copying or review." Fed. R. Crim. P. 41(e)(2)(B) (emphasis added). Accordingly, "[u]nless otherwise specified, the warrant authorizes a later review of the . . . [seized or copied] information consistent with the warrant." *Id.* No such specification was listed on the May 24 warrant, which meant that while Agent Connor had to seize the forensic copies by June 7, he was allowed to review them thereafter. This is exactly what Agent Connor did. *See* Kamaldoss Mot.

---

[18] Even assuming, *arguendo*, that I had concluded that the April 23 border search was impermissibly broad, suppression would still be improper because Agent Connor conducted his searches in good faith reliance on the May 24 warrant. "If a reviewing court determines that a search warrant was not supported by probable cause, a motion to suppress will still be denied if the court finds that the officers who conducted the search acted in good faith reliance on a facially valid warrant." *United States v. Salameh*, 152 F.3d 88, 114 (2d Cir. 1998). Only in four situations does this exception not apply: "(1) [W]here the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (citation omitted). None of these situations applies here. Most relevant and as just described, the application supporting the warrant contained ample indicia of probable cause separate from the references to the April 23 border search. Agent Connor's reliance on the warrant and subsequent search of the forensic copies were therefore reasonable and in good faith.

GA040

Ex. I, at 4 ("Rep't of Investigation") (discussing Agent Connor's review of the forensic copies on June 4, 2019, three days before June 7).

### C. Mr. Kamaldoss's Apple and Yahoo email accounts.

On May 1, 2019, the government obtained a warrant to search materials associated with Mr. Kamaldoss's Apple iCloud account. Kamaldoss Mot. 9–10, 31. Just a few weeks later, on May 30, the government obtained search warrants requiring Oath Holdings, the parent company of Yahoo, to produce emails associated with Mr. Kamaldoss's two Yahoo accounts. *Id.* at 10, 31. Mr. Kamaldoss contends that suppression of this material is appropriate because all three search warrants relied upon information that was learned by agents during the April 23 border search. *Id.* at 30−31. For the very same reasons that this argument previously failed, *see supra* Discussion III.B, so too does it fail here.

Propounding another ground for suppression, Mr. Kamaldoss argues that the warrants authorizing the search of his Yahoo email accounts were overbroad and thus violated the Fourth Amendment. Kamaldoss Mot. 32−34. Specifically, both search warrants required Oath Holdings to disclose all emails associated with Mr. Kamaldoss's two Yahoo email accounts without any limiting time period, even though probable cause for the warrant was based on events post-dating May 2018. *See id.* at 32–33; Kamaldoss Mot., Exs. N & O (collectively, "Yahoo Warrants and Applications"), ECF No. 159-1.

"To achieve its goal, the Warrants Clause requires particularity and forbids overbreadth." *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009). Whether a warrant is overbroad turns on whether the "description of the objects to be seized is broader than can be justified by the probable cause upon which the warrant is based." *United States v. Nejad*, 436 F. Supp. 3d 707, 725 (S.D.N.Y. 2020). Although there is agreement among district courts in this circuit "that a time

39

frame is relevant [to the question of overbreadth], there is no apparent consensus as to when one is required." *United States v. Cohan*, 628 F. Supp. 2d 355, 366 (E.D.N.Y. 2009) (emphasis omitted) (collecting cases addressing time frame limitations in the context of business-record search warrants). And in the context of electronic information, several courts in this and other circuits have "upheld the [g]overnment's ability to obtain the entire contents of the email account to determine which particular emails come within the search warrant." *United States v. Scully*, 108 F. Supp. 3d 59, 95 (E.D.N.Y. 2015) (collecting cases); *see, e.g.*, *United States v. Bowen*, 689 F. Supp. 2d 675, 682 (S.D.N.Y. 2010) ("Nor does the Fourth Amendment require the executing authorities to delegate a pre-screening function to the internet service provider or to ascertain which e-mails are relevant before copies are obtained from the internet service provider for subsequent searching."), *aff'd sub nom*, *United States v. Ingram*, 490 F. App'x 363 (2d Cir. 2012).

Here, the warrants at issue required Oath Holdings to *disclose* all information in its possession but authorized the government to *seize* only certain types of communications and information dated May 1, 2018, or after. In light of the limitations set on the warrants and existing caselaw on the seizure of email accounts, I am inclined to find that the warrants were not overbroad. This conclusion is not compelled, however because the agents acted in good faith reliance on the warrants' contents. *See Nejad*, 436 F. Supp. 3d at 732; *Levy*, 2013 WL 664712, at *11. "[E]vidence seized pursuant to an overly broad search warrant will be suppressed only if the warrant was so facially invalid that the executing agents could not reasonably have relied on it." *United States v. Wapnick*, No. 92-CR-419 (CBA), 1993 WL 86480, at *7 (E.D.N.Y. Mar. 16, 1993), *aff'd*, 60 F.3d 948 (2d Cir. 1995).[19] Because "the Second Circuit has never spoken to when,

---

[19] Because Mr. Kamaldoss has challenged the search warrants only on the ground that they failed to include a limiting time period, the other exceptions to the rule that suppression is improper where officers act in good faith reliance on a seemingly valid warrant, *see supra* n.18, are not at

GA042

if at all, time-frames are a constitutional requirement . . . [for] search warrants, and district courts in this circuit have not converged upon a clear rule," *Cohan*, 628 F. Supp. 2d at 367, "it cannot be said that [the] executing officers should have realized a lack of date limitation constituted a facial deficiency in the [s]earch [w]arrant such that reliance on it would be unreasonable," *Levy*, 2013 WL 664712, at \*11; *see also United States v. Jacobson*, 4 F. Supp. 3d 515, 527 (E.D.N.Y. 2014) ("[T]he fact that the precise relevance of the absence of an express time frame on the particularity and breadth of a warrant has yet to be settled in this [c]ircuit further supports the idea that agents reasonably relied on the magistrate's authorization and should be protected by the 'good faith' exception."); *Nejad*, 436 F. Supp. 3d at 732 (finding that under the good-faith exception, the fruits of a warrant to search emails should not be suppressed because "there is no consensus in this [c]ircuit as to when temporal limitations are required—or when the lack thereof alone may invalidate an otherwise valid search warrant" (internal citation omitted)). Accordingly, even assuming, *arguendo*, that the May 30 warrants were overbroad for lack of a time frame, "the good-faith exception to the exclusionary rule [would] render[] suppression unwarranted." *Cohan*, 628 F. Supp. 2d at 368.[20]

## IV.    Dismissal of the Underlying and Superseding Indictments Is Improper.

In a final effort to stall his criminal case, Mr. Kamaldoss argues that, regardless of my

---

issue. Accordingly, I decline to address them.

[20] In his suppression motion, Mr. Kamaldoss also contends that the Oath Holdings search warrants were improperly executed because the government seized information predating May 2018, even though the warrant authorized it to seize certain categories of information only if that information was created *after* May 1, 2018. Kamaldoss Mot. 33−34. In support of his argument, Mr. Kamaldoss points to emails produced by the government in discovery that dated back to 2012. *Id.* at 34. The government has since clarified that these emails were produced pursuant to the government's discovery obligations under Federal Rule of Criminal Procedure 16(a)(1)(E)(iii) and will not be reviewed or used by the government at trial except to authenticate the account data. Gov't Opp'n 30−31. I therefore decline to address Mr. Kamaldoss's argument.

41

GA043

rulings on his suppression motions, I should dismiss his underlying and superseding indictments. Kamaldoss Mot. 36. His reason for suggesting such drastic action is curious: because the FDA's authority to conduct criminal investigations derives from the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301−399d, Mr. Kamaldoss posits that the agency does not have jurisdiction to investigate violations of the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.*, the Act under which Mr. Kamaldoss is charged. *Id.* In other words, because the FDA's investigation—undertaken with other agencies, including the Department of Homeland Security— led to the discovery of evidence that was used to indict Mr. Kamaldoss under the CSA, the FDA exceeded the scope of its investigative authority and Mr. Kamaldoss's underlying and superseding indictments should be dismissed. This logical leap is without authority. Indeed, in support of his argument, Mr. Kamaldoss cites not a single case concluding that an indictment should be dismissed because the "wrong" federal agency was involved in the defendant's investigation, and I have found no such proposition in the course of my independent research. As the government points out, this could be because "[w]hich particular law enforcement agencies participated in the investigation prior to" the issuance of an indictment by the grand jury "has no conceivable relevance to the indictment['s] validity." Gov't Opp'n 36. After all, the FDA was not responsible for bringing the case before the grand jury or issuing the indictment. Accordingly, I see no meritorious ground for dismissing Mr. Kamaldoss's original and superseding indictments.

## CONCLUSION

Because I find that Mr. Kamaldoss's and Mr. Navaratnarajah's constitutional rights were not violated and that there is no basis to dismiss the superseding indictment in this case, their pre-trial motions are denied.

42

GA044

SO ORDERED.


_____/s/_____

Allyne R. Ross
United States District Judge


Dated:        April 22, 2022
              Brooklyn, New York

GA045

1

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   --------------------------------x
                                      19-CR-543(ARR)
 3   UNITED STATES OF AMERICA,
                                      United States Courthouse
 4          Plaintiff,               Brooklyn, New York

 5          -against-                June 21, 2022
                                     9:00 a.m.
 6   EZHIL SEZHIAN KAMALDOSS,

 7          Defendant.
     --------------------------------x
 8
               TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
 9            BEFORE THE HONORABLE ALLYNE R. ROSS
              UNITED STATES SENIOR DISTRICT JUDGE
10                      BEFORE A JURY

11   APPEARANCES

12   For the Government:      UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
13                            271 Cadman Plaza East
                              Brooklyn, New York 11201
14                            BY:  MARGARET SCHIERBERL, AUSA
                                   ROBERT M. POLLACK, AUSA
15                                 NICHOLAS J. MOSCOW, AUSA

16
     For the Defendant:       MORVILLO ABRAMOWITZ GRAND IASON &
17                            ANELLO P.C.
                              565 Fifth Avenue
18                            New York, New York 10017
                              BY:  ROBERT M. RADICK, ESQ.
19                                 RUSSELL FELDMAN, ESQ.
                                   KATHERINE J. DROOYAN, ESQ.
20

21   Court Reporter:          Georgette K. Betts
                              Phone:  (718)804-2777
22                            Fax:    (718)804-2795
                              Email:  Georgetteb25@gmail.com
23

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
25
```

GEORGETTE K. BETTS, RPR, FCRR, CCR
*Official Court Reporter*

GA046

PARAMESWARAN - DIRECT - MR. POLLACK

54

```
1    A    Thirty-four, 35 years.

2              THE COURTROOM DEPUTY:  Excuse me.

3    Q    Where are you from originally?

4    A    Sri Lanka.

5    Q    How long have you been in the United States?

6    A    Thirty-four, 35 years.

7    Q    What is your native language?

8    A    Tamil, T-A-M-I-L.

9    Q    Do you speak any language other than English and Tamil?

10   A    No.

11   Q    Do you know Ezhil or Ezhil Sezhian Kamaldoss?

12   A    Yes.

13   Q    How do you pronounce his name?

14   A    Ezhil Kamaldoss.

15   Q    Do you know him by any other names?

16   A    No.

17   Q    Do you recognize him in the courtroom today?

18   A    Yes.

19   Q    Can you identify him by an article of clothing?

20   A    Yeah.

21   Q    Can you say an article of clothing that Mr. Kamaldoss is

22   wearing?

23   A    A white shirt.

24              THE COURT:  A light shirt.  Where is he seated at

25   counsel table?
```

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

GA047

64

Parameswaran – Direct/Mr. Pollack

1  Q    Did you see pills in the -- any part of the van on

2  multiple occasions on different times?

3         MR. RADICK:  Objection.

4         THE COURT:  Overruled.  Go ahead.

5         THE WITNESS:  Yes.

6  Q    Can you say, approximately, how often or how many times?

7  A    Two or three times.

8  Q    What did you think about that?

9         MR. RADICK:  Objection.

10        THE COURT:  One second.

11        Sustained.  Just reword it.

12 Q    Did you ask Rajah about the pills?

13 A    I asked him and he said they were painkillers.

14 Q    Did you do anything about that?

15 A    I did not do anything at that time.  After that, the

16 second or third time, I asked a friend of mine what it was

17 about.

18 Q    Who was that friend?

19 A    He works in the FBI.

20 Q    Why did you tell that friend?

21 A    Initially, they said they were going to start a spice

22 business.  And then I saw these medications and I wanted to

23 check with that friend and find out what it was about.

24 Q    Did Rajah ever ask you to come work with him?

25 A    Yes, in 2019.

GA048

65

Parameswaran – Direct/Mr. Pollack

1   Q    Did he tell you what you would be doing?

2   A    Yes.

3   Q    What would you be doing?

4   A    Packing the pills and putting them in envelopes.  Putting

5   them in bubble wrap and pasting them.  He showed me all that.

6   Q    Do you know why Rajah needed help doing that?

7            MR. RADICK:  Objection.

8            THE COURT:  Sustained.  Just reword it.

9   Q    When Rajah asked you to come work with him, did you tell

10  anyone?

11  A    (In English) Yes.  (Through the Interpreter) Yes.

12  Q    Who did you tell?

13  A    I told the FBI agents.

14  Q    And did you start working with the Government?

15  A    Yes.

16  Q    What did you tell Rajah?

17  A    He said not to tell anyone.  I did not say anything to

18  Rajah.

19  Q    Did the Government offer to pay you money?

20  A    They gave me but I did not take it.

21  Q    I'm sorry, the translator said "gave," does that mean the

22  Government offered?

23  A    Yes.

24  Q    Why did you not accept the Government's money?

25            THE INTERPRETER:  I have to clarify that.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GA049

66

Parameswaran – Direct/Mr. Pollack

1   A   I was getting the SSA and SSI for disability from the

2   Government at that time so I did not want to take this money.

3   Q   For approximately how long did you go work with Rajah?

4   A   Three months.

5   Q   Approximately when did that begin?

6           THE INTERPRETER:  I have to ask him to repeat again.

7           THE COURT:  You can respond in Tamil if it's easier.

8   A   I started in 2019.  I started in March and I moved out in

9   April or May around that time.

10  Q   And during that time, how often did you work with Rajah?

11  A   Monday to Friday.  9:00 o 'clock to 1:00, 1:30.  Around

12  2:00 o'clock.  Sometimes I used to work on Saturdays, too.

13          THE COURT:  What are 1:30, in the afternoon or at

14  night?

15  A   9:00 to 1:30 p.m. After 1:30, we used to go to the post

16  office.

17  Q   Where did this happen?  Where did you work with Rajah?

18  A   What do you mean?  I'm not understanding the question.

19  Q   When you worked with Rajah, where did you do that?

20  A   In the warehouse.

21  Q   How did you get to the warehouse?

22  A   Rajah used to come to my house and pick me up from there.

23  Q   And did that happen each morning?

24  A   Yes, he used to pick me up at 8:30.

25  Q   And then what did you do at the warehouse?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GA050

Parameswaran – Direct/Mr. Pollack                    67

1    A    He would give me a list of things to pack and I would

2    pack those things.

3    Q    What kinds of things?

4    A    All of them are pills.

5    Q    How did you know how to do it?

6    A    Rajah showed me everything.

7    Q    How did you know what the orders were?

8    A    Sometimes the orders were through the phone, WhatsApp

9    app, and sometimes through e-mail.  And sometimes they used

10   get a printout of the orders.

11   Q    Do you know if Rajah was speaking to anyone else about

12   the orders?

13   A    He was talking to Kamaldoss.

14   Q    How do you know that?

15   A    He used to converse in Tamil so I knew he was talking to

16   him.

17   Q    Can you tell us what the inside of the warehouse looked

18   like?

19   A    There were boxes of pills.  They were like big boxes and

20   they were like 4,000, 5,000, 8,000.  On the sides, there were

21   packages that were already packed.  Pills, the packages of

22   pills, that were already packed.

23   Q    Can you say, in general, where the warehouse was?

24   A    Rockaway Boulevard in Queens.

25   Q    After the envelopes were packed, do you know what

GA051

Parameswaran – Direct/Mr. Pollack

68

1    happened to them?

2    A    Based on the orders, they will pack the pills and put

3    them in bags and take them to the post office.

4    Q    Did you ever go to the post office?

5    A    Yes.  I used to go with Rajah.

6    Q    How did you or Rajah carry the envelopes?

7    A    It's like a laundry bag like a bag made of cloth.  I used

8    to be able to put the envelopes in the bags and take them.

9    Q    Do you remember the color of the laundry bag?

10   A    They were all different colors.  Red maybe white.

11   Q    Did you see Rajah putting envelopes in the mail?

12   A    Yes.

13   Q    Did you ever meet Kamaldoss in person?

14   A    I have seen him, like, three times in the warehouse.

15   Q    Did you ever see Kamaldoss pack pills into envelopes in

16   the warehouse?

17   A    Yes.

18   Q    Did you ever go with Kamaldoss to the post office with

19   envelopes?

20   A    I went with them one day but they dropped me in my house

21   and they both went.

22   Q    Who is "they both went"?

23   A    Rajah and Kamaldoss.

24   Q    So, at the beginning, I asked you if you saw Kamaldoss in

25   the courtroom and I think you said he was wearing a white

GA052

                    Parameswaran – Direct/Mr. Pollack          69

1    shirt.

2           Now that you're maybe a little more comfortable and

3    you have the interpreter, can you say whether you see

4    Kamaldoss in the courtroom?

5    A    I have a problem with my vision, with my glasses.

6           THE COURT:  Do you want to -- are your glasses on?

7           THE WITNESS:  Even with my glasses it's a problem.

8           THE COURT:  For this purpose, you can pull up the

9    mask and look.

10          Can you see more clearly now?

11          THE WITNESS:   Everyone is wearing a mask.  It's

12   kind of difficult to identify someone.

13          THE COURT:  Do you want to get up and get closer?

14          THE WITNESS:  Okay.

15          THE COURT:  Okay.  Go ahead.

16          (Witness leaves the witness stand.)

17          THE WITNESS:  (Pointing).

18          THE COURT:  Okay.  Identifying the defendant.  Okay.

19          Thank you.  Go back and sit down.

20          (Witness takes the witness stand.)

21          MR. POLLACK:  May I inquire, Judge.

22          THE COURT:  Yes, please.

23   EXAMINATION BY

24   MR. POLLACK:

25   (Continuing.)

                Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
                        Official Court Reporter

GA053

70

Parameswaran – Direct/Mr. Pollack

1   Q    Did you take photographs in the warehouse?

2   A    Yes.

3   Q    Why did you do that?

4   A    The Homeland Security people set it up and asked me to

5   take photographs.

6   Q    And a few minutes ago when you said, "the FBI people,"

7   are those the same as the Homeland Security people?

8   A    My friend worked with the FBI, worked for the FBI, and he

9   arranged to meet with these people, the Homeland Security.

10  Q    I'm going to show you a disk.

11           MR. POLLACK:  Your Honor, may I approach?

12           THE COURT:  Yes.

13           (Approaching the witness.)

14           (Showing to the witness.)

15  A    I know that.  I have seen it.

16  Q    You recognize this disk?

17  A    Yes.

18  Q    Is the signature on the disk your signature?

19  A    Yes.

20  Q    Did you review all the items on the disk?

21  A    Yes.

22  Q    The disk is marked with the contents as Government

23  Exhibits 401 through 410; 413 through 414; 421, 424, 436, 443

24  through 446; 461, 463, 466 through 468; 472, 494, and 401-A

25  through 414A.

GA054

Parameswaran – Direct/Mr. Pollack

71

1   A    Yes.

2   Q    Did you review those in my office yesterday?

3   A    Yes.

4   Q    What are they?

5   A    Photographs of the pills.

6   Q    Are they photos that you took inside the warehouse?

7   A    Yes.

8   Q    Are they fair and accurate copies of the photos that you

9   took?

10  A    Yes.

11       MR. POLLACK:  The Government offers the exhibits

12  that I enumerated as evidence.

13       MR. FELDMAN:  No objection.

14       THE COURT:  Admitted.

15       (Government Exhibits 401 through 410; 413 through

16  414; 421, 424, 436, 443 through 446; 461, 463, 466 through

17  468; 472, 494, and 401-A through 414A, were received in

18  evidence.)

19       MR. POLLACK:  Your Honor, may we publish from the

20  list?

21       THE COURT:  Yes.

22  Q    We'll start with Government Exhibit 401.

23       Is this visible on your screen as well?

24  A    Yes, these are the pills.

25  Q    Did you take this photo inside the warehouse?

GA055

```
                       Parameswaran – Direct/Mr. Pollack          72

 1   A     Yes.

 2   Q     Ms. Cronin can we publish Exhibit 403.

 3             What is this?

 4   A     These are all pills.

 5   Q     These are pills?

 6   A     I took these photographs in the warehouse.

 7   Q     Ms. Cronin, can we pub 405.

 8             And what are these?

 9   A     These are all pills.  I took these photographs inside the

10   warehouse.

11   Q     Ms. Cronin, can we publish Exhibit 406.

12             What are these?

13   A     These are also pills.

14   Q     Ms. Cronin, can we publish 407.

15             What are these?

16   A     These are also pills with different names.

17   Q     Ms. Cronin, 414.

18             What's this?

19   A     These were all pills before packing.  They were all in a

20   big basket.

21   Q     We'll skip around a little bit.  Ms. Cronin, can you

22   publish 424?

23             What are these?

24   A     These were all packages of pills ready to go to the post

25   office.
```

GA056

Parameswaran – Direct/Mr. Pollack

73

1    Q    And this is inside the warehouse?

2    A    Yes.

3    Q    Ms. Cronin, Exhibit 436.  What are these?

4    A    These are also pills.

5    Q    Ms. Cronin, 444.  What are these?

6    A    These were all boxes of pills before packing after they

7    arrived from India, they have 4,000; 8,000; 5,000 pills inside

8    them.

9    Q    Ms. Cronin, can you publish Government Exhibit 446.

10        What are these?

11   A    These were all the packages that were ready to go to the

12   post office.  Packages based on the orders received.

13   Q    Ms. Cronin, 467.

14        What is this?

15   A    Bubble wraps to wrap the pills.

16   Q    Ms. Cronin, Exhibit 472.

17        What is this?

18   A    This is a big box of pills.  This is how they arrive.

19   Q    Ms. Cronin, 401-A.  What is this?

20   A    These are the orders from India on who it send it to.

21   Q    Ms. Cronin, 403-A.  What is this?

22   A    This is a box with 4,000 pills inside.

23   Q    Ms. Cronin, 404-A?

24   A    This is a box with 6,000 pills.

25   Q    Can you see that clearly?

GA057

74

Parameswaran – Direct/Mr. Pollack

1    A    8,000.

2    Q    Ms. Cronin, 408-A.  What is this?

3    A    These are papers with the orders.  And once packed they

4    just check them off to confirm that they were all packed.

5    Q    Ms. Cronin, 409-A.  What is this?

6         THE INTERPRETER:  I have to ask him to clarify.

7    A    This was the credit card Navaratnarajah was using it

8    purchase items like bubble wraps.

9    Q    Can you see the name on the credit card?

10   A    Ezhil Kamaldoss.

11   Q    Ms. Cronin, can we publish 410-A.

12        What's this?

13   A    This is another card that Rajah was using.

14   Q    Can you see the name on this card?

15   A    Ezhil Kamaldoss.

16   Q    Ms. Cronin, can we put up Government Exhibit 468.  What

17   is this?

18   A    It's a box of pills that is opened and you can see the

19   pills inside the box.

20   Q    Thank you.  Mr. Parameswaran, while you were in the

21   warehouse, did you ever make audio recordings?

22   A    Yes.

23   Q    How did you do that?

24   A    The Homeland Security people set it up for me.

25   Q    When they set it up for you, were they putting a

GA058

Parameswaran - direct - Pollack

86

1    (Continuing.)

2           THE COURT:  Please be seated.

3           Ladies and gentlemen, I understand it's warm in the

4    courtroom and that is making us all sleepy.

5           So, if anybody feels that way, just stand up and

6    we'll all stand up and stretch, okay?  Because it's important

7    that we all be awake.

8           MR. POLLACK:  May I inquire?

9           THE COURT:  Yes.

10          MR. POLLACK:  So, we are going to play Government

11   Exhibit 808, and the translation is under Tab A of the binder

12   is mis-stamped also as Government Exhibit 808, that should be

13   808T.

14          We are going to play that and I'll ask some

15   questions when it's finished.

16          (Audio played.)  (Audio stopped.)

17   EXAMINATION CONTINUING

18   BY MR. POLLACK:

19   Q   Can you describe for us what's happening in that

20   recording?

21   A   It was a conversation between me, Navaratnarajah and

22   Kamaldoss.

23   Q   What was the conversation about, did you hear it okay?

24   A   Kamaldoss arrived from India to New York and we were just

25   talking.

GA059

Parameswaran – direct – Pollack

87

1    MR. POLLACK:  We'll now play Government Exhibit 809,

2  which is beneath Tab B.  The translation should be marked

3  Government Exhibit 809T.

4    We'll play it, and then we'll ask you some questions

5  about it.

6    (Audio played.)  (Audio stopped.)

7  BY MR. POLLACK:

8  Q    Can you describe what happened in that recording?

9  A    Yes.

10  Q    Please describe what's happening.

11  A    It was a conversation between me, Kamaldoss and Rajah.

12  The printer was not working, so Rajah had to hand write all

13  the addresses.  The orders came in late.

14  Q    And when you said that the orders came in late, who said

15  "I was in the flight yesterday"?

16  A    It was Kamaldoss who was on the flight and his internet

17  connection got disconnected, so he had to pay $10 and that's

18  what he was saying.  He could only send the orders through the

19  internet.

20    MR. RADICK:  Objection, it's not responsive.

21    THE COURT:  Could you just try to elicit what you

22  want differently, please?

23  BY MR. POLLACK:

24  Q    When you said your order was late to arrive and Kamaldoss

25  said I was in the flight yesterday --

SAM      OCR      RMR      CRR      RPR

GA060

                    Parameswaran - direct - Pollack                    88

1           (Interpreter translating.)

2   A    Yes, his internet connection got disconnected, so he

3   couldn't send it immediately.

4   Q    -- was it your understanding that the internet on the

5   plane was the reason why the orders were late?

6           MR. RADICK:  Objection.  Objection.

7           THE COURT:  You have to say it louder.

8           MR. RADICK:  I'm sorry, Your Honor, let me turn on

9   my mic.

10          THE COURT:  That's all right.

11          MR. RADICK:  Objection.

12          THE COURT:  Yes, I heard.

13          MR. POLLACK:  Your Honor, I can withdraw the

14  question and rephrase it.

15          THE COURT:  Yes, withdraw it and rephrase it.

16  BY MR. POLLACK:

17  Q    Did you have an understanding of why the orders were

18  late?

19  A    Yes.

20  Q    What was your understanding of why the orders were late?

21          THE COURT:  What was the basis for his understanding

22  first?

23  BY MR. POLLACK:

24  Q    How did you know -- what was the basis for your

25  understanding of why the orders were late?

            SAM      OCR      RMR      CRR      RPR

GA061

Parameswaran - direct - Pollack                    89

1   A    Kamaldoss was telling Rajah that he did not have the

2   internet connection, so he -- he was not able to send it until

3   it was late.

4          THE COURT:  Is that Navaratnarajah?

5          THE WITNESS:  Yes.

6          THE COURT:  Just draw it out.

7   BY MR. POLLACK:

8   Q    How do you -- how do you know how Navaratnarajah would

9   get the orders?

10         THE INTERPRETER:  Sorry?

11  Q    How do you know --

12         MR. RADICK:  Objection.

13         THE COURT:  Generally, is this a question that goes

14  to generally?

15         MR. POLLACK:  Yes, Your Honor.

16         THE COURT:  Okay, go ahead.  "Generally."

17  BY MR. POLLACK:

18  Q    In general, how do you -- how did -- how do you know how

19  Rajah received orders?

20  A    He used to tell me that he received orders on his

21  WhatsApp or on his phone or through his --

22         THE INTERPRETER:  Sorry, I am going to ask him for

23  the last part.

24         (Interpreter translating.)

25  A    -- fax, through fax.

SAM      OCR      RMR      CRR      RPR

GA062

                                                                              90
                         Parameswaran – direct – Pollack

1    Q     And what do you mean by orders?

2    A     The addresses that we needed to pack and send the stuff

3    to.

4    Q     What do you mean by stuff?

5    A     Pills to whichever address we had to send it to.

6    Q     In the recording when Rajah referred to Babu --

7              THE COURT:  I guess there is a connecting question

8    here as to whether or not Mr. Navaratnarajah got those orders

9    solely from Kamaldoss, as far as he knows, because of

10   conversations between.

11   BY MR. POLLACK:

12   Q     Do you know who sent orders to Navaratnarajah?

13   A     Yes, it was Kamaldoss.

14   Q     Do you know if anyone else sent orders to Navaratnarajah?

15   A     They used to get it from the printer.  They did not tell

16   me who it was from.

17   Q     In the recording there's reference to someone named Babu.

18         Who is Babu?

19   A     Babu was working in the post office.

20             MR. POLLACK:  We'll play Government Exhibit 810 and

21   when it's done playing, I'll ask some questions about it.

22             (Audio played.)   (Audio stopped.)

23   BY MR. POLLACK:

24   Q     Who are the people on this recording?

25   A     It was Navaratnarajah and myself.

            SAM        OCR        RMR        CRR        RPR

91

Parameswaran – direct – Pollack

1  Q    And can you describe for us what's happening in this

2  recording?

3  A    He was telling me what the plan was going to be that day.

4  He would give me a list of things that I had to pack, list of

5  pills that I had to pack.  After that, he was going to pick up

6  Kamaldoss and go to dinner or maybe lunch.  So, he asked me to

7  take the bus to go home after finishing everything.

8  Q    So, at the end of the recording when Rajah says he wants

9  to take his wife to lunch, who was he talking with?

10  A    He was referring to Kamaldoss and to his wife.

11  Q    And in the beginning of the recording when Rajah said:

12  He has finished taking a shower, let's go pick him up and go

13  to the office?

14  A    Kamaldoss.

15  Q    And when Rajah said:  I'll write everything down clearly

16  for you, in the meantime he will make the labels.

17       Who was going to make the labels?

18  A    Kamaldoss.

19       MR. POLLACK:  We'll play Government Exhibit 812,

20  it's very short.  I'll ask you some questions when it's

21  finished.

22       (Audio played.)   (Audio stopped.)

23  BY MR. POLLACK:

24  Q    Who are the two people talking on this recording?

25  A    Me and Kamaldoss.

SAM      OCR      RMR      CRR      RPR

GA064

Parameswaran – direct – Pollack

92

```
1    Q    And who says:  Let me print the labels?

2    A    Kamaldoss.

3         MR. POLLACK:  We'll start to play Government

4    Exhibit 813, but it's much longer, so we'll stop after.

5         (Audio played.)   (Audio stopped.)

6         MR. POLLACK:  So, for the record, we stopped at

7    about one minute and 19 seconds.

8    BY MR. POLLACK:

9    Q    Can you tell us what's happening there in the recording?

10   A    Rajah was giving me directions on what to pack.

11        MR. RADICK:  I'm sorry, can you just repeat that,

12   please?

13   A    Rajah was giving me instructions on what to pack.

14        MR. RADICK:  Thank you.

15   Q    And what was he telling you to pack?

16   A    Pills.

17        MR. POLLACK:  Let's skip up, Ms. Cronin, to

18   20 minutes and 40 seconds in the recording.

19        THE COURT:  Where in the transcript is that?

20        MR. POLLACK:  That's going to be on the third page,

21   page 3 of the transcript, toward the bottom there's a place

22   that says "long silence," and it ends at 20:43.

23        THE COURT:  Okay.

24        (Audio played.)   (Audio stopped.)

25        MR. POLLACK:  The record can show that we've stopped
```

GA065

Parameswaran – direct – Pollack                                    93

1    at 20 minutes 54 seconds.

2    BY MR. POLLACK:

3    Q    Can you say what's happening there?

4    A    We were cleaning inside the warehouse.

5    Q    Did you hear someone say something about strips of Xanax?

6            MR. RADICK:  Objection.  Objection.

7            THE COURT:  I'm sorry?

8            MR. RADICK:  I'm objecting to the leading.

9            THE COURT:  Oh.  It is very hard if we don't speak

10   loudly.  I can't hear it.  The court reporter can't hear it.

11   We all really have to shout.

12           Reword the question, please.

13           MR. POLLACK:  Can we listen again from 20:43 in the

14   recording to make sure the witness hears it?

15           (Audio played.)   (Audio stopped.)

16           MR. POLLACK:  And so the record will reflect, we

17   stopped at 20:48.

18   BY MR. POLLACK:

19   Q    Can you hear what was said on the recording,

20   Mr. Parameswaran?

21   A    Rajah was asking me to pack up the pills.

22   Q    And --

23           THE COURT:  Did he say what kind of pills?

24           THE WITNESS:  There were pills with different names.

25   I forgot the name.

*SAM        OCR        RMR        CRR        RPR*

Parameswaran – direct – Pollack

94

1    THE COURT:  All right, go ahead.

2    I'm sorry, I didn't mean to interrupt your

3 questioning, Mr. Pollack.  You ask your question.

4    MR. POLLACK:  That's all right.

5    Let's skip up to 28:50, which is the middle of the

6 next page.

7    (Audio played.)   (Audio stopped.)

8    MR. POLLACK:  And the record will show that we

9 stopped at 28:57.

10 BY MR. POLLACK:

11 Q    Who was speaking in that brief recording?

12 A    Kamaldoss was asking me where the Lypin was.

13 Q    Could you repeat the word that you said, what did he ask

14 you where it was?

15 A    The name of the pill was Lypin, and Kamaldoss was asking

16 me where that pill was.

17    MR. POLLACK:  Thank you.

18    No further questions, Your Honor.

19    THE COURT:  It is almost 1 o'clock.

20    Ladies and gentlemen, we are going to break for

21 lunch.  And I understand that the cafeteria in the building is

22 not open, so you may go out for lunch.  And I am going to give

23 you enough time to do that.

24    If you could be back in the second floor jury room,

25 the one on the second floor where Dennis gets you.

GA067

171

Connor – direct – Pollack

1    there.

2    Q    Did you say you also did physical surveillance at that

3    location?

4    A    Yes, I also did physical surveillance.

5    Q    How often did you perform surveillance there?

6    A    Starting in August of 2018, almost on a daily basis.

7    Q    Was that always in person or sometimes on the phone?

8    A    Sometimes in person, but usually using technical

9    surveillance.

10   Q    During the course of that surveillance, did you see a

11   person you would eventually identify as Kamaldoss?

12   A    I did.

13   Q    Approximately how often did you see him?

14   A    I would see him almost every day up until a certain

15   point, and then he disappeared off the -- the technical

16   surveillance.  And then he came back later on.

17   Q    Do you see Kamaldoss now?

18   A    I do.

19   Q    How do you see him?

20   A    I see him on one of the cameras.

21   Q    Can you identify him by an article of clothing?

22   A    He's wearing a white shirt with a blue hatched tie.

23          THE COURT:  Indicating the defendant.

24   BY MR. POLLACK:

25   Q    Can you describe for us what the warehouse looks like,

SAM        OCR        RMR        CRR        RPR

GA068

179

Connor – direct – Pollack

1   Q    Who is that?

2   A    That's the defendant.

3            MR. POLLACK:  We'll play a few more seconds.

4            (Video played.)

5            MR. POLLACK:  Can you pause it?

6            (Video stopped.)

7   BY MR. POLLACK:

8   Q    We're pausing the video at 11:12 and 35 seconds a.m.

9            Special Agent Connor, can you tell us what we're

10  seeing here?

11  A    So, at first the associate left the building and loaded

12  two bags into the Nissan mini -- the Nissan Quest minivan.

13  And then Mr. Kamaldoss, the defendant, came out and he's

14  trying to get into the van, but he can't get into the

15  passenger side door.

16           MR. POLLACK:  Keep playing the video.

17           (Video played.)

18           MR. POLLACK:  Stop it there.

19           (Video stopped.)

20  BY MR. POLLACK:

21  Q    Can you describe for us, Special Agent Connor, what we

22  saw in those last moments since the time we last paused?

23  A    Yes.  The defendant moved the van away from the warehouse

24  wall so he could get into the passenger side door.  Then he

25  got into the passenger side door.  Then his associate came out

*SAM        OCR        RMR        CRR        RPR*

GA069

180

Connor - direct - Pollack

1   of the building, got into the driver's seat, and they drove

2   off.

3   Q     In all of your surveillance, did you ever see the

4   defendant driving himself?

5   A     No.

6   Q     What, if anything, did you do after seeing that man drive

7   away?

8   A     I followed them to the Fresh Meadow Post Office.

9   Q     Did you follow them the entire way?

10  A     I did.

11  Q     Did you lose sight of the van at any time?

12  A     No.

13  Q     What, if anything, did you see when -- when you arrived

14  at the post office?

15  A     The van stopped in front of the post office and parked on

16  the street.  The defendant got out of the van and went into

17  the post office.  I waited a few minutes and then parked my

18  vehicle into an alley, which is right next to the post office,

19  where the post office vehicles come out.

20        I then went into the post office, down by the

21  hallway to the right side where you can get to the back of the

22  post office.  As I was going down there, I poked -- poked my

23  head in the door and saw Mr. Kamaldoss at the -- at the

24  counter.  I then joined a postal inspector, who had been

25  waiting in the back of post office for me, and we waited for

SAM      OCR      RMR      CRR      RPR

GA070

181

Connor - direct - Pollack

1  Mr. Kamaldoss, the defendant, to be done mailing all the --

2  the envelopes.

3  Q    Did you examine the packages that the defendant left?

4  A    I did.

5  Q    Do you remember how many there were?

6  A    Eighty-eight.

7  Q    Did you take any of them?

8  A    We took five.

9  Q    Why did you do that?

10  A    To see if there were drugs inside the packages.

11  Q    Did you choose a particular five?

12  A    No, we just chose five at random.

13  Q    Did you get a warrant for those packages?

14  A    We did get a warrant for those packages, yes.

15  Q    When did you do that?

16  A    So, we got that warrant on the -- August 30th.

17  Q    And what happened with the packages in the meantime?

18  A    The postal inspector detained the packages and secured

19  them at the postal office in Brooklyn.

20  Q    And after you obtained a warrant, did you open those

21  packages?

22  A    We did.

23  Q    Where did you do that?

24  A    We did it at the postal office in Brooklyn.

25  Q    What did you find inside?

SAM        OCR        RMR        CRR        RPR

GA071

Connor – direct – Pollack

182

1    A    We found tramadol in four of the packages, and alprazolam

2    or -- in one of the packages.

3    Q    I previously sent you a binder with items marked for

4    identification as Government Exhibit 902 through 919, and

5    Government Exhibit 921 through 936.

6         Have you reviewed all of the items in that binder

7    before your testimony today?

8    A    I did review the binder, yes.

9    Q    Do you recognize those exhibits?

10   A    I do.

11   Q    What are they?

12   A    These are -- are pictures of the envelopes that I took on

13   August 29th at the Fresh Meadows post office.

14   Q    All right.  Are there pictures you took on any other

15   dates?

16   A    There are also pictures of the opening the packages that

17   we took on August 31st at the post office or the postal office

18   in Brooklyn.

19   Q    Did you take all of the photos in that binder?

20   A    I did.

21   Q    And are the copies in that binder fair and accurate

22   copies of the photos you took?

23   A    They are.

24         MR. POLLACK:  The Government offers Government

25   Exhibits 902 through 919 and 921 through 936 to be admitted as

SAM        OCR        RMR        CRR        RPR

GA072

Connor – direct – Pollack

183

1   evidence.

2          MR. RADICK:  Sorry, if I could just have one moment.

3          After 919 what was the second range, please?

4          MR. POLLACK:  921 through 936.

5          THE COURT:  To 36?

6          MR. POLLACK:  902 to 919; and then 921 through 936.

7   So, we're only skipping 920.

8          THE COURT:  That's okay.

9          Any objection?

10         MR. RADICK:  Just one moment.

11         No, no objection.

12         THE COURT:  Okay, admitted.

13         (Government Exhibits 902 through 919 and 921 through

14  936, were received in evidence.)

15         MR. POLLACK:  I'll note that there are jury aid

16  binders with these photos underneath the seats of the jurors.

17         THE COURT:  Okay.

18  BY MR. POLLACK:

19  Q   I will direct your attention to Government Exhibit 921.

20         Government Exhibit 921.

21         (Pause.)

22  Q   So, 921 is under Tab 21.  Special Agent Connor, can you

23  tell us what this photo, Government Exhibit 921, shows?

24  A   It's a photograph of the -- the envelopes that was mailed

25  by the defendant on August 29th, 2018.

SAM       OCR       RMR       CRR       RPR

GA073

Connor - direct - Pollack

184

1   Q    Where was this photo taken?

2   A    It was taken at the Fresh Meadows post office.

3   Q    I'll now direct your attention to 908, which is under

4   Tab 8.

5   A    Yes, sir.

6   Q    Can you tell us what that photo is?

7   A    That is one of the five envelopes that we took from

8   the -- from the previous photo of the bins.  And this one is

9   going to Shakopee, in Minnesota.

10  Q    Now turning to Government Exhibit 911, which is under

11  Tab 11 of the binders.

12  A    Yes, sir.

13  Q    What is this video -- I'm sorry.  What does this

14  photograph show?

15  A    It shows that same package going to Shakopee, Minnesota,

16  but it's after I opened it and it shows a picture of the

17  contents of what we found inside the envelope.

18  Q    I'll now show or I'll direct your attention, rather, to

19  Government Exhibit 913, which is under Tab 13 of the binder.

20  A    Yes, sir.

21  Q    What is this showing?

22  A    That's a close-up of the front and back of each of the

23  packages or each of the strips that were inside that package

24  of the drug tramadol, brand name SuperTram 100.

25            (Continued on the following page.)

SAM        OCR        RMR        CRR        RPR

GA074

185

CONNOR – DIRECT – MR. POLLACK

1    DIRECT EXAMINATION

2    BY MR. POLLACK:

3    (Continuing)

4    Q    I'll direct your attention now to Exhibit 931 which is

5    under Tab 31 in the binder.

6         What is this?

7    A    That is the evidence bag that I placed that envelope in

8    after I'd opened it and inventoried the contents.

9    Q    Is that your handwriting on the back?

10   A    It is.  Those are my initials in the upper right and

11   left-hand corner and I wrote that date in the center.

12   Q    Did you seal that bag?

13   A    I did.

14   Q    Did you write over the sealing flap?

15   A    I did.

16   Q    Why did you do that?

17   A    That's, one, to identify it and, two, to show the seal

18   hasn't been compromised.

19   Q    Without going through one by one all of these photos,

20   what, in general, do these other photos show?

21   A    They show the same thing for the other four envelopes

22   that we took the day of the -- that we did the operation on

23   August 29, 2018.

24   Q    What, if anything, did you do with these envelopes after

25   sealing them?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

GA075

186

CONNOR – DIRECT – MR. POLLACK

1  A   So they were brought to my evidence room, which is in

2  Beltsville, Maryland, then later on two of the envelopes were

3  sent to the laboratory for testing.

4  Q   Very quickly I'll direct your attention to the Government

5  Exhibit 904, which is under Tab 4 of the binder.

6  A   Yes.

7  Q   What is this?

8  A   That is an envelope going to Venetie, Alaska with the

9  contents we found inside that envelope underneath it.

10 Q   And Government Exhibit 919, which is under Tab 19.

11 A   That's an envelope going to Port Orange, Florida, also

12 with the contents that we found inside underneath.

13 Q   And now Government Exhibit 924, which is under Tab 24.

14 A   That is an envelope going to Smyrna, Georgia also with

15 the contents of the envelope under it.

16 Q   Can you see what those contents are?

17 A   That's the Alps 1, which is the Alprazolam.

18 Q   Do you know if Alprazolam is known by any other names.

19 A   It's known by the -- better by the brand name in the U.S.

20 here as Xanax.

21 Q   I direct your attention to Government Exhibit 932, which

22 is under Tab 32 in the binder.

23 A   That's going to McKinney, Texas, also with the contents

24 of the envelope underneath it.

25 Q   I'm going to show you several physical objects.  I'm

GA076

CONNOR - DIRECT - MR. POLLACK

187

1   going to hold them up for the camera the best I can.  These

2   are marked Government Exhibit 8 through 12.

3          So can you see -- first of all, there is an exhibit

4   label here which says, Government Exhibit 8.  I'll show you

5   the flap, can you see that?

6   A    I can.

7   Q    What is it?

8   A    That is Item Number 1 from the five envelopes that we

9   took on August 29th.

10         THE COURT:  I'm sorry, can the jurors see that?

11         MR. POLLACK:  We haven't admitted it yet.

12         THE COURT:  I'm sorry.

13  Q    And Government Exhibit 9, can you see this?

14  A    I can.

15  Q    Tell me if you need me to move it?

16  A    No, I can see it.

17  Q    What is this?

18  A    That's Item Number 2.  So the second of the envelopes

19  that we took on the day of August 29th.

20  Q    And I'm going to hold up for you an item marked

21  Government Exhibit 10.  Tell me if you need me to move it.

22  Can you see it?

23  A    That's Item Number 3, also we took on August 29th.

24  Q    Government Exhibit 11.

25  A    It's Item Number 4, that's number four of the envelopes

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

GA077

233

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   --------------------------------x
                                        19-CR-543(ARR)
 3   UNITED STATES OF AMERICA,
                                        United States Courthouse
 4           Plaintiff,                 Brooklyn, New York

 5           -against-                  June 22, 2022
                                        9:00 a.m.
 6   EZHIL SEZHIAN KAMALDOSS,

 7           Defendant.
     --------------------------------x
 8
                 TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
 9             BEFORE THE HONORABLE ALLYNE R. ROSS
              UNITED STATES SENIOR DISTRICT JUDGE
10                        BEFORE A JURY

11   APPEARANCES

12   For the Government:      UNITED STATES ATTORNEY'S OFFICE
                             Eastern District of New York
13                           271 Cadman Plaza East
                             Brooklyn, New York 11201
14                           BY:  MARGARET SCHIERBERL, AUSA
                                  ROBERT M. POLLACK, AUSA
15                                NICHOLAS J. MOSCOW, AUSA

16
     For the Defendant:       MORVILLO ABRAMOWITZ GRAND IASON &
17                           ANELLO P.C.
                             565 Fifth Avenue
18                           New York, New York 10017
                             BY:  ROBERT M. RADICK, ESQ.
19                                RUSSELL FELDMAN, ESQ.
                                  KATHERINE J. DROOYAN, ESQ.
20

21   Court Reporter:         Georgette K. Betts
                             Phone:  (718)804-2777
22                           Fax:    (718)804-2795
                             Email:  Georgetteb25@gmail.com
23

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
25
```

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

GA078

336

Chunton – Direct – Schierberl

1    credit even one dollar.  How I will get stock?  If account is

2    not zero always, I have to stop shipping from next week.

3    Q    What does the defendant appear to text in the next green

4    text?

5    A    This is online business.  Your client get payment

6    immediately when they get orders, so why they delay all the

7    time?

8    Q    What does the defendant appear to text in the next green

9    text?

10   A    Valium and new ready in New York.  I have no payment to

11   buy.

12   Q    Turning to page 39, what does Akshay appear to text in

13   the first two blue text messages?

14   A    Today I send you money.  Don't worry.

15   Q    What does the defendant's response appear to be?

16   A    Two days seller calling me to take Valium in New York.

17   Because I don't have payment, I no buy.

18   Q    Turning to page 51, what does the defendant appear to

19   text in the first green text message?

20   A    Update payment.  Make at zero.

21   Q    What does the response from Akshay appear to be?

22   A    Bro, can you cheak [sic] your USA account?

23   Q    What does the defendant appear to reply in the last two

24   green text messages?

25   A    On the first one, there's an image; and on the second

GA079

374

H. SINGH - DIRECT - MS. SCHIERBERL

1   A    I go by the name Vicky.

2   Q    How old are you, sir?

3   A    I'm 31.

4   Q    Have you ever been arrested in connection with this case?

5   A    Yes, ma'am.

6   Q    When was that?

7   A    It was September 12th, 2019.

8   Q    What crime were you arrested for in September of 2019?

9   A    Ma'am, I was arrested in crime for conspiracy to

10  distribute opioids.

11  Q    Do you see anyone in this courtroom that you committed

12  that crime with?

13  A    Yes, ma'am.

14  Q    Who do you see?

15  A    I see Mr. Kamal.

16  Q    Can you please identify him by an article of clothing.

17  A    He's wearing mauve shirt, a mauve-colored shirt and a tie

18  and stripes.

19         THE COURT:  Indicating the defendant.

20  BY MS. SCHIERBERL:

21  Q    Mr. Singh, do you know the defendant by any other names?

22  A    I know by the name of Ezhil and Kamal and Kamaldoss.

23  Q    Mr. Singh, what is your native language?

24  A    It's Hindi.

25  Q    To your knowledge, does the defendant speak Hindi?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

GA080

375

H. SINGH – DIRECT – MS. SCHIERBERL

1    A    No, ma'am.

2    Q    What language did you use to communicate with the

3    defendant?

4    A    English.

5    Q    And I notice that you and I are speaking English here

6    today, but we do have a Hindi interpreter available if you are

7    unclear about any of the questions that I ask or that you are

8    asked on cross-examination, you may always ask to use the

9    Hindi interpreter to assist you.

10          Do you understand?

11   A    Yes, ma'am.

12   Q    Would you like to use the interpreter at this time?

13   A    Not right now, ma'am.

14   Q    What were you doing for work when you first met the

15   defendant?

16   A    Ma'am, I was -- I was running a shipping -- shipping and

17   freight forwarding company when I first met.

18   Q    How did you first become involved in the shipping and

19   forwarding business?

20   A    In the year 2014 I was working for a company in Queens,

21   after working for that company I started my own company after

22   one year in 2015.

23   Q    What was the name of your company?

24   A    My company name was Urban Mail, Inc.

25   Q    What was the nature of the work of Urban Mail, Inc.?

GA081

376

H. SINGH – DIRECT – MS. SCHIERBERL

1  A    Nature of the work, it was shipping, freight forwarding

2  and custom clearing company.

3  Q    What is freight forwarding?

4  A    Freight forwarding means like forwarding the shipments,

5  forwarding the goods through UPS, FedEx and USPS.

6  Q    Did you also clear items through customs at JFK?

7  A    Yes, ma'am.

8  Q    What does it mean to clear items through customs?

9  A    Clearing items means -- like, clearing items mean like

10 goods coming from India, we clear them through custom, customs

11 and forward them.  And it can be any goods like clothes, food

12 items, anything.

13 Q    What types of items did your company clear and forward?

14 A    We cleared like -- we cleared whatever stuff belonged to

15 the people, like clothes, utensils, food items, glass pipe.

16 Q    What do you mean by glass pipe?

17 A    Glass pipe means drug paraphernalia.

18 Q    Are you familiar with the substance khat, K-H-A-T?

19 A    Yes, ma'am, I am.

20 Q    To your knowledge, is khat legal in the United States?

21 A    No, ma'am, it's not.

22 Q    Did you use your company at any time to import khat into

23 the United States?

24 A    Yes, ma'am, I have.

25 Q    Did there ever come a time when you began importing

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

GA082

377

H. SINGH - DIRECT - MS. SCHIERBERL

1   illegal drugs into the United States?

2   A    Yes, ma'am.

3   Q    When did you first import illegal drugs into the United

4   States?

5   A    Ma'am, in the beginning year 2017 approximately.

6   Q    Tell us about the first time that you imported illegal

7   drugs into this country.

8   A    In the year 2017 I had got a call from a person named --

9   by the name Nilesh Shukla from Mumbai and he had asked me to

10   clear the goods, which were the drugs or opioids.  And first

11   in beginning of 2017 he had called me up and he had asked me

12   to clear the goods for him and get them delivered to New York.

13   Q    Did he ask you to deliver those drugs to anyone in

14   particular?

15   A    Ma'am, he had asked me to deliver the drugs to Mr. Kamal.

16   Q    Is that the same individual that you identified as the

17   defendant a moment ago?

18   A    Yes, ma'am.

19   Q    Did you do as Nilesh asked and deliver drugs to the

20   defendant?

21   A    Yes, ma'am.

22   Q    What type of drugs did you deliver to the defendant that

23   first time?

24   A    It was -- it was tramadol 100.

25   Q    Were these drugs illegal to your knowledge?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

GA083

378

H. SINGH – DIRECT – MS. SCHIERBERL

1   A    Firstly they were not, the very first time they were not.

2   Q    Did you come to learn that tramadol was illegal?

3   A    Yes, ma'am.

4   Q    To your knowledge, does tramadol require a prescription?

5   A    Yes, ma'am.

6   Q    At any time did you see a prescription for the tramadol

7   that you delivered to the defendant?

8   A    No, ma'am.

9   Q    In that initial sale, approximately how many pills of

10  tramadol did you deliver to the defendant?

11  A    Approximately it was 50,000 to hundred thousand pills.

12  Q    Mr. Singh, what is a strip of pills?

13  A    A strip contains 10 pills in it.

14  Q    Were you paid for that initial delivery of 50 to 100,000

15  pills of tramadol?

16  A    Yes, ma'am.

17  Q    Who paid you?

18  A    It was paid by Kamal or Rajah, I don't recall exactly.

19  Q    Who is Rajah?

20  A    Rajah was a person who was working for Mr. Kamal.

21  Q    How did the defendant or Rajah pay you at that time?

22  A    Ma'am, it was cash at that point of time.

23  Q    How much money did they pay you at that time?

24  A    I don't remember that.

25  Q    Do you remember if it was more or less than $5,000?

GA084

379

H. SINGH – DIRECT – MS. SCHIERBERL

1   A    It was more than $5,000.

2   Q    To your knowledge, why might Rajah have paid you for

3   drugs you were delivering to the defendant?

4        MR. RADICK:  Objection.

5        THE COURT:  I don't think you laid a foundation for

6   who gave him the money.

7   BY MS. SCHIERBERL:

8   Q    Did Rajah ever pay you for drugs that were intended to be

9   delivered to the defendant?

10       MR. RADICK:  Objection.

11       THE COURT:  Sidebar.

12       (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

GA085

384

H. SINGH – DIRECT – MS. SCHIERBERL

1        (In open court.)

2        THE COURT:  Okay, we're taking a stretch.

3        MS. SCHIERBERL:  May I ask the court reporter to

4  just read back the last question and answer.

5        (Record read.)

6  Q   After that initial sale, did the defendant ever contact

7  you?

8  A   After that initial sale, we had exchanged numbers between

9  us and we were in touch with each other.

10  Q   What, if anything, did the defendant say to you after

11  that initial delivery of drugs?

12  A   When we –– we began to talk with each other, but as he

13  asked me, like, if I could get him more of tramadols.

14  Q   Other than tramadol, did he ask you for any other drugs?

15  A   Other than tramadol, he asked me for tramadol different

16  MGs and Xanax, Lypin, alprazolam, Soma, and also he asked me

17  for tramadol...that's what I remember right now.

18  Q   How many times a month, approximately, following that

19  initial sale, did the defendant ask you to get him drugs?

20  A   After the first one, then we were in touch, but I did not

21  get for a longer time until, five, six months, but we were

22  touch and he was asking me if I could get him the drugs.

23  Q   How many times a month would he ask you to get him drugs?

24       MR. RADICK:  Objection –– withdrawn.

25  A   Once a month or twice a month.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

GA086

385

H. SINGH - DIRECT - MS. SCHIERBERL

1  Q     For how many months did that go on?

2  A     Five to six months.

3  Q     What was your understanding as to why the defendant asked

4  you in particular to get him drugs?

5  A     As I was a courier and cargo company and I was a freight

6  forwarding company and I had delivered him the drugs already

7  once so that's why he was asking me if I could get more.

8  Q     Did you ever talk to the defendant specifically about

9  using your legitimate business to provide a cover to import

10  illegal drugs?

11  A     Yes, we had -- we had -- we had talk about it.

12  Q     After that initial sale in 2017, did there come a time

13  when you began importing drugs for the defendant a second

14  time?

15  A     Yes.

16  Q     When was that?

17  A     It was approximately in August or September 2017.

18  Q     What did you do to supply drugs to the defendant that

19  second time?

20  A     The second time I had spoken to a person in Mumbai, a

21  logistics company, which was already working with me and they

22  were sending courier to me, so I asked them if they could get

23  me the same drugs that he had asked for and more important

24  then they provided -- they told me that they can send the

25  drugs.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

GA087

386

H. SINGH - DIRECT - MS. SCHIERBERL

1    Q    Which drugs specifically did you ask that person in

2    Mumbai for?

3    A    It was a tramadol 100.

4    Q    Why did you ask for tramadol?

5    A    Because that was asked for me from Mr. Kamal.

6    Q    Did you receive tramadol in response to that request?

7    A    Yes.

8    Q    Who, if anyone, did you deliver that tramadol to?

9    A    I didn't understand.

10   Q    After receiving that tramadol, who did you deliver it to?

11   A    Ma'am, after receiving that tramadol I had delivered it

12   in Bellerose, but I do not remember to whom, Rajah or

13   Mr. Kamal.

14   Q    Why -- did you ever deliver drugs to Rajah that

15   Mr. Kamaldoss ordered?

16   A    Yes.

17   Q    Why did you do that?

18   A    If Mr. Kamaldoss was not in the country and he was in

19   India, then he would ask me to deliver it to Mr. Rajah.

20   Q    Were you paid for that second shipment of drugs?

21   A    Yes, ma'am.

22   Q    Who paid you?

23   A    Ma'am, I do not remember at that time if it was Mr. Kamal

24   or Rajah.

25   Q    Do you remember how you were paid?

GA088

387

H. SINGH - DIRECT - MS. SCHIERBERL

1  A    Ma'am, I was paid cash.

2  Q    Do you remember how much you were paid?

3  A    No, ma'am, I do not remember.

4  Q    Do you remember if it was more or less than $5,000?

5  A    It was more than $5,000.

6  Q    Taking a step back, to your knowledge, how did customers

7  place orders for tramadol?

8  A    Ma'am, the orders were placed online, do no know exactly

9  how online, but they were placed online and orders were

10 received in Mumbai or some part of India and they were then

11 sent here to U.S.

12 Q    Who were they sent to here in the U.S.?

13 A    To Mr. Kamal.

14 Q    What happened after they were communicated to the

15 defendant?

16 A    I don't understand.

17         MR. RADICK:  I object to the foundation.

18         MS. SCHIERBERL:  I can rephrase, your Honor.

19         THE COURT:  Could you please.

20         MS. SCHIERBERL:  Yes.

21 Q    Do you know what happened after the orders were sent to

22 the defendant?

23 A    Ma'am, after the orders were sent to U.S., then they were

24 being packed, in the USPS mail, flat mail, flat mails, and

25 then they were shipped out through USPS.

GA089

388

H. SINGH - DIRECT - MS. SCHIERBERL

1    Q    Who packaged them into flat rate envelopes?

2    A    Ma'am, it was either Rajah or Mr. Kamal.

3    Q    Who bought the drugs to fill those orders?

4    A    Who bought the drugs?  Mr. Kamal bought the drugs from

5    me.

6    Q    Do you know how, if at all, the defendant got paid for

7    shipping those drugs?

8    A    Ma'am, he was paid in India.

9    Q    How do you know that?

10   A    I think we discussed it somewhere in the office or -- I

11   do not remember where we discussed it, but I think it was paid

12   in India.

13   Q    When you reference the office, where is the office

14   located?

15   A    My office was located in Queens, near JFK on Rockaway

16   Boulevard.

17   Q    Do you remember the exact address?

18   A    Ma'am, it is 161-15 Rockaway Boulevard, Jamaica 11419.

19   Q    In general, what information did the defendant give you

20   in order to place an order for pills?

21   A    In general, ma'am, he would let me know the amount of his

22   strips he would need, the drug name, the mg of the drugs.

23        MR. RADICK:  Sorry, I didn't hear the last part of

24   the answer.

25        MS. SCHIERBERL:  The mg of the drugs.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

GA090

H. SINGH - DIRECT - MS. SCHIERBERL

389

1    MR. RADICK:  Thank you.

2    Q    And just to clarify, Mr. Singh, when you say the mg of

3    the drugs, what do you mean?

4    A    Milligram of the drugs, like hundred milligram or

5    50-milligram.

6    Q    How frequently did the defendant place orders for drugs

7    with you?

8    A    Ma'am, as soon as his stock would go down, he would ask

9    me for the drugs.

10    Q    Approximately how many strips of pills would the

11    defendant order at a time?

12    A    How many strips?

13    Q    Yes.  Approximately how many strips of pills would the

14    defendant order at a single time?

15    A    Ma'am, it depended on him, but approximately it was like

16    10,000 to 15,000 tramadol-100.

17    Q    And that's strips?

18    A    That's strips.

19    Q    So is that 10 times as many pills?

20    A    Yes, ma'am.

21    Q    So is that 100,000 to 150,000 pills at a time?

22    A    Yes, ma'am.

23    Q    What did you do, if anything, in response to the

24    defendant's request for pills?

25    A    If Mr. Kamal would ask me for the pills, then I would ask

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

GA091

390

H. SINGH - DIRECT - MS. SCHIERBERL

1  the person who's in Mumbai to send me, if he could arrange me

2  those pills and ship them out from Mumbai to New York.

3  Q    How did you make deliveries of pills to the defendant?

4  A    How did I make the deliveries?

5  Q    Yes.  How did you make deliveries of pills to the

6  defendant?

7  A    When Mr. Kamal was situated in Bellerose, then I would

8  deliver it to the delivery van or my car, and later on, ma'am,

9  he was in the same warehouse, then I would -- we would deliver

10  it by the hand.

11  Q    Did you ever hire employees to help you deliver pills to

12  the defendant?

13  A    Yes, ma'am.

14  Q    Who did you hire?

15  A    I had Mukul Chugh, Sunny, Baljeet Singh, Gulab, and

16  Deepak.

17  Q    Mr. Singh, are you familiar with the term "customs hold"?

18  A    Yes, ma'am, I am.

19  Q    What is a customs hold?

20  A    Custom hold is a hold on a shipment which is coming to

21  the custom CBP, the Custom Border Protection, it's coming from

22  the CBP and it gets hold -- it's coming from the CBP and if

23  there is a hold on that shipment or on a parcel or on a box,

24  it gets hold in the customs.

25  Q    Did you ever take steps to avoid a customs hold for boxes

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

GA092

391

H. SINGH – DIRECT – MS. SCHIERBERL

1   containing pills?

2   A    Yes, ma'am.

3   Q    How, if at all, did you take steps to avoid a customs

4   hold for boxes containing pills?

5   A    Ma'am, the shipment is cleared through customs, then it

6   arrives to a place called NYACC in JFK, and when it is arrived

7   there, if there's a hold on the custom to people working in

8   there we would ask them to switch the box with other box and

9   give that box to us.

10  Q    Would you pay employees of NYACC to swap boxes of pills

11  with different boxes to get those boxes through customs?

12  A    Yes.

13  Q    What is NYACC?

14  A    New York Air Courier Clearance.

15  Q    Would you ever personally pay bribes to switch the boxes

16  to clear them through customs?

17  A    Yes, ma'am.

18  Q    Did you ever instruct your employees to swap out boxes of

19  pills to clear them through customs?

20  A    Yes, ma'am.

21  Q    Did you give your employees money to pay bribes to NYACC

22  to clear boxes of pills through customs?

23  A    Yes, ma'am.

24  Q    Once a box of pills was cleared through customs, who did

25  you give that box to?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

GA093

392

H. SINGH – DIRECT – MS. SCHIERBERL

1    A    Can you please repeat it.  Sorry.

2            (Continued on the next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GA094

393

H. Singh – Direct/Ms. Schierberl

1   EXAMINATION BY

2   MS. SCHIERBERL:

3   (Continuing.)

4   Q   Once a box of pills was cleared through customs, who did

5   you give that box to?

6   A   I would deliver it to Mr. Kamala Rajah.

7   Q   Beginning in 2017, where was your office?

8   A   Beginning in 2017, my office was in South Richmond Hill,

9   Queens.

10   Q   Did the address ever change?

11   A   Yes.

12   Q   When?

13   A   Approximately in August 2017.

14   Q   Did you relocate your office to the warehouse located at

15   161-15 Rockaway Boulevard that you just testified about?

16   A   Yes, ma'am.

17   Q   Is that building a warehouse?

18   A   That building has suites inside it. And also a few

19   suites are just offices and few are like warehouse, yes.

20   Q   When you say suites?

21   A   Suites.

22   Q   You mean unique rooms?

23   A   Yes, ma'am.

24   Q   What neighborhood was the warehouse in?

25   A   It was in Queens near JFK.

GA095

H. Singh – Direct/Ms. Schierberl

394

1  Q    How far was the warehouse from JFK Airport?

2  A    Five to seven minutes.

3  Q    Why did you relocate your office to the warehouse?

4  A    Ma'am, because business was increasing and the shipments

5  were also increasing.  So I needed a bigger place to get those

6  shipments.

7  Q    Did the defendant ever rent space in this same warehouse?

8  A    Yes, ma'am.

9  Q    Who told him about the warehouse?

10  A    I told him about the place.

11  Q    Why did you do that?

12  A    He was looking for a place.  He was looking for a place

13  at that time and I believe he was -- he wanted to move out

14  from the place where he was living or doing the business.  He

15  was looking for a place to do the business, and I told him

16  that there is a suite available on the same floor where I was

17  so I introduced him to that suite.

18  Q    When you say that the defendant was looking for a place

19  to do the business, what do you mean by, "do the business"?

20  A    To send -- to make the packages and to send the packages

21  out through the USPS.

22  Q    Were these packages of pills?

23  A    Yes, ma'am.

24  Q    What, if anything, did the defendant tell you about why

25  he was looking for a space to rent?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GA096

H. Singh – Direct/Ms. Schierberl                    395

1   A     When he was looking for a place to rent, he was getting

2   out of the lease and he needed a place and something like

3   that, I do not remember exactly.  He wanted to get out of that

4   place.

5   Q     Where did the defendant end up renting space in that

6   warehouse?

7   A     On the same floor.  I do not remember the suite number

8   but on the same floor where I was.

9   Q     How often would you see him at the warehouse?

10  A     If he's in the country, and I'm also coming to the

11  warehouse from my work, then I would see him.

12  Q     Was that more or less than once a week when he was in the

13  country?

14  A     If he's in the country and if he's in the same place we

15  would meet once in a week.

16  Q     Did the defendant ever come to your suite to collect

17  boxes of pills?

18  A     Yes, ma'am.

19  Q     Would you or one of your employees ever deliver boxes of

20  pills to the defendant in his suite?

21  A     Yes, ma'am.

22  Q     What, if anything, did you see in the defendant's suite?

23  A     The suite was divided into two parts.  There was a part

24  in between, and on the left-hand side there was a office; and

25  on the right-hand side, there was tables kept to do the

GA097

396

H. Singh – Direct/Ms. Schierberl

1  packaging.

2  Q    What do you mean by do the packaging?

3  A    To put the pills in the packages and to post them out to

4  USPS.

5  Q    Did you ever personally see the defendant pack pills into

6  envelopes?

7  A    No, ma'am.

8  Q    Did you ever see anyone inside of the defendant's suite

9  pack pills into envelopes?

10 A    I've seen Rajah and Kalam.

11 Q    Who is Kalam?

12 A    Kalam was the person who used to work for Mr. Kamal.

13 Q    What kinds of envelopes were the defendant's associates

14 packing pills into?

15 A    One was a flag draped envelope.

16 Q    What did the defendant do with those envelopes of pills?

17 A    When he would go to the nearest USPS post office and he

18 would then ship them out through there.

19 Q    Approximately how many envelopes would the defendant

20 carry to the post office at a single time?

21 A    I believe it depends on the order he used to receive.

22      MR. RADICK:  Your Honor, I'm just going to object to

23 the foundation.

24      MS. SCHIERBERL:  I can rephrase, your Honor.

25      THE COURT:  Okay.

GA098

397

H. Singh - Direct/Ms. Schierberl

1  Q    Do you know how many packages the defendant would carry

2  to the post office at any given time?

3  A    200 to 300 as depends on the order he used to receive.

4         MR. RADICK:  Objection.  Nonresponsive.

5         MS. SCHIERBERL:  I think the yes is implied.

6         MR. RADICK:  It's supposed to be one step.

7         THE COURT:  I'm sorry.  I'm having difficulty,

8  Mr. Radick.

9         MR. RADICK:  I don't think he's explained how he

10 knows the answer.

11        THE COURT:  I'm sorry.

12        MR. RADICK:  I don't think he's explained how he

13 knows the answer to the question.

14        THE COURT:  Okay.  Go back to that.  Has he seen the

15 defendant do that?

16 Q    Mr. Singh, have you seen the defendant bring 100 to 200

17 or 300 envelopes of pills to the post office at a single time?

18 A    I have seen him taking the packages to the post office,

19 but whether it's a 100 or 200, I don't know.

20 Q    Did he ever talk to you about taking packages to the post

21 office?

22 A    Yes, ma'am.

23 Q    What did he say?

24 A    Pardon me.

25 Q    What did he say to you about taking packages of pills to

GA099

398

H. Singh – Direct/Ms. Schierberl

1   the post office?

2   A    He said he or Rajah would pack the pills in them and take

3   the packages to the USPS and ship them out to the customers or

4   orders they had received.

5   Q    Did he ever tell you how many orders he received in a

6   single day?

7   A    In the end -- in the year 2019, he had told me he used to

8   receive two to three hundred orders.

9   Q    Do you know how the defendant would carry the pills to

10  the post office?

11  A    He would carry them in the laundry bags.

12  Q    To your knowledge, was there a laundry machine in that

13  warehouse?

14  A    No.

15  Q    Did the defendant ever talk to you about mailing these

16  pills at the post office?

17  A    I do not understand.

18  Q    Did the defendant ever talk to you about using multiple

19  post offices to mail these pills?

20  A    Yes.  He used to take the packages to -- when there were

21  more of the load, I believe more of the packages, then he

22  would take them to the different post offices.

23  Q    What, if anything, did he say about why he went to

24  multiple post offices?

25  A    If there would be 200 or more packages in one warehouse,

GA100

399

H. Singh - Direct/Ms. Schierberl

1    in one USPS, then it would -- it might cause trouble for him.

2    Q    Did he say anything about avoiding identification by

3    using multiple post offices?

4    A    He would pay by cash instead of using his credit card or

5    debit card.

6    Q    What did he say to you about why he would pay in cash?

7    A    I believe once we would were talking about it and then I

8    asked him and then he told me, like, he used to pay cash so

9    that if he runs through the credit, if he runs the credit card

10   through the USPS, then, if anything happens in the USPS, they

11   might track him down.  He might get caught.

12   Q    I'm showing you what has been admitted into evidence as

13   Government Exhibit 508.

14         MS. SCHIERBERL:  Ms. Cronin, can we publish it but

15   not play it yet.

16   Q    Mr. Singh, do you recognize the image in the screen?

17   A    Yes, ma'am.

18   Q    What is this an image of?

19   A    Ma'am, this is the back side of the warehouse.

20   Q    What is the date on this image?

21   A    It's like date is 29th, August 2018.

22   Q    What is the time on this image?

23   A    It's 11:09 in the morning.

24         MS. SCHIERBERL:  Ms. Cronin, can we please play

25   Government Exhibit 508.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GA101

H. Singh – Direct/Ms. Schierberl

400

1      (Video file played in open court.)

2      (Video file concludes.)

3      MS. SCHIERBERL:  Can you pause the video.

4  Q   Mr. Singh, do you recognize this video?

5  A   Yes, ma'am.

6  Q   Who is this video?

7  A   These Sonny.

8  Q   Is Sonny Baljeet Singh?

9  A   Yes, ma'am.

10  Q   Do you know what he is doing?

11  A   Ma'am, he carrying packages of the pills in the laundry

12  bag and taking them to the post office.

13      MS. SCHIERBERL:  Ms. Cronin, can you please continue

14  to play the video.

15      (Video file played in open court.)

16      (Video file concludes.)

17      MS. SCHIERBERL:  Ms. Cronin, can you pause the

18  video, please.

19  Q   Mr. Singh, do you recognize the individual who has just

20  entered the screen?

21  A   That's Kalab.

22      MS. SCHIERBERL:  Can we please play the video.

23  Q   Mr. Singh, as we watch this video, where is Baljeet Singh

24  loading the bags of pills?

25  A   He is loading it into Rajah's van.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GA102

H. Singh – Direct/Ms. Schierberl

401

1  Q    How do you recognize the van as Rajah's?

2  A    Ma'am, because as he used to be in the same place I had

3  asked him if it was his van.

4        MS. SCHIERBERL:  Ms. Cronin, can you please pause

5  the video.

6  Q    Mr. Singh, do you recognize this individual?

7  A    Yes, ma'am.

8  Q    Who is this individual?

9  A    This is Mr. Kamal.

10  Q    Can you please read for me the timestamp at the top of

11  the screen?

12  A    The time?

13  Q    Time.

14  A    It's 11:12 in the morning.

15  Q    And you say that's Mr. Kamaldoss?

16  A    Yes, ma'am.

17        MS. SCHIERBERL:  Ms. Cronin, can you please play the

18  video.

19        (Video file played in open court.)

20        (Video file concludes.)

21  Q    Mr. Singh, what is Mr. Kamaldoss doing in the video at

22  this time?

23  A    He's in the driving seat and driving the van.

24  Q    Did he enter the same van that Baljeet Singh put all

25  those pills into?

GA103

402

H. Singh – Direct/Ms. Schierberl

1    A    Yes, ma'am.

2    Q    Does he pull the van out away from the wall?

3    A    Yes, ma'am.

4    Q    What is the defendant doing now?

5    A    Going and sitting in the passenger's seat.

6    Q    Again, is that the same van that Mr. Singh, Baljeet

7    Singh, put all those pills into?

8    A    Yes, ma'am.

9    Q    To your knowledge, does the defendant drive in the

10   United States?

11   A    To my knowledge, no, ma'am, he doesn't have a driver's

12   license.

13   Q    What is happening in the video now?

14   A    Ma'am, they're taking the van out.

15   Q    Who is driving?  The defendant?

16   A    No, ma'am, Sonny.  Baljeet.

17   Q    Thank you.

18        MS. SCHIERBERL:  Ms. Cronin, you can take that down.

19   Q    Mr. Singh, did there ever come a time when an employee of

20   the United States Postal Service began collecting the pills

21   directly from the warehouse?

22   A    Repeat that, please.

23   Q    Yes.

24        Did there ever come a time when an employee of the

25   United States  Postal Service came directly to the warehouse

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GA104

403

H. Singh – Direct/Ms. Schierberl

1    to collect pills?

2    A    Yes, ma'am.

3    Q    When was that?

4    A    I remember it was approximately in 2019, March or April.

5    Q    Do you know why that was?

6    A    Ma'am, because, like, me, Sammy, Baljeet, and Deepak also

7    started the same business, what Mr. Kamal was doing, and then

8    we started giving the passengers to the USPS.

9    Q    In or about March of 2019, you started doing the same

10   business that the defendant was doing?

11   A    After March, yeah.

12   Q    Why did you start doing that yourself?

13   A    Ma'am, because the person in Mumbai asked me to start the

14   business and to make more money.  Even I got more into that

15   business.

16   Q    What exactly do you mean when you say, "Do the same

17   business as the defendant"?

18   A    Like, packaging and putting those strips, pills, of drugs

19   inside the USPS mail office and giving them to the USPS driver

20   who used to come at the warehouse.

21   Q    Did you keep a record of the payments the defendant made

22   to you for drugs?

23   A    Yes, ma'am.

24        MS. SCHIERBERL:  Ms. Cronin, can we please show to

25   the witness -- I beg your pardon.

GA105

404

H. Singh – Direct/Ms. Schierberl

1    I understand Government Exhibit 2240 is in evidence,

2  so I will ask Ms. Cronin to please publish Government

3  Exhibit 2240.

4  Q   Mr. Singh, do you recognize this?

5  A   Yes, ma'am.

6  Q   What is this?

7  A   Ma'am, that's from accounts.admin@protonmail.com that's

8  my e-mail address.

9  Q   Who is this e-mail to?

10 A   That's kdoss999@yahoo.com.  That's Mr. Kamal.

11 Q   How do you know that kdoss999 is the defendant's e-mail?

12 A   We had exchanged e-mails.  I had -- he had given it to

13 me.

14 Q   Did the defendant tell you specifically to use this

15 e-mail to communicate with him?

16 A   Yes, ma'am.

17 Q   What is the date of this e-mail?

18 A   It's February 12, 2019.

19 Q   Looking at the body of the e-mail who is Vicky?

20 A   Vicky is me.

21 Q   Looking at the subject line of the e-mail what does Kamal

22 a/c statement mean?

23 A   That's Kamal account statement.

24 Q   What is the Kamal account statement?

25 A   The account, the ledger which was maintained between me

GA106

405

H. Singh - Direct/Ms. Schierberl

1   and Kamal.

2   Q    What did that ledger contain by way of information?

3   A    When the ledger had the money received from Mr. Kamal or

4   the pills -- the drugs delivered to him on this date like

5   that.

6   Q    In the body of the e-mail, what did you mean when you

7   wrote, "Please find your account statement. Kindly check and

8   confirm."

9   A    Like, please find the attached copy of the statement of

10  the ledger we had maintained.  And check if everything is

11  right or wrong and confirm it.

12  Q    Have you been filling drug orders for the defendant since

13  mid-2017 by the date of this e-mail sent in February 2019?

14  A    Yes, approximately.

15  Q    Approximately how many years is that?

16  A    One and a half years to two years.

17  Q    Is that an attachment to this e-mail?

18  A    Yes, ma'am.

19  Q    Is that the attachment called Kamal's statement?

20  A    Yes, ma'am.

21  Q    What does Kamal refer to?

22  A    Kamaldoss.

23  Q    Is that the defendant?

24  A    Yes, ma'am.

25  Q    Who created the Kamal statement?

GA107

                    H. Singh – Direct/Ms. Schierberl            406

1    A    I did, ma'am.

2         MS. SCHIERBERL:  Ms. Cronin, can you please publish

3    Government Exhibit 2241.

4         Mr. Singh, do you recognize this exhibit?

5    A    Yes, ma'am.

6    Q    What is this?

7    A    Ma'am, this is the ledger of which I maintained with

8    Mr. Kamal in exchange with him.

9    Q    Looking at the top of the page where it says Kamal.  Who

10   does that refer to?

11   A    That's Kamaldoss, Kamal.

12   Q    What does it mean when it says, "Statement of account

13   from 1/11/2018 to 1/3/2019"?

14   A    It's from November 2018 to January 1, 2019.

15   Q    Are you always consistent in this ledger with how you

16   refer to the date?

17   A    Sometimes we do it in the Indian way and sometimes we do

18   it in the American way.

19   Q    Does this ledger reflect your accounting of drugs

20   delivered to the defendant and money the defendant owed you

21   for those drugs?

22   A    Yes, ma'am.

23   Q    Please walk us through the information in this ledger.

24   What does the date column represent?

25   A    Date column represents on which date the shipment was

GA108

407

H. Singh – Direct/Ms. Schierberl

1    delivered or the invoice was registered or the payment was

2    received.

3    Q    What does the "Particulars" column represent?

4    A    That's the description of what is happening on that date.

5    Q    The column labeled "Box No.," does it mean box number?

6    A    Yes, ma'am.

7    Q    What does box number indicate?

8    A    Box number is the number which we used to put on the box.

9    And, like, 47, 48, we would put it on the box.  And then I

10   would inform Mr. Kamal if he's here in U.S., or if he's

11   outside, then I would inform him that this box has been

12   delivered to you.

13   Q    If the defendant is in the United States, you would tell

14   him that box number 47, for example, had been delivered to

15   him?

16   A    Why em.

17   Q    And if the defendant was in India, who would you tell

18   that Box 47 had been delivered?

19   A    It Kamal.

20   Q    And who did you deliver that box to when the defendant

21   was in India?

22   A    To Rajah.

23   Q    The column labeled "QTY," does that stand for quantity?

24   A    Yes, ma'am.

25   Q    What does quantity indicate?

GA109

408

H. Singh – Direct/Ms. Schierberl

1    A    That's the quantity of strips.

2    Q    Would pills be ten times that amount?

3    A    Yes, ma'am.

4    Q    Looking at the rate column, what does the rate represent?

5    A    The rate represents the rate per strip.

6    Q    Who set the rate?

7    A    It was set by Mr. Kamal.

8    Q    Did the rate ever change?

9    A    If the rate changed, basically, when more -- there was a

10   change of the drug name.  I mean, if it was different drug

11   name and drug I.D. required, then it was different from India,

12   then it would change.

13   Q    Can you explain that a little more clearly?

14   A    For example, if, like, 1.50 or is $1.50 per strip is set,

15   then we would deliver this first strip at $1.50.  And if there

16   is expensive something coming India and I would let Mr. Kamal

17   know then he would increase the rate.

18   Q    So the defendant would increase the rate per strip of

19   pills if those drugs became more expensive in India?

20   A    Yes.

21   Q    What is a debit?

22   A    Debit is the amount he owed Mr. Kamal owed me.

23   Q    What is a credit?

24   A    What he has paid me.

25   Q    What does the balance column represent?

409

H. Singh – Direct/Ms. Schierberl

1   A    The balance column is the amount which is pending which

2   is he's supposed to pay me.

3   Q    Looking at Row 5, at the top of this ledger, what was the

4   balance the defendant owed you for drugs as of 11/1/2018?

5   A    It was $23,114.88.

6   Q    Looking at Row 6, what does A mean?

7   A    Alprazolam.

8   Q    Looking at Row 7, what does V mean?

9   A    Valium.

10  Q    Looking at Row 18, what does X mean?

11  A    Xanax.

12  Q    Looking at Row 20, what does Z mean?

13  A    Zaleplon.

14  Q    Looking at Row 31, what does X2 mean?

15  A    That's Xanax 200 MG.

16  Q    Looking at Row 47, what does C mean?

17  A    C means SOMA.

18  Q    Sticking with Row 47.  Tell us what happened on

19  12/1/2018?

20  A    On 12 /1/2018, C, I believe it means SOMA, Box No. 60 it

21  had a box number on it to said 60 had a quantity of 3,360

22  strips and at the rate of $1.50 which is equal to $5,0404.

23  Q    So the defendant owed you over $5,000 for 3,360 strips of

24  sow a; is that correct?

25  A    Yes, ma'am.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GA111

410

H. Singh – Direct/Ms. Schierberl

1   Q    How many pills is 3,360 strips of SOMA?

2   A    It's 33,6000.

3   Q    Looking at Row 81.  What is Lypin?

4   A    Lypin is also a drug.

5   Q    Sticking with Row 81.  On January  22, 2019, how many

6   boxes of Lypin did the defendant order in total?

7          MR. FELDMAN:  Objection.

8          MR. RADICK:  That's not what that column means.

9          THE COURT:  I'm sorry.

10         MR. RADICK:  That's not what that column means.

11         THE COURT:  Oh.  Are you looking at box number?

12         MS. SCHIERBERL:  Your Honor, I can clarify through

13  this witness and I think if he's allowed to answer, there is

14  actually no misunderstanding.

15         MR. RADICK:  Go ahead.

16  Q    How many boxes of Lypin did the defendant order on

17  January  22, 2019?

18  A    Ma'am, it was seven boxes of Lypin.

19  Q    Does it?

20         MS. SCHIERBERL:  Does that clarify the --

21  Q    How many pills of Lypin, approximately, were contained in

22  those seven boxes of Lypin?

23  A    I did a rough --

24  Q    Did you tally this before, Mr. Singh?

25  A    Yes, ma'am.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GA112

411

H. Singh - Direct/Ms. Schierberl

1    Q    Would looking at your notes help refresh your

2    recollection?

3    A    Yes, ma'am, it would help.

4         MS. SCHIERBERL:  Your Honor, may I approach with

5    what has been previously marked as 3500-HS-83.

6         THE COURT:  Yes.

7         (Approaching the witness.)

8    Q    Mr. Singh, I'm handing you what's been marked as

9    3500-HS-83.

10        Do you recognize this document?

11   A    Yes, ma'am, I do.

12   Q    What is it?

13   A    They were the rough notes made by me.

14   Q    Did you tally approximately how many pills of Lypin the

15   defendant ordered on January 22, 2019, prior to giving

16   testimony here today?

17   A    Yes, ma'am.

18   Q    Does looking at your notes help refresh your recollection

19   of that amount?

20   A    Yes, ma'am.

21   Q    Approximately how many pills of Lypin did the defendant

22   order on January 22, 2019?

23   A    256,668.

24   Q    How much money did the defendant owe you for those

25   250,000 pills?

GA113

412

H. Singh – Direct/Ms. Schierberl

1   A    Approximately 29,000.

2   Q    Can looking at Row 88, what is T-225 mean?

3   A    That's Tramadol 225 mg.

4   Q    I beg your pardon.  Please hold the mic up to your mouth.

5        What is T-225.

6   A    It's Tramadol 225 mg.

7   Q    On January 22, 2019, as reflected in Row 88, how many

8   boxes of Tramadol were delivered to the defendant?

9   A    One box of Tramadol was delivered.

10  Q    How many pills were contained in that box?

11  A    40,000.

12  Q    On this date alone, how many total pills were delivered

13  to the defendant?

14  A    Total, these were approximately 300,000.  More than

15  300,000.

16  Q    On this date alone, how much money did the defendant owe

17  you?

18  A    44,000 for all of them.

19  Q    Turning to the September tab, looking at Row 6, what does

20  200 mean?

21  A    200 means Tramadol 200.

22  Q    Looking at Rows 7 to 15, what does 100 mean?

23  A    That's Tramadol 100.

24  Q    On September 1, 2018, how many pills of Tramadol  200

25  were delivered to the defendant?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GA114

413

H. Singh – Direct/Ms. Schierberl

1    A    For 200, it was 14,000.

2    Q    How many pills of Tramadol were delivered to the

3    defendant?

4            14,000, I'm sorry, you just said that.

5            On that same date, how many pills of Tramadol 100

6    were delivered to the defendant.

7    A    100 was approximately pills 300,000.

8    Q    How much money did the defendant owe you for over 300,000

9    pills?

10   A    For 300,000, it's approximately 45,000.

11   Q    Turning to the August tab.  Looking at Rows 11 to 18, how

12   many boxes of Tramadol were delivered to the defendant between

13   August 20th and August 21st?

14   A    Eight.

15   Q    Approximately how many pills were contained in those

16   eight boxes?

17   A    200,000.

18   Q    How much money did the defendant owe you for

19   approximately 200,000 pills?

20   A    Approximately 30,000.

21   Q    Only three to four days later, on August  23rd to 24th

22   represented in Rows 21 to 23, how many pills of Tramadol were

23   delivered to the defendant?

24   A    Approximately 120,000.

25            THE COURT:  Excuse me for a moment.  I think we

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GA115

414

H. Singh – Direct/Ms. Schierberl

1   should take a stretch.

2          MS. SCHIERBERL:  Thank you, your Honor.

3          (A brief pause in the proceedings was held.)

4          THE COURT:  We'll take an afternoon break when the

5   direct of the witness is complete unless somebody wants it

6   earlier.  Anyone who wants it earlier, just raise your hand.

7   Okay.

8          (A brief pause in the proceedings was held.)

9          THE COURT:  We can go a little longer.

10  EXAMINATION BY

11  MS. SCHIERBERL:

12  (Continuing.)

13  Q    Sticking with Rows 21 to  23 on August  23rd to 24th for

14  over 120,000 pills, how much money did the defendant owe you?

15  A    Approximately 18,000.

16  Q    Let's talk about how the defendant paid you for pills.

17  Looking at Row 6, what does "Paid in NYC office," mean.

18  A    That means paid in New York office which was in Jamaica,

19  the warehouse.

20  Q    Was that the warehouse you testified to located at 161-15

21  Rockaway Boulevard?

22  A    Yes, ma'am.

23  Q    How much money did the defendant pay you for pills on

24  8/10/2018?

25  A    It's 10,000.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GA116

415

H. Singh – Direct/Ms. Schierberl

1    Q    How did he pay you?

2    A    Cash.

3    Q    Looking at Row 24, how much money did the defendant pay

4    you for drugs on 8/26/2018?

5    A    It was 15,000.

6    Q    How did he pay you?

7    A    Cash.

8    Q    Looking at Row 7.  What does "Paid in Satish A/C 2.80"

9    mean?

10   A    That means paid in Satish account with 2.80 is 280,000

11   Rupees.

12   Q    What does that mean?

13   A    Satish is one of the counterparts in India who I'm

14   supposed to pay.  And then I had asked Kamal to pay in his

15   account as it was easy for him to pay in India.  So he paid

16   there and I just entered Satish balance.

17   Q    Why did you reflect this as a credit to the defendant?

18   A    Because he paid in India on behalf of me.

19   Q    Did this reduce the amount of money the defendant owed

20   you for pills?

21   A    Yes, ma'am.

22   Q    Looking at Row 9, what does paid to Kapu mean?

23   A    Paid to Kapu.  Kapu is also a counterpart in India.  He's

24   paid for 500,000 Rupees plus 187,000 Rupees at the dollar rate

25   of 70, approximately, which is equivalent to $9,813.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

416

H. Singh – Direct/Ms. Schierberl

1   Q    Who made that payment?

2   A    Kamal made the payment in Kapu's account.

3   Q    Why is that reflected as a credit to the defendant?

4   A    Because he paid in India on behalf of me to Kapu.

5   Q    And did this reduce the amount the defendant owed you for

6   pills?

7   A    Yes, ma'am.

8   Q    Looking at Row 10, what does paid to AWCC2L mean?

9   A    Paid to AWCC is a -- this is a company.  AWCC, my

10  counterpart to whom 2L means 200,000 Rupees were paid.

11  Q    What does the L stand for?

12  A    It stands for Lack.

13  Q    What is a Lack?

14  A    One Lack is equal to hundred thousand.

15  Q    Why is this reflected as a credit?

16  A    Because I asked Mr. Kamal to pay on behalf of me to AWCC.

17  Q    Does it reduce the amount of money the defendant owed you

18  for pills?

19  A    Yes, ma'am.

20  Q    Looking at Row 25, what does amount transferred from

21  FedEx A/C mean?

22  A    Ma'am, this means amount transferred from FedEx account.

23  This means this amount is transferred from the FedEx account

24  into this ledger.

25  Q    So what happened on 8/26/2018?

GA118

417

H. Singh – Direct/Ms. Schierberl

1  A     What happened was there were invoices of $30,000.

2  $30,446 approximately from the FedEx account. And I owe him,

3  I owe Kamla this money because of the FedEx account, so this

4  has been put in here.

5  Q     Why is this reflected as a credit?

6  A     Because I'm supposed to pay him this money.

7  Q     Who paid the FedEx bill?

8  A     Kamal paid the FedEx bill.

9  Q     Looking at the FedEx sheet, does "Invoice No." mean

10  invoice number?

11  A     Yes, ma'am.

12  Q     And what does the invoice number column represent?

13  A     The invoice number refers the invoice number of FedEx.

14  Q     In whose name is the FedEx account generating these

15  invoices?

16  A     It's Hosea Express, Inc.?

17  Q     Is that H-o-s-e-a, Hosea Express?

18  A     Yes, ma'am.

19  Q     Whose company is Hosea Express?

20  A     Kamal's.

21  Q     How do you know?

22  A     Because I had taken this FedEx account. So through them,

23  I got to know about Hosea Express, company by the name of

24  Hosea Express.

25  Q     Who used this FedEx account?

Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

GA119

418

H. Singh – Direct/Ms. Schierberl

1  A    Ma'am, I had used this account.

2  Q    What did you do use the FedEx account for?

3  A    It -- shipments I was receiving from India to New York.

4  Q    Who paid the FedEx bill?

5  A    This FedEx bill was paid by Kamal.

6  Q    Why did the defendant pay the FedEx bill for you to use

7  his account?

8  A    He paid the FedEx bill because he was using this FedEx

9  bill because I was using his account.

10 Q    Did this payment of the FedEx bill enable you to  import

11 more pills?

12 A    Yes, ma'am?

13 Q    Is that why these payments show up as credits to the

14 defendant?

15 A    Yes, ma'am, because, for example, if this bill was

16 remitted, I would deliver pills on behalf of that and it would

17 get adjusted in the ledger.

18 Q    So the defendant owed you less money for pills as a

19 result of his payment of your FedEx bills?

20 A    I don't understand.

21 Q    Did the defendant owe you less money for pills because he

22 paid your FedEx bill?

23 A    Yes, ma'am.

24       MS. SCHIERBERL:  Ms. Cronin, can we please pull up

25 Government Exhibit 190.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

GA120

419

Singh – Direct – Schierberl

1    (Continuing.)

2              MS. SCHIERBERL:  We can publish it.

3              (The above-referred to exhibit was published.)

4    Q    Mr. Singh, do you recognize this document?

5    A    Yes, ma'am.

6    Q    Who is this email from?

7    A    This is coming from kdoss9 --

8    Q    I'm sorry, can you repeat that answer?

9    A    Kdoss999@yahoo.com.

10   Q    Who is that?

11   A    That's Kamal.

12   Q    Is Kamaldoss the defendant, Mr. Kamaldoss?

13   A    Yes, ma'am.

14   Q    Who is urbanmailinc@gmail.com?

15   A    Urbanmailinc@gmail.com is my company's account.

16   Q    What is the date of this email?

17   A    I'm sorry?

18   Q    What is the date of this email?

19   A    It's May 15th, 2018.

20   Q    What is the subject of this email?

21   A    It says AMEX.

22   Q    Are there attachments?

23   A    Yes, ma'am.

24   Q    How many attachments?

25   A    Two.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

GA121

420

Singh – Direct – Schierberl

1    Q     Are they images?

2    A     Yes, ma'am.

3          MS. SCHIERBERL:  Ms. Cronin, can we please pull up

4    Government Exhibit 1902.

5          (The above-referred to exhibit was published.)

6    Q     Mr. Singh, do you recognize this image?

7    A     Yes, ma'am.

8    Q     Is this one of the attachments the defendant attached to

9    that AMEX email?

10   A     Yes, ma'am.

11   Q     What is this an image of?

12   A     This is an American Express card.

13   Q     Whose name is on this AMEX card?

14   A     Ezhil S. Kamaldoss.

15   Q     Is that the name of the defendant?

16   A     Yes, ma'am.

17   Q     What are the last five digits of this AMEX card?

18   A     52013.

19         MS. SCHIERBERL:  Ms. Cronin, can we please pull up

20   Government Exhibit 1903.

21         Thank you.

22         (The above-referred to exhibit was published.)

23   Q     Mr. Singh, do you recognize this image?

24   A     Yes, ma'am.

25   Q     What is this an image of?

GA122

421

Singh – Direct – Schierberl

1   A    That's the back of the AMEX card.

2   Q    Is that the same AMEX card we just looked at?

3   A    Yes, ma'am.

4   Q    Was this image sent in the AMEX email sent from the

5   defendant to you?

6   A    Yes, ma'am.

7        MS. SCHIERBERL:  Ms. Cronin, can we please pull up

8   Government Exhibit 1904.

9        (The above-referred to exhibit was published.)

10  Q    Do you recognize this email, Mr. Singh?

11  A    Yes, ma'am.

12  Q    Who sent this email?

13  A    This is me -- I'm sending the email.

14  Q    Who are you sending it to?

15  A    I'm sending it to Kamal.

16  Q    What's the date of the email?

17  A    It's May 15, 2018.

18  Q    Can you repeat that?

19  A    May 15, 2018.

20  Q    What do you write in the body of this email?

21  A    It says:  Please send me the zip code.

22  Q    What does that mean?

23  A    Asking for the zip code of AMEX.

24  Q    Why?

25  A    Because to write AMEX, I needed to make the payment on

GA123

422

Singh - Direct - Schierberl

1  FedEx.

2  Q    Why did the defendant send you images of his AMEX card?

3  A    He -- as he -- I believe he was in India, and we were not

4  able to make the payment for FedEx sitting there, so I had

5  asked him to send me the dates when I can move forward and

6  make the payment through FedEx.

7  Q    How frequently did you use the defendant's AMEX card to

8  pay FedEx bills?

9  A    Whenever he's not -- he was not able to make the payment.

10 Q    Mr. Singh, other than the crime that you were arrested

11 for, have you ever committed any other crimes?

12 A    Yes, ma'am.

13 Q    What other crimes?

14 A    When I got married for the -- to get the green card.

15 Q    Was this marriage fraud?

16 A    Yes, ma'am.

17 Q    When did you commit marriage fraud?

18 A    In the year 2013.

19 Q    Why did you do that?

20 A    To -- to get -- to get settled here and to get green card

21 here.

22 Q    What did you do specifically to commit marriage fraud?

23 A    Specifically, I got married to one of my friend's

24 sister -- cousin's sister in the year 2013, October; and I got

25 married to her and I had asked, like, through marriage if I

Denise Parisi, RPR, CRR
Official Court Reporter



| City | State | Zip | Drug | Quantity |
|---|---|---|---|---|
| San Jose | California | 95121-2415 | lypin | 100 |
| Seattle, | Wa | 98178 | Tramadol 200mg | 100 |
| Los Angeles | , CA | 10017-2814 | lypin | 100 |
| Staten Island, | NY, | 10301-2062 | lypin | 100 |
| San Dimas, | CA | 91773-2488 | lypin | 400 |
| Los Angeles, | CA | 90017-3447 | lypin | 100 |
| Sugar Land, | Tx | 77496-6268 | lypin | 100 |
| North Richland Hills, | TX | 76182 | Tramadol 200mg | 200 |
| TIJUNGA | CA | 91042 | Valium | 90 |
|  | CA | 94582 | Valium | 110 |
| Phoenix | AZ | 85032 | Valium 10mg (Blue ones) 120 TABS | 120 |
| Chandler | AZ | 85224 | Xanax & lypin | 120 & 120 |
| SLC | UT | 84117 | lypin | 90 |
| Fayetteville | NC | 28306 | Valium | 250 |
| Lincoln, | NE | 68506 | Tramadol 200mg | 100 |
| portland, | ct | 6480 | lypin | 100 |
| Tucson | AZ | 85705 | lypin | 60 |
| Tucson, | AZ | 85705 | lypin | 100 |
| Grand Junction, | CO | 81505 | lypin | 100 |
| Clovis, | CA | 93611 | lypin | 100 |
| MARINA DEL REY, | CA | 90292 | lypin | 100 |
| Minneapolis | MN | 55426 | lypin | 60 |
| Redwood City | CA | 94061 | Tramadol 200mg | 100 |
| PITTSBURGH | PA | 15237 | XANAX 2 MG | 100 |
| Morrison | IL | 61270 | lypin | 100 |
| Lone Tree, | CO, | 80124 | lypin | 100 |
| CHAPEL HILL, | NC | 27516-8712 | lypin | 100 |
| Valencia | PA | 16059 | lypin | 60 |
| Highlands Ranch | CO | 80130 | AMBIEN | 200 |
| PORTALES | NM | 88130 | XANAX 2MG | 180 |
| CINCINNATI | OH | 45224 | Tramadol 50 MG | 180 Pills |
| SAINT MARY | OH | 45885 | Tramadol 50 MG | 180 Pills |
| Wilkes-Barre | PA | 18702 | Tramadol 50 MG | 180 Pills |
| MILLVILLE | NJ | 0 8332 | VALIUM | 90 Pills |
| Smyrna | GA | 30080 | lypin | 90 Pills |
| omaha | nebraska | 68137 | lypin | 90 Pills |
| MARILTON | NJ | *08053 | Tramadol 50 MG | 180 Pills |
| EDGEWOOD | WA | 98372 | TRAMADOL— 50 mg | ~180 pills |
| Apache Junction | AZ | 85119 | SOMA | 180 |
| Apache Junction | AZ | 85119 | lypin | 90 |
| PEMBROKE PINES | FL | 33026 | lypin | 180 |
| BUCKEYE | AZ | 85326 | XANAX 2MG | 90 |
| BRONX | NY | 10475 | lypin | 90 |
| R WEST GROVE | PA | 19390 | TRAMADOL— 50 mg | 180 |
| WEST FRIENDSHIP | MD | 21794 | SOMA 350MG | 180 |
| DETROIT | MICHIGAN | 48219 | lypin | 90 |
| CADILLAC | MICHIGAN | 49601 | lypin | 90 |
| LAKE ELSINORE | CA | 92530-5000 | AMBIEN 10MG | 180RESHP |
| Gainesville | FL | 32607 | XANAX | 100 |
| Gainesville | FL | 32607 | XANAX | 100 |
| Austin | TX | 78701 | LYPIN | 100 |
| Wilmington | NC | 28403 | LYPIN | 60 |
| Wilmington | NC | 28403 | CIALIS 50MG | 30 |

GA125



GA126



| City | State | Number | Drug | Quantity |
|---|---|---|---|---|
| Phoenix | AZ | 85932 | Valium | 120 |
| Baltimore | MD | 21223 | Lypin | 145 |
| Harlingen | TX | 78550 | Lypin | 90 |
| BOX ELDER | SD | 57719 | Lypin | 450 |
| Spring | TX | 77381 | Lypin | 60 |
| Avia | FL | 34142 | Lypin | 90 |
| Ave Maria | FL | 23606 | Xanax | 90 |
| Newport News | VA | 26501 | LYPIN | 90 |
| Morgan Town | WV | 38737 | XANAX | 90 |
| Brew | MS | 56537 | LYPIN | 180 |
| Fergus Falls | mn | 15136 | Xanax 2 mg almee | 90 |
| Mc Kees Rocks | PA | 2649 | AMBIEN 10MG | 90 |
| MASHPEE | MA | 60654-0175 | AMBIEN 10MG | 60 |
| Chicago | IL | 48360 | XANAX 2MG | 180 |
| LAKE ORION | MI | 94534 | XANAX 1MG | 180 |
| FAIRFIELD | CA | 77357 | LYPIN 10MG | 180 |
| Newcaney | tx | 75126 | LYPIN 10MG | 180 |
| FORNEY | TEXAS | 0.91604 | LYPIN 10MG | 180 |
| studio city, | CA | 12401 | LYPIN 10MG | 180 |
| KINGSTON | NY | 32081 | LYPIN 10MG | 90 |
| PONTE VEDRA | FL | 84054 | LYPIN | 90 |
| NORTH SALT LAKE | UTAH | 98604 | LYPIN 10MG | 180 |
| BATTLEGROUND | wa | 89801 | VALUUM 10MG | 180 |
| ELKO | NV | 1930 | AMBIEN | 180 pill |
| GLOUCESTER | MA | 75751 | ambien | 180 |
| ATHENS | TX | 84070 | AMBIEN | 180 |
| Sandy | UT | 12863 | XANAX 1MG | 180 PILLS |
| ROCK CITY FALLS | NY | *02720 | ATIVAN 2MG | 200 |
| Fall River | MA | | AMBIEN 10MG | 180 |
| | | | AMBIEN | 180 |
| | | | LYPIN | 180 |
| | | | lypin 10mg | 90 Pills |

GA127

| From: | kamal doss <kdoss999@yahoo.com> |
|---|---|
| To: | Ezhil Sezhian |
| Sent: | 4/29/2019 11:36:43 AM |
| Subject: | 29 2 |

meridian ville, AL 35759
Tramadol 100mg360 pills

CO 81301 tramadols 100mg180pills

holyoke MA *01040
T100 180pills

Waterloo IA 50707
tramadol 100mg180pills

Murrieta CA 92562
T100mg180pills

earlsboro, OK 74840
tramadol 100mg180pills

Duluth, MN 55803
tramadol 100mg180pills

gulf breeze , Florida 32563
tramadol 100mg 180pills

Memphis TN 38109
tramadol 100 mg180pills

Alexandria, LA 71303
tramadols 100mg180 pills

brooksville FL 34601
tramadol 100mg180 pills

GA128

Solon OH 44139
Tramadol. 100mg. 360 pills

Melrose WI 54642
tramadol 100mg180pills

Woodstock, Georgia, 30189
tramadol 100mg360pills

claymont DE 19703
Tramadol 100mg180pills

mountain NC 28086
Tramadol 100mg180pills

Reno NV 89509
Tramadol 100mg 180pills

South Lyon, Michigan 48178
Tramadol 100mg 180pills

Detroit, MI 48206
Tramadol 100mg 180pills

Chickamauga GA 30707
Tramadol 100mg 90pills

Stockton, CA 95219
Tramadol 100mg 360pills

Southgate MI 48195
Tramadol 200mg 180pills

Bismarck, ND 58501
Tramadol 100mg 360pills

Burgettstown, PA, 15021

GA129

Tramadol 100mg 360pills

████████████████

FITZGERALD GA 31750
Tramadol 100mg 180pills

█████████████████████ TRUSSVILLE AL 35173

Tramadol 100mg 180pills

Sent from my iPhone



| | | |
|---|---|---|
| Salem OH 44460 | LYPIN | 180 |
| Manteca CA 95336 | LYPIN | 90 |
| Milwaukee WI 53219 | LYPIN | 180 |
| Devon PA 19333 | LYPIN | 180 |
| Rocky Point NC 28457 | Tramadol 100mg 180pills | |
| Youngstown OH 44505 | Tramadol 100mg 360pills | |
| Columbus OH 43201 | Tramadol 100mg 1080pills | |
| Columbus OH 43201 | Tramadol 100mg 1080pills | |
| vacaville CA 95688 | tramadol 100mg 180pills | |
| Warren MI 48092 | tramadol 100mg 180pills | |
| aurora CO 80014 | tramadol 100mg 180pills | |
| summersville WV 26651 | Tramadols 100mg 180pills | |
| grapevine TX 76051 | Tramadols 100mg 180pills | |
| meridian ville, AL 35759 | Tramadol 100mg360 pills | |
| CO 81301 | tramadols 100mg180pills | |
| holyoke MA *01040 | T100 180pills | |
| Waterloo IA 50707 | tramadol 100mg180pills | |
| Murrieta CA 92562 | T100mg180pills | |
| earlsboro, OK 74840 | tramadol 100mg180pills | |
| Duluth, MN 55803 | tramadol 100mg180pills | |
| gulf breeze , Florida 32563 | tramadol 100mg 180pills | |
| Memphis TN 38109 | Tramadol 100 mg180pills | |
| Alexandria, LA 71303 | tramadols 100mg180 pills | |
| brooksville FL 34601 | Tramadol 100mg180 pills | |
| Solon OH 44139 | Tramadol. 100mg .360 pills | |
| Melrose WI 54642 | tramadol 100mg180pills | |
| Woodstock, Georgia, 30189 | tramadol 100mg360pills | |
| claymont DE 19703 | Tramadol 100mg180pills | |
| mountain NC 28086 | Tramadol 100mg180pills | |
| Reno NV 89509 | Tramadol 100mg 180pills | |
| South Lyon, Michigan 48178 | Tramadol 100mg 180pills | |
| Detroit, MI 48206 | Tramadol 100mg 180pills | |
| Chickamauga GA 30707 | Tramadol 100mg 90pills | |
| Stockton, CA 95219 | Tramadol 100mg 360pills | |
| Southgate MI 48195 | Tramadol 200mg 180pills | |
| Bismarck, ND 58501 | Tramadol 100mg 360pills | |
| Burgettstown, PA, 15021 | Tramadol 100mg 360pills | |
| FITZGERALD GA 31750 | Tramadol 100mg 180pills | |
| TRUSSVILLE AL 35173 | Tramadol 100mg 180pills | |

GA131



GA132





| City | State | No./Zip | Drug | Qty |
|---|---|---|---|---|
| Snook | TX | 77678 | T-100 | 900 |
| Caldwell | TX | 77836 | T-100 | 900 |
| Romulus | MI | 48174 | Xanax 1Mg | 120 |
| Woodbury | NJ | 08090 | T-50 | 90 |
| TINDALL | GAITHERSBURG, MD | 20879 | ALLYpin 10) | 100 |
| Costa Mesa | california | 92627 | Xanax 1mg | 250 |
| | ARKANSAS | 72699 | ALLYpin 10) | 100 |
| LELAND | NC | 28451-4166 | Amber 10mg | 180 |
| SAN FRANCISCO | CA | 94080-3142 | Xanax 1 MG | 90 |
| SAN FRANCISCO | CA | 94080-1899 | XANAX 1MG | 360 |
| INTERNATIONAL FALLS | MN | 56649-4433 | Xanax 1mg(Generic) | 180 |
| RIVERSIDE | CA | 92506-2238 | Valium 10MG(Diazepam) | 180 |
| Austin | TX | 78759-5644 | Xanax 1 MG | 100 |
| Jacksonville | FL | 33221 | Tramadol 50 MG | 180 |
| OXFORD | MS | 38655 | Xanax 1 MG | 90 |
| MANHATTAN BEACH | CA | 90246 | Xanax 1 MG | 90 |
| Miami Beach | FL | 33139 | Xanax 1 MG | 90 |
| MURFREESBORO | TN | 37130 | AMBIEN 10 MG | 90 |
| LIMESTONE | TN | 37681 | AMBIEN 10 MG | 90 |
| MANHATTAN BEACH | CA | 90246 | AMBIEN 10 MG | 90 |
| SYLVANIA | OH | 43560 | AMBIEN 10 MG | 90 |
| Hampton | NH | 3843 | AMBIEN 10 MG | 90 |
| Wilmington | NC | 28409 | AMBIEN 10 MG | 90 |
| Leighton | AL | 35646 | Valium 10 MG | 90 |
| winter park | FL | 32790 | Valium 10 MG | 90 |
| Broomfield | CO | 80021-3767 | Valium 10 MG | 90 |
| Licking | MO | 65542 | Valium 10 MG | 180 |
| Highlands Ranch | CO | 80130 | AMBIEN 10 MG | 200 |
| TWIN FALLS | ID | 83303 | Xanax 1 MG | 180 |
| MURRIETA | CA | 92563 | SOMA 350 | 360 |
| JACKSON | MI | 49202 | Xanax 1 MG | 180 |
| PLANO | TX | 75074 | AMBIEN | 180 |
| Hoosaumu | HI | 96726-0793 | Valium 10mg(Generic) | 90 |
| MCLEAN | VA | 22101-3823 | Ambien (Zolpidem)10mg | 90 |
| Boerne | TX | 78606 | VALIUM | 60 |
| Jupiter Inlet Colony | FL | 33469 | LYPIN 10MG | 180 |
| Apache Junction | AZ | 85119 | LYPIN | 90 |
| SAN DIEGO | CA | 92109 | XANAX 2MG | 90 |
| SAN JOSE | CA | 95118 | T200 | 180 |
| Panama City | FL | 32406 | VALIUM | 90 |
| RICHMOND | FL | 77407 | VIAGRA 100MG | 60 |
| PLANO | TX | 75093 | LYPIN | 180 |